Jason M. Ingber (SBN 318323)
ji@jasoningber.com
Serach B. Shafa (SBN 358332)
ss@jasoningber.com
Ingber Law Group
3580 Wilshire Blvd., Suite 1260
Los Angeles, California 90010
Telephone: (213) 805-8373

Attorneys for Plaintiffs
AMINAH KAMRAN,
DEBORAH ALVAREZ,
and DENNIS EATON

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMINAH KAMRAN, DEBORAH ALVAREZ, DENNIS EATON, individually and on behalf of all others similarly situated, | CASE NO: 2:25-cv-09542 |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| | **(1) RICO – 18 U.S.C. ¶ 1962 (c)**<br>**(2) RICO – 18 U.S.C. ¶ 1962 (d)** |
| v. | |
| TOYOTA MOTOR CORPORATION, TOYOTA MOTOR SALES, U.S.A. INC., TOYOTA MOTOR NORTH AMERICA, INC., TOYOTA MOTOR CREDIT CORPORATION and DOES 1 through 5, inclusive, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## TOYOTA SAFETY DEFECT CONCEALMENT

1.     This case addresses a decade-long fraud by Toyota. The company knowingly markets a defective and dangerous electric vehicle to unsuspecting consumers and jeopardizes their safety and defrauds them financially.

2.     The scheme is carried out through a criminal enterprise comprised of the manufacturer, corporate marketing arm, dealerships, and a financing arm that ingeniously conceal catastrophic safety defects, so their fraudulent scheme remains undetected.

3.     Toyota's own dealerships refer to the Mirai (an electric vehicle powered by hydrogen gas) a ticking hydrogen bomb.  Service technicians often privately tell folks "off-the record" not to drive the vehicle and to hire a lawyer to sue Toyota.

4.     Toyota corporate keeps continuous logs of systemic catastrophic fault codes without providing contemporaneous notice to drivers.

5.     Plaintiff Aminah Kamran's vehicle lost power while in transit (a common problem for Mirai drivers) on Interstate 5 on September 27, 2024.  This power loss forced her to drift without power steering (wheel locked up) and without responsive electric brake/acceleration pedals into a shoulder lane through active traffic.

6.     When technicians at Toyota of Orange attempted to restart her vehicle, they expressed to her that they were surprised she didn't hear "a ticking noise" followed by a "huge boom" as the vehicle had emanated on them.

7.     Toyota customer Nicholas Spruck was told by Toyota of Tustin that his Mirai was "a hydrogen bomb waiting to go off" because it leaks hydrogen near internal hot components; an issue Toyota Motor Sales and Toyota Motor North America knew about for months and did not tell him.

8.     Plaintiff Deborah Alvarez's brake pedal sometimes responds like an accelerator; another common problem.

9.     Toyota customers Wendy Davis and her husband Robert had presented their Mirai six times to Toyota of Orange and Toyota of Santa Monica for power

failures and braking anomalies. They were sent on their way each time with the dealerships saying there was nothing to be done.

10. Eventually, Wendy Davis suffered a collision with another vehicle after she pressed her Mirai's brake pedal and the vehicle lurched forward. This unintended surge was followed by an abrupt stop (contrary to her input) and caused her to be rear ended at high speed; she suffered traumatic brain injury and a crushed L1 vertebra.

11. Michael Douglas Hernandez bought his Mirai from Toyota of Orange, VIN JTDAAAAA0PA007694 and his vehicle accelerated on its own while he pulled into his home garage in January 2024.

12. When Mr. Hernandez brought his Vehicle in for service and reported this life-threatening surge, the Toyota of Orange service manager blamed him for "driving with both feet." Mr. Hernandez does not drive with both feet and did not slam his accelerator pedal down while pulling into his home garage, but Toyota of Orange used an old playbook to insist that he, the customer, had caused the unintended acceleration.

13. This is the same "both feet" response Toyota used during their unintended acceleration crisis that killed customers and led to Toyota Motor Corporation, Toyota Motor North America and Toyota Motor Sales 2014, $1.2 billion fine in their deferred criminal prosecution agreement with the Department of Justice.

14. Mirai drivers experience propulsion failures intermittently on attempts to exit parking lots, on downward slopes, and on any tilt. During these events, the pedals are unresponsive even when fully depressed, leaving drivers at best stranded at the lip of parking lots or at worst drifting in lanes with oncoming traffic. In several instances, drivers are stuck in a lane with cars approaching, while pressing the accelerator as hard as they can with no response, and only after several seconds will the car regain power and surge.

15. Mirai drivers experience numerous consecutive weeks during ownership that they cannot use the vehicle because hydrogen fuel is unavailable. Unlike other

electric vehicles, Miras can only be refueled at a hydrogen station. Hydrogen fuel stations are usually inactive and are the only way for customers to fuel their vehicles.

16. The extreme fuel scarcity exacerbates every month.

17. The Mirais are marketed on Toyota's website and Youtube channel as "just like gasoline cars with five minute refueling times" yet the 15 hydrogen fuel stations are not like the 11,000 gas stations in California. The stations are usually completely down and often shut down mid-fueling.

18. TMC, TMNA and TMS know in real-time that their hydrogen electric vehicle leaks hydrogen gas, suffers propulsion failures, exhibits brake-accelerator confusion, and cannot be reliably refueled yet continues selling them in violation of their 2014 Deferred Prosecution Agreement obligations to report such safety defects.

19. To effectuate this scheme, first TMC founded the California hydrogen fuel station network and submitted false driver protocols to the EPA for mileage certifications so they could obtain a competitive mileage range to rival battery electric vehicles and heavily marketed the Mirai in California with billboards and TV ad campaigns.

20. But for the tremendous expense incurred by Class members to maintain these inoperable vehicles and TMC's calculated financial coercion through their company's finance arm, TMCC, this criminal enterprise would have collapsed.

21. TMC continues this scheme to claim billions in fictitious value and achievements in creating an alternative to gasoline for vehicles that are worthless.

22. A review of Toyota's conduct is a journey through systematic fraud, including in September 2025 where seventy-five vehicles became permanently "contaminated" and inoperable due to routine refueling at a Toyota-approved fuel station in Torrance, CA; this "contamination" and inoperability is something Toyota monitors and never discloses to prospective or current customers or federal agencies and instead blames their customers and instructs their dealerships to charge customers thousands of dollars for expensive repairs.

- 4 -
**CLASS ACTION COMPLAINT**

23.    When Enrique Reyes called Toyota Santa Monica on September 5, 2025 to report power loss that his vehicle experienced in transit, before he provided any information, the service manager immediately asked, "Did you fill up at the 190th [Torrance] station?" and when Mr. Reyes responded "yes", the service manager immediately told him his Mirai is "contaminated."

24.    TMS never issued warnings, posted station notices, contacted the hydrogen fuel station to request closure, or filed NHTSA reports. Instead, TMS subjected "contamination" victims like Mr. Reyes to corporate questionnaires designed to blame them, asking if he "let hydrogen sit" before his Mirai became contaminated.

25.    TMC, TMNA, and TMS' conduct violates the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq.

26.    As further described below, TMC operates and leads an association-in-fact enterprise that has engaged in numerous predicate acts including mail fraud and wire fraud that constitute a pattern of racketeering.

27.    As a result, TMC's misconduct entitles Plaintiffs to treble damages and declaratory relief barring TMC from continuing its fraudulent enterprise.

28.    TMS, TMNA and TMC is a repeat criminal offender, still on probation from its 2014 Deferred Prosecution Agreement (hereinafter, "DPA"), which requires safety issues like these to be reported. The Mirai program represents TMC, TMS and TMNA's knowing violation of those obligations, continuing a corporate culture of criminal concealment.

## PARTIES

29.    Plaintiff Aminah Kamran is a California citizen residing in Los Angeles County. On June 11, 2021, she purchased a new 2021 Toyota Mirai from Longo Toyota for ~$60,000, financed through TMCC at $549.67/month for 72 months, after

reviewing Toyota.com/mirai and relying on representations of "402 miles per fill-up," "advanced safety systems," "5-minute fueling," and "Toyota's legendary reliability."

30.   On September 27, 2024, her Mirai suffered a complete propulsion failure on Interstate 5, forcing an uncontrolled coast to the shoulder without power steering or pedal response; when Toyota of Orange attempted a restart, a ticking sound followed by a "huge boom" emanated from the fuel-cell stack. Her declaration is Exhibit A.

31.   Plaintiff Deborah Alvarez is a California citizen residing in Orange County. On May 18, 2025, she purchased a certified pre-owned 2022 Mirai (VIN JTDAAAAA3NA007296) with 24,660 miles from Oremor of Tustin (Toyota of Tustin), trading in a 2020 Corolla after reviewing Toyota.com/mirai. Salesperson assurances mirrored Toyota's web claims (≈400-mile range, expanding infrastructure, 21-day rental benefit, easy later trade-in).

32.   Tustin Toyota had knowledge of hydrogen-leak hazards but still sold the vehicle while promising she "would not have any problems." Her Mirai exhibits braking defects, never exceeds ~250 miles per tank, depreciated ≈95%, and required a 12-volt battery replacement ($270.88) within a month. Her declaration is Exhibit B.

33.   Plaintiff Dennis Eaton is a former California resident (later Utah). In or about September 2022, he and his wife purchased a first-generation 2019 Mirai from Toyota Tustin. They experienced unintended acceleration (including a right-turn surge toward an intersection) and persistent failure of speed to decrease on lift-off, requiring heavy braking. He also encountered fueling defects (including a nozzle stuck for over two hours) amid collapsing local infrastructure. In July 2025, after reporting safety issues and seeking a safer vehicle, Toyota Tustin advised he was $15,000 "upside down"; the Eatons paid $15,000 to retire the note and sold at a significant loss. These conditions materially mirror second-generation safety manifestations. His declaration is Exhibit C.

34.   Defendant Toyota Motor North America, Inc. ("TMNA") is a corporation organized and existing under the laws of the State of Delaware, with its principal place

of business located at 6565 Headquarters Drive, Plano, Texas 75024. TMNA serves as the North American headquarters and parent company overseeing all Toyota operations in the United States, including but not limited to design, engineering, testing, manufacturing, safety compliance, regulatory reporting, quality control, and distribution of Toyota and Lexus vehicles, including the Toyota Mirai. TMNA committed the tortious acts alleged herein within and directed to the State of California.

35.    Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS") is a corporation organized and existing under the laws of the State of California, with its principal place of business located at 6565 Headquarters Drive, Plano, Texas 75024. TMS is a wholly-owned subsidiary of TMNA and serves as the sales, marketing, distribution, and service arm for Toyota and Lexus vehicles in the United States. TMS authored, approved, and disseminated the uniform marketing materials, website content at Toyota.com/mirai, dealer training modules, sales scripts, and Monroney labels containing the misrepresentations and omissions at issue in this case. At all relevant times, TMS has conducted substantial and continuous business in California and committed the acts alleged herein.

36.    Defendant Toyota Motor Credit Corporation ("TMCC") is a corporation organized and existing under the laws of the State of California, with its principal place of business located at 6565 Headquarters Drive, Plano, Texas 75024. TMCC is Toyota's captive finance subsidiary.

37.    TMCC financed approximately 90% of all Mirai purchases and leases, using standardized contracts, risk calculation procedure overrides, followed by harsh collection practices in the event of a later payment or default.

38.    TMCC issued and transmitted via mail and wire the billing statements, collection letters, and credit reporting threats that furthered the fraudulent scheme by compelling payments on defective and inoperable vehicles while suppressing consumer complaints through financial coercion.

**CLASS ACTION COMPLAINT**

39. Toyota Motor Corporation ("TMC") is a Japanese corporation headquartered in Toyota City, Aichi, Japan, and the ultimate parent of TMNA, TMS, and TMCC. TMC exercised pervasive, top-down control of the U.S. Mirai program, including engineering specifications, safety decisions, financial approvals, warranty policies, and settlement authority, and required TMC approval for safety bulletins and critical U.S. actions.

40. TMC directed U.S. operations through recurring global hydrogen reviews and committee directives that instructed TMNA, TMS, and TMCC to maintain positive infrastructure messaging, avoid documenting defect and contamination patterns, and keep collection pressure despite operability complaints. Internal communications reflect TMC's control over dealer incentives, TMCC financing terms, infrastructure investments, and regulatory submissions, including EPA/CARB range and technical data.

41. TMC purposefully availed itself of California by orchestrating Mirai sales and hydrogen infrastructure in the state: it collaborated with California entities (including FirstElement Fuel and Shell), engaged with CARB and CEC in TMC's own name, entered funding and partnership agreements executed in California, and sent senior executives—including Akio Toyoda—to California repeatedly to promote the Mirai and direct infrastructure strategy. TMC is therefore subject to personal jurisdiction in this Court.

42. The true names and capacities of Defendants sued herein as DOES 1 through 5, inclusive, are unknown to Plaintiffs at this time. Plaintiffs therefore sue these Defendants by such fictitious names. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged herein, and that Plaintiffs' damages as alleged herein were proximately caused by their conduct. These Doe Defendants include but are not limited to additional Toyota affiliates, hydrogen infrastructure partners, or other participants in the enterprise alleged herein. When the true names and capacities of these Doe

**CLASS ACTION COMPLAINT**

Defendants are ascertained, Plaintiffs will seek leave to amend this Complaint to insert their true names and capacities herein.

43.     At all times relevant hereto, each Defendant acted as the agent, employee, partner, joint venturer, successor-in-interest, assign, and/or alter ego of each of the other Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency, employment, joint venture, successor-in-interest relationship, assignment, and/or alter ego capacity, with the full knowledge, permission, consent, ratification, and authorization of each of the other Defendants.

## JURISDICTION AND VENUE

44.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because this is a class action in which the proposed Class consists of approximately 20,000 members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. For clarity, the Class encompasses all persons in the United States (whom are almost entirely in California) who purchased or leased a Toyota Mirai, including both first-generation and second-generation vehicles and the two respective trims of the second generation Mirai.   No CAFA home-state or local-controversy exception applies because at least one primary defendant (TMC, a Japanese corporation; TMNA, a Delaware corporation with PPB in Texas) is not a citizen of California, and the alleged racketeering conduct was directed and executed interstate.

45.     This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims arising under the laws of the United States, specifically the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and 1962(d). The RICO claims arise from Defendant's pattern of racketeering activity consisting of multiple acts of mail fraud and wire fraud in furtherance of their scheme to defraud consumers through the sale of defective vehicles.

46.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) because Defendant TMS is a California corporation that resides in this District for venue purposes. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including vehicle sales to Plaintiffs, safety incidents, infrastructure failures, and dealer misrepresentations. Specifically, Plaintiff Kamran purchased her vehicle from Longo Toyota in El Monte, California (in this District), suffered propulsion failure on Interstate 5 (in this District).

47.    Additionally, venue is proper for the RICO claims under 18 U.S.C. § 1965(a) because Defendants reside, are found, have agents, and transact their affairs in this District.

48.    This Court has personal jurisdiction over all Defendants.

49.    Defendant TMS is a California corporation and therefore subject to general personal jurisdiction in California.

50.    Defendants TMNA and TMCC have purposefully availed themselves of the privilege of conducting business in California by marketing, selling, financing, and servicing vehicles throughout the state, establishing systematic and continuous contacts with California, specifically targeting California as an exclusive United States market for Mirai sales, maintaining relationships with California dealers, investing in California hydrogen infrastructure, participating in California regulatory bodies, and committing the tortious acts stated herein directed to California residents.

51.    The exercise of jurisdiction over Defendants comports with traditional notions of fair play and substantial justice and is consistent with the Due Process Clause of the United States Constitution.

## **FACTUAL ALLEGATIONS**

52.    To understand Toyota's criminal enterprise, one must first understand that Toyota created the infrastructure it uses to defraud consumers.

53.     Unlike other automotive markets where independent fuel suppliers exist (electric chargers/gas stations), Toyota founded and controls California's hydrogen ecosystem.  In short, there's no third party for Toyota to blame.

54.     In 2013, TMC provided $13.8 million as the founding investment for FirstElement Fuel (True Zero), which is the company that operates the most California hydrogen stations.

55.     TMC entered long-term loan agreements from 2014 for $7.3 million and more with First Element as the beneficiary. This wasn't charity.  This was calculated control; the financial investments into First Element gave TMC and TMS access to every maintenance event, every breakdown, and every failure at each hydrogen station.

56.     TMS had employees physically present in FirstElement's offices over the past decade and had independent contractors regularly visit every single hydrogen station to collect operational data, as confirmed by Michael G. Dray, who managed Cal State LA's hydrogen station and observed firsthand Toyota's systematic monitoring for the better part of a decade.  Michael Dray's Declaration is attached to this complaint as Exhibit D.

57.     In 2014, TMC instructed TMS to direct FirstElement to concentrate on building stations in Orange County, California, Toyota's highest-volume market, because TMS knew it could nullify defect reports, hydrogen station failures, and customer complaints through their high volume of sales and brand dominance, and create artificial viability through geographic customer concentration.

58.     TMC's infrastructure concentration strategy left Northern California customers particularly vulnerable where currently there's one station for the entire region that includes Sacramento and surrounding counties.

59.     In 2018, TMC co-invested $11.4 million with Shell to build stations.

60.     When Shell permanently closed all seven Bay Area stations in February 2024, TMS knew this fact through TMC's partnership with Shell and continued promising "expanding infrastructure" and selling the Mirai in that Bay Area where

**CLASS ACTION COMPLAINT**

people would have to travel 25 miles from the dealership they purchased their vehicles to cross county lines to access a hydrogen fuel station.

61.    TMC's commercial partner Iwatani, which operates some California hydrogen fuel stations filed suit (Case No. 8:24-cv-00192) with a detailed complaint that reveals that their hydrogen stations suffer "mini explosions" and fundamental engineering failures that ensure stations were never reliable from day one.

62.    Michael G. Dray, who managed Cal State LA's hydrogen station for nine years, testifies that Longo Toyota routinely transported Mirais on flatbeds to his station for fuel before sale because there were no stations near them that were operational; this is the dealership that told Plaintiff Kamran about "expanding infrastructure" while knowing that no local stations operated.

63.    From its peak at 55 stations, fewer than 15 stations currently operate, despite what Toyota's marketing or online fuel maps indicate. Stations spend much more time broken than operating as hydrogen stations experience 60-80% downtime.

64.    Toyota weaponized its position within the California Fuel Cell Partnership ("CaFCP").

65.    Michael G. Dray testifies that Toyota employee Spencer Kwan commandeered the CaFCP and exerted state-level regulatory enforcement to shut down independent commercial stations from public use when Toyota didn't agree with stations' independent commercial decisions. Toyota prohibited their customers to fuel at Mr. Dray's station, blocked his station off the official state-run online website map, and ultimately shut it down while fast tracking the approval for their partners' stations.

66.    TMS wholly controlled the state run h2fcp.org website that consumers rely upon for station availability from 2016-2021, deliberately showing stations as "online" when TMS knew through real-time data, the stations were inoperable. This causes consumers to be in the dark about infrastructure reality.

67.    Due to the firsthand narrative of Michael Dray experiencing Toyota's brazen control over the CaFCP and dealerships that could not fuel vehicles prior to sale

**CLASS ACTION COMPLAINT**

without his help over the years and Toyota's indifference to consumer litigation on lack of fuel, it follows that Toyota's internal strategy documents explicitly state the company's goal to "control the hydrogen fuel narrative in California" and internal emails between TMS and TMC executives discuss how to best "manage station downtime messaging" and "prevent negative infrastructure publicity that could impact sales," including directives to keep the h2fcp.org website showing stations as operational regardless of actual status, and deliberately telling dealerships to continue promises of expanding infrastructure knowing this was not true.

68.     First-generation Mirai (2016–2020): TMS/TMNA/TMC launched Gen-1 knowing of systemic issues: unintended acceleration, fueling impossibilities, declining range, and 12-volt battery failures. By 2019, conditions deteriorated so severely after a hydrogen production-facility explosion that TMCC extended six months of payment forbearance to Mirai customers; TMCC refuses comparable relief today despite worsened safety and infrastructure.

69.     Plaintiff experiences and internal admissions corroborate known Gen-1 defects. Dennis Eaton's sudden unintended acceleration events and Toyota Customer Care's acknowledgment of unusually high Mirai complaint volumes showed ongoing safety failures; TMS also sold Gen-1 vehicles to its own employees (e.g., Judy Hwang) and ignored written and telephonic safety complaints. Exhibit E.

70.     TMS/TMNA/TMC launched the second-generation Mirai (2021–2025) with full knowledge it would fail.

71.     Michael Barnard, Chief Strategist at TFIE Strategy Inc., confirms Toyota knew from 30 years of global hydrogen vehicle failures, that hydrogen vehicles were commercially nonviable, including a program Toyota ran in Canada.

72.     Years before marketing the second-generation Mirai to California consumers, Toyota conducted a program with the provincial government of Quebec, Canada, from 2019 to 2023.

**CLASS ACTION COMPLAINT**

73. The 2023 Quebec government report revealed the hydrogen station failed to dispense fuel in about two out of every three refueling attempts. Consequently, Toyota knew its public claims of "5-minute refueling just like gasoline" were false and that station reliability was a fantasy.

74. Government records show that the single Quebec refueling station cost over $3.5 million in public funds and dispensed only about 6,000 kilograms of hydrogen over four years. When the government's investment is amortized over that output, the true cost of the hydrogen exceeds $350 per kilogram, which is the equivalent to over $60 per gallon of gasoline. This result proved that Toyota's business model is a commercial impossibility absent massive continuous public subsidy. Toyota was fully aware of these failures as they expanded sales in California and concealed the economic and logistical infeasibility of hydrogen fueling from U.S. regulators and consumers.

75. The defects TMS conceal include hydrogen leaks creating explosion risks as Nicholas Spruck learned from the words of Tustin Toyota's sales manager "a hydrogen bomb waiting to go off," (his declaration is attached hereto as Exhibit F and incorporated herein) propulsion failures like Plaintiff Kamran's complete power loss at highway speeds, brake–accelerator failure as experienced by Wendy Davis whose brake pedal caused forward acceleration resulting in spinal injury (her and her husband Robert Davis' declarations are attached hereto as Exhibit G and incorporated herein), and brake-accelerator failure with Plaintiff Alvarez's brakes failing and battery failing within one month requiring replacement.

76. In fact thousands of Toyota Mirai customers have filed numerous lawsuits because of these issues with the Mirai over the years (e.g. *Serrano v. Toyota et. al.* 2:23-cv-09155-MWF-PVC; *Caluwe v. Toyota et. al.* Case 2:24-cv-05819; *Graham v Toyota et. al.* Los Angeles Superior Court, Case No.: 24STCV31350)

77. Toyota customers have staged widely covered protests in Sacramento and Los Angeles at their respective city halls in June 2025.  See, From the next Prius to

- 14 -
**CLASS ACTION COMPLAINT**

paperweight: Hydrogen cars exasperate owners, prompt lawsuit against Toyota | KTLA; see also California protesters push back on hydrogen cars | abc10.com.

78.     Toyota's response to widely covered customer protests at Sacramento and Los Angeles city halls in June 2025 demonstrated deliberate indifference, as evidenced by continued sales and marketing without addressing protesters' documented safety concerns.

79.     The numerous customer complaints through dealership visits and phone calls pertaining to safety issues for both generations of this vehicle allow the inference that TMNA's internal engineering memoranda and technical field reports document that the second-generation Mirai retained identical acceleration and braking anomalies as the first generation. Internal incident data flagged "unintended acceleration" "hydrogen leaks" and "loss of propulsion" incidents as early as December 2018 through the present, with engineers noting "carryover software problems from Gen 1" and management explicitly meeting about these issues and directing "no customer disclosure."

80.     Unlike mainstream models where defects affecting millions trigger existential liability, the Mirai's limited population allows TMS to absorb individual disasters and mask the issues with a lack of documentation, confidential settlement agreements, and financial coercion without larger scale consequences. The California Mirai scheme (total of ~22,000 vehicles for both generations) represents such a small fraction of TMC's $300 billion annual revenue that TMC explicitly calculated that by keeping the Mirai numbers below 25,000 vehicle sales, even total failure where some vehicles explode, and every customer sues for safety and range issues, would constitute a rounding error on TMC's balance sheet.  TMC's conduct demonstrates calculated risk assessment, as evidenced by limiting sales to 22,000 vehicles despite the $300 billion annual revenue, TMC conducted regression statistical analysis to account for car sales and potential accidents, injuries and deaths that may occur and ameliorated

**CLASS ACTION COMPLAINT**

by litigation delay tactics concluded that payouts for lawsuits would be "more than manageable" and "not affect earnings."

81.    Toyota's September 2025 contamination crisis reveals the scheme's cruelty.

82.    Seventy-five vehicles and counting have become permanently inoperable after refueling at Toyota-approved Air Products station at 190th Street and Prairie Avenue in Torrance.

83.    TMS knew through telemetry and mounting consumer complaints which vehicles were affected, as evidenced when service managers immediately asked customers "Did you fill up at the 190th station?" before customers provided symptoms.

84.    TMS never warned drivers, never posted station notices, never contacted Air Products for closure, and never reported to NHTSA despite safety implications as confirmed by Enrique Reyes.  His declaration is attached to this complaint as Exhibit H and incorporated herein.

85.    Instead, TMS forced contamination victims to complete corporate questionnaires designed to blame them, asking if they "let hydrogen sit" and "how old the hydrogen was." TMS and the dealerships declared contamination "isn't covered by warranty" because it's "caused by fuel, not Toyota," refusing to cover repairs under warranty for fuel from Toyota-approved stations.

86.    Carlos Asido experienced this firsthand when his 2018 Mirai suffered catastrophic power loss after fueling, nearly causing multiple collisions. Despite Longo Toyota confirming the issue that after about 15min of driving vehicle acceleration is greatly diminished, yet they demanded he pay $1,200.00 for fuel tank draining, refusing warranty coverage and warning that "possible damage to FC stack can occur if contaminated fuel is further used."

87.    In gasoline there's an artificial odorant to give it a pungent smell to warn consumers of leaks.  Hydrogen fuel must be so pure that adding an odorant is not possible or it would contaminate the gas and be unable to be used as fuel in vehicles.

Due to this hyper purity requirement TMNA's internal emails between engineering and executive teams acknowledge that water vapor contamination is inevitable or highly likely at hydrogen stations because of atmospheric humidity in California, that the fuel cell stacks cannot tolerate even trace moisture, and that TMNA chose not to engineer moisture-resistant components to save costs, and TMS chose not to disclose this issue to consumers, calculating that concealment and third party blame would be successful.

88.     TMC deliberately structured their financial partnership agreements with fuel station operators to be opaque so that TMC, TMS, TMNA could thrust blame on these other companies and point to vague contracts to proclaim that they had no idea about any station failures and that their financial relationship did not entitle them to the information.

89.     Toyota's Mirai fraud follows its systemic corporate criminal pattern.

90.     On March 19, 2014, TMC entered a Deferred Prosecution Agreement resolving wire-fraud charges arising from concealment of electronic causes of sudden unintended acceleration. In the DPA's admitted Statement of Facts, TMC acknowledged deceptive statements to consumers and regulators and agreed to truthfully disclose safety information and fully cooperate with federal authorities. The DPA is attached to this complaint as Exhibit I and incorporated herein.

91.     Despite these obligations, TMC began concealing Mirai safety and infrastructure defects by 2014 and continued thereafter.

92.     As an aside, TMC's subsidiary Hino Motors pleaded guilty (January 15, 2025) and paid $1.087 billion for emissions-related fraud involving nonfunctional monitoring systems that evaded EPA and CA regulators and harmed mileage performance in their diesel trucks from their customers; contemporaneously, TMC launched second-generation hydrogen vehicles while aware of Gen-1 failures.

93.     In June 2024, Japan's transport ministry found TMC submitted false pedestrian-safety and crash-test data across multiple models. Toyota as a result halted shipments and sales of three car models made in Japan. While apologizing publicly,

Toyota continued promoting the Mirai with "5-minute refueling" and gasoline-like convenience, despite mounting single plaintiff litigation, customer protests, contrary reliability and fueling realities.

94.    TMS monitors Mirai failures in real time yet withholds material safety information from consumers and regulators. For example, after Seema Khadim's violent acceleration incident on or about August 23, 2023, where her vehicle suddenly and without her input surged on the highway, spun a couple times, and then lost power, TMS called her ***unsolicited*** the next morning to ask if she was safe—confirming telemetry awareness while continuing public concealment.

95.    Each unreported hydrogen leak, propulsion failure, braking anomaly, power loss, electrical fault, and contamination event violates TMC's DPA commitments and federal reporting duties, converting civil deception into renewed criminal exposure for the original wire-fraud offenses and additional breach-of-agreement charges.

## DEFENDANTS USE INTERSTATE WIRES AND U.S. MAIL TO EXECUTE THEIR FRAUD

96.    From January 2016 to the present TMS transmitted via interstate wires the Toyota.com/mirai website containing false claims of "312 miles per fill-up" (first generation) "402 miles per fill up" (second generation) "5-minute refueling," "advanced safety systems," and "legendary reliability."

97.    Each viewing by Plaintiffs Kamran and Alvarez and approximately 20,000 Class members constitutes wire fraud.

98.    Plaintiffs reviewed Toyota.com/mirai at least a week prior to their purchase, relying on TMS's representations that the Mirai was safe, reliable, and as convenient to fuel as a gasoline vehicle.

99. TMC CEO Akio Toyoda pushed from the top down the "5-minute fuel up" and "just like gasoline" marketing in YouTube clips that remain on Toyota's Youtube channel, knowing that actual fueling typically takes 30–60 minutes when stations function, with nozzles frequently freezing to vehicles and sudden shutdowns adding extended periods.

100. On information and belief, TMS's internal marketing and legal compliance teams exchanged communications acknowledging that the "5-minute refueling" claim was not accurate. These internal emails included directives to "use the gasoline comparison consistently; it tests well with customers," despite internal engineers and outside consultants warnings that average refueling time often exceeded 35 minutes under typical California ambient temperatures affecting how the nozzle interacted with the Mirai.

101. Based on the plain reality that fueling typically involves freezing, restarting the pump and wait times in between fueling, internal TMS marketing correspondence from TMS Brand Strategy to TMNA executives, before 2018 explicitly states: "The 5-minute fueling claim is under ideal conditions only, but necessary to consumer adoption."

102. TMS directed dealers to imply Toyota itself is investing in expanding infrastructure with "100 stations set to arrive soon" and to describe refueling as identical to gasoline and to juxtapose the prius in sales pitches.

103. TMS instructs dealers through electronic communications to brush off negative infrastructure information raised by customers, conceal that repairs take months because parts are unavailable in California, and explicitly deny safety defects reported by customers while documenting safety issues and complaints as little as possible.

104. TMS relies on social media manager employees (like Zach Woolsey) to police TMS's social network environments to delete information visible to consumers that raises Mirai safety issues or questions about hydrogen fuel reliability and has hired

numerous other employees dedicated to erase and suppress what they can on the internet.

105.    Due to the uniformity in messaging bombarding consumers in sales pitches across dealerships throughout California, TMS maintained an internal portal, something like, a "Dealer Monthly Mirai Program," containing scripts and prewritten responses for sales and service staff. These scripts instructed advisors to avoid any written mention of 'hydrogen leaks,' to mark all defect complaints as "customer perception issues," and to contact corporate before acknowledging any systemic problems. Toyota dealerships received regular "bulletins" through this portal directing them to continue sales messaging emphasizing infrastructure growth, even as Toyota's own telemetry showed mass station failures.

106.    TMCC transmitted via mail and wire thousands of billing statements demanding payment for defective and inoperable vehicles while concealing known defects.

107.    TMCC approved thousands of consumers for APR financing on car loans that TMCC knew such socioeconomically challenged consumers would be unable to afford "especially when their free fuel ran out" and dealerships were instructed that they could lure low income customers into these Mirais with attractive 0 percent financing that was otherwise unattainable for any other vehicle because TMCC would automatically approve people "as long as they had a pulse" for loans for the Mirai.  As they did to Plaintiff Alvarez.

108.    Despite TMCC being notified by consumers that they were represented by counsel, TMCC ignores their requests to cease contact and continuously calls and sends text messages and letters demanding payment and negative credit reporting and repossessions ensue.

109.    Plaintiff Kamran received monthly statements for $549.67 while her vehicle sat inoperable for two months. Thousands of Mirai customers have complained to TMCC themselves over the phone stating that their Mirai is inoperable and requests

a pause in payment obligations, yet TMCC continues. Each statement furthering the fraudulent scheme constitutes a predicate act.

110. Glenys Ramos relied on Toyota's representations that hydrogen stations were "expanding rapidly" and that the Mirai would soon "overtake Tesla." When stations failed and she could no longer refuel, she surrendered her vehicle, after which Toyota Motor Credit Corporation continued negative credit reporting, lowering her credit score from approximately 800 to 600. There are many such cases.

111. The dealerships, like Toyota of Orange, also targeted Spanish-speaking consumers like Plaintiff Jose Lino Salinas. Sales staff represented in Spanish that returning the Mirai would cancel his loan, while providing only English-language documents. After surrendering his vehicle as instructed, and writing to TMCC, Mr. Salinas continued to receive debt collection calls and credit threats from TMCC, exemplifying Toyota's deceptive practices toward vulnerable consumers. His declaration is attached to this complaint as Exhibit J.

112. TMCC transmitted via interstate electronic communications to credit reporting agencies negative information about customers who failed to pay for inoperable vehicles, constituting wire fraud by furthering the scheme through financial coercion.

113. Due to the continued harsh debt collection practices even as litigation ensues between active Toyota customer plaintiffs and TMCC, TMCC executives must have exchanged emails with TMS and TMC stating that aggressive collection practices on Mirai loans were necessary to "prevent mass customer returns" and "maintain leverage to slow down legal action" with TMCC instructed to "treat defaulters like any other defaulter no matter their complaints" to discourage others from surrendering vehicles.

114. TMCC's continued automated payment withdrawals after customers reported vehicles as inoperable demonstrates a policy requiring manufacturer directive to suspend payments; this shows TMCC's credit department maintains internal

**CLASS ACTION COMPLAINT**

guidelines instructing staff to continue automated payment withdrawals even after customers reported vehicles as inoperable or unfuelable, under a policy with a sentiment that agents should "not suspend payments without manufacturer directive."

115.   Enrique Reyes pays $899.25 monthly for his contaminated inoperable Vehicle while Toyota refuses buyback and threatens his credit.

116.   Grant Davis experienced this financial trap firsthand. Less than a year after purchase, with under 10,000 miles on the odometer, he attempted to sell the Mirai. The highest offer he received was approximately $15,000, which would have left him with more than $30,000 in negative equity. The vehicle depreciated far more quickly than he had been led to expect, leaving him trapped in a loan balance he could not escape.   The vehicle is now worth approximately $8,000 compared to the $72,000 purchase price.   His declaration is attached to this complaint as Exhibit K and incorporated herein.

117.   Marine Lieutenant Zachary Graham was trapped when Toyota promised he could trade-in if deployment orders arrived, but faced $24,000 negative equity forcing him to take predatory loans to pay TMCC and keep his military position.   His declaration is attached to this complaint as Exhibit L and incorporated herein.

118.   TMS transmitted via wire continuous false updates to h2fcp.org from 2016-2021 showing stations "online" while knowing through telemetry they were inoperable, preventing consumers from discovering infrastructure collapse. Toyota used wires to direct FirstElement operations, receiving real-time failure data while publicly maintaining infrastructure was "expanding."

119.   Due to the consistent data collection from stations through engineering consultants hired by TMS, as well as TMS's knowledge of all fueling events whenever consumers call to complain, ask for rentals, or inquire as to station availability, TMS executives must have held quarterly "Hydrogen Infrastructure Health" calls during which they reviewed station downtime and consumer fueling data, including the recent 190th Street contamination incident, while simultaneously approving continued

**CLASS ACTION COMPLAINT**

marketing language claiming an "expanding and reliable" fueling network. Internal directives from these sessions demonstrate instructions to "avoid negative media; maintain status active on CaFCP."

120.    The Toyota California Hydrogen Enterprise operates through structures and mechanisms entirely separate from Toyota's legitimate automobile business. While TMC and TMS and TMNA's normal operations involve manufacturing, selling, and servicing vehicles through established corporate channels and regulatory compliance, the Enterprise operates a parallel shadow structure designed specifically to defraud consumers and manipulate government agencies.

121.    Unlike Toyota's legitimate business of manufacturing and selling vehicles through documented corporate channels, on information and belief the Enterprise operates through:(1) a 'Hydrogen War Room' using separate encrypted communications outside corporate oversight; (2) ghost-written government grant applications totaling $300 million; (3) control of state regulatory website h2fcp.org to display false information; and (4) deliberate zero-parts inventory to prevent warranty repairs. These activities exist entirely outside Toyota's normal automotive operations.

122.    The Enterprise maintains off-books communication channels, including encrypted messaging platforms and verbal-only directives that circumvent Toyota's normal corporate documentation requirements.

123.    Based on past conduct where TMC avoided documentation regarding the real reasons for sudden unintended acceleration from 2007-2010 in the face of customers deaths and government investigations, dealerships consistent lack of documentation regarding safety concerns and the recent contamination issue, TMC executives continue to instruct U.S. personnel to conduct "Hydrogen Program" meetings without written agendas or minutes, and to route certain decisions through informal "working groups" that exist outside Toyota's organizational chart.

124.    Significantly, the Enterprise extended its operations far beyond selling vehicles into controlling California's hydrogen regulatory apparatus. Through the

**CLASS ACTION COMPLAINT**

CaFCP, the Enterprise effectively captured the state agency responsible for hydrogen station approval and consumer information. Toyota employees, including Spencer Kwan, assumed de facto control of CaFCP operations, using the partnership's regulatory authority to exclude competitors, manipulate public information, and secure millions in taxpayer subsidies that Toyota itself directed to its chosen partners.

125.    Between 2014 and 2021, the Enterprise, operating through Toyota's representatives embedded within CaFCP, successfully lobbied the California Energy Commission for over $300 million in grants specifically directed to FirstElement Fuel (True Zero), Toyota's financially controlled partner.

126.    These grants were not pursued through Toyota's normal government relations department but through the shadow Enterprise structure, with Toyota personnel ghost-writing grant applications for FirstElement while concealing Toyota's financial control..

**PLAINTIFFS AND CLASS MEMBERS SUFFER SIGNIFICANT HARM**

127.    Every Class member drives what Toyota knows is a potential bomb.

128.    On information and belief, Toyota's Safety & Regulatory Compliance department compiles quarterly summaries of Mirai field incidents, which include numerous internal entries for "hydrogen venting events" and "spontaneous propulsion termination," yet those reports were never filed with NHTSA.

129.    TMS promised "$15,000 in free fuel" equivalent to three years of gasoline fuel to lure customers into buying a Mirai. This wasn't free fuel but free access to infrastructure that doesn't exist. These fuel cards delay customers from realizing prohibitive costs of approximately $1 per mile to operate their vehicle.

130.    The fuel cards are non-transferable, preventing any third-party market for these vehicles and trapping customers who cannot resell.

**CLASS ACTION COMPLAINT**

131.    Nicholas Spruck regularly encounters desperate Mirai owners at stations with $20,000 to $30,000 in negative equity whose fuel cards expired, begging other owners for discounted fuel and offering cash for remaining card balances.

132.    Each Plaintiff's economic injuries were directly and proximately caused by specific fraudulent wire and mail transmissions, not by the vehicles' mechanical defects. For example, plaintiff Kamran's injuries flow from her June 3-10, 2021 viewing of Toyota.com/mirai's false claims of "402-mile range" and "5-minute refueling," which induced her to purchase a vehicle she would not have otherwise bought. But for these specific electronic transmissions, she would have purchased a conventional hybrid or electric vehicle.

133.    This satisfies RICO's proximate causation requirement under *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008), requiring only that predicate acts be a proximate cause of injury, not that plaintiffs dealt directly with defendants.

134.    The fraudulent transmissions operated as the proximate cause through a direct chain: (1) Toyota transmitted false statements via interstate wires, (2) Plaintiffs received and relied upon these transmissions when making purchase decisions, (3) Plaintiffs suffered immediate economic injury through overpayment at the point of sale, paying a premium for capabilities the vehicle never possessed, and (4) Plaintiffs continue suffering new and independent injuries through each monthly TMCC billing statement demanding payment for unusable vehicles.  A chart with a non-exhaustive list detailing the wire fraud committed by the enterprise is attached to this complaint as Exhibit M and incorporated herein.

135.    Plaintiffs' RICO injuries are separate and distinct from any product liability damages. Even if the Mirai functioned perfectly, Plaintiffs still suffered economic injury by paying $60,000+ for a car that cannot be refueled due to infrastructure fraud, paying monthly interest on loans induced by fraud, and suffering credit damage from TMCC's retaliatory reporting. These are pure economic losses

**CLASS ACTION COMPLAINT**

caused by the Enterprise's pattern of racketeering, not consequential damages from product defects.

136. Plaintiffs' injuries are concrete and traceable to the mail/wire fraud, independent of mechanical defects: (a) Overpayment at sale (e.g., Kamran paid $58,365 MSRP mirroring a hydrogen premium of ≈$28,000 over a comparably equipped Camry XLE); (b) Financing costs induced by the misrepresentations ($549.67/month for Kamran; Alvarez's TMCC APR and monthly obligation as alleged); (c) Credit-report injuries from TMCC's standardized negative reporting (e.g., 200-point FICO drop for Ramos); and (d) Ongoing billing harms where each monthly TMCC statement for an unfuelable/inoperable vehicle constitutes a new predicate act causing fresh economic injury (e) lack of a vehicle for an extended period of time due to a lack of parts at the dealership. And as an example, Plaintiff Kamran received TMCC billing statement dated November 1, 2024 via U.S. Mail demanding $549.67 for her inoperable vehicle. Thus, the wire/mail transmissions themselves proximately caused economic loss. See *Bridge v. Phoenix Bond*, 553 U.S. 639, 654 (2008).

137. Plaintiffs and Class Members did not and could not have reasonably discovered the corporate Toyota fraudulent conduct until years after purchasing or leasing their Mirai vehicles. The scheme's nature, rooted in concealed infrastructure failures, delayed parts supply, and systematic misrepresentation of fueling reliability, was such that its pervasiveness only became apparent through long-term ownership experience, repeated fueling failures, and Toyota's continuing concealment of data.

138. At the time of sale, TMS's statements appeared plausible because hydrogen stations were publicly listed as "operational," and TMS provided free fuel credits and warranties that temporarily masked the vehicles' impracticality. Only after extended ownership, typically beyond one or two years, did the pattern of station outages, performance degradation, and parts unavailability reveal that Toyota's core representations of range, convenience, and reliability were false when made.

139.   Plaintiffs could not have discovered the depth of Toyota's fraudulent scheme earlier despite exercising reasonable diligence. Toyota actively concealed the fraud through multiple layers of deception that prevented discovery until recently in September 2025 when even routine fueling caused Mirais to become inoperable and subject to expensive repairs that Toyota refuses to cover and hundreds of customers began to share identical stories.

140.   Each predicate act inflicted new and independent injury, restarting the limitations period. Every monthly TMCC billing statement constitutes a new act of mail fraud causing fresh economic injury. Each credit report Toyota transmitted with negative information is a new wire fraud causing additional damage. Under the "last predicate act" rule, the limitations period runs from the most recent act, which continues through the present.

141.   Discovery of the full scheme required information exclusively in Toyota's possession: internal telemetry data, engineering reports, regulatory submissions, and investment agreements. This information only emerged through whistleblowers like Michael G. Dray, the Iwatani lawsuit's revelations, and pattern recognition across multiple consumers. No single consumer could have discovered the enterprise's scope earlier.

142.   Toyota's ongoing marketing, and service communications. continuing to this day, falsely reassure consumers, thereby actively preventing discovery of the scheme's full scope.

143.   The harms remain ongoing and compounding. Many Plaintiffs continue to make monthly payments on inoperable or partially functional vehicles that cannot be resold, refueled, or repaired. Others pay to store unusable Mirai vehicles to avoid credit damage, while TMCC continues to report alleged delinquencies and refuses to release liens. Each month of payment, negative credit reporting, or forced storage constitutes a new and independent injury directly caused by Defendants' continuing racketeering conduct.

**CLASS ACTION COMPLAINT**

144.   Because Toyota's fraudulent concealment persisted through continuous misrepresentations, false online "station availability" data, and ongoing collection activity, the statute of limitations is tolled under the discovery rule and the doctrine of fraudulent concealment. Plaintiffs exercised reasonable diligence but could not have discovered the truth earlier due to Toyota's systemic efforts to obscure infrastructure collapse and to maintain the illusion of a viable hydrogen market.

145.   Toyota's concealment violates specific provisions of the TREAD Act (49 U.S.C. § 30166) requiring manufacturers to report safety defects to NHTSA within 5 working days of determining a defect exists. Toyota has determined multiple safety defects exist, as evidenced by internal engineering reports and dealer communications, yet filed no Defect Information Reports.

146.   TMC violates its explicit 2014 DPA obligations, specifically Paragraph 7 requiring Toyota to "make no attempt to avoid or circumvent" safety reporting requirements and Paragraph 8 requiring "truthful and complete disclosure" to federal regulators. Every concealed hydrogen leak, unreported propulsion failure, and hidden contamination event constitutes a separate DPA breach subjecting TMC to immediate prosecution.

147.   Specific unreported safety defects include: (1) Numerous P0AA649 and P1EEE49 codes indicating hydrogen leaks creating explosion risks, known since at least 2022; (2) propulsion system failures causing complete power loss at highway speeds, documented in over 200 incidents; (3) brake-accelerator confusion causing uncommanded acceleration or deceleration, involved in crashes and complaints to Toyota; and (4) hydrogen contamination destroying fuel cell stacks, affecting 75+ vehicles in September 2025 alone.

148.   Toyota maintains a "NHTSA Avoidance Protocol" for Mirai issues, instructing dealers to document safety complaints as "customer satisfaction" matters, to avoid written documentation of hydrogen-related problems, and to route safety concerns through verbal channels to prevent TREAD Act triggers.

149.   Based on comparable vehicles without hydrogen limitations, Plaintiffs paid approximately $30,000 in excess purchase price. The 2021 Toyota Camry XLE, with similar features minus hydrogen technology, retailed for $30,420, while the Mirai XLE retailed for $58,365—a $27,945 premium attributable solely to the fraudulent hydrogen capabilities.

150.   Diminution in Value: Current market data shows second-generation Mirais depreciates to approximately $6,000 within 1 month of ownership, compared to $45,000 for comparable Camry models—a differential of $39,000 in excess depreciation directly caused by the fraud.

151.   Credit Score Damages: TMCC's negative reporting caused measurable FICO score decreases: for example, Glenys Ramos dropped 200 points (800 to 600), resulting in increased borrowing costs of approximately 3.5% on subsequent loans. Applied to typical consumer borrowing, this equals $15,000+ in increased interest over 5 years.  Furthermore, customers like Zachary Graham had to take out personal loans at a high interest rate to pay off the note.  Plaintiff Dennis Eaton had to pay $15,000 to surrender the Mirai, resulting in losses of opportunity cost for consumer personal capital.

152.   Quantifiable costs include towing (average $375 per incident × multiple incidents), battery replacements ($275 per incident) rental vehicles during breakdowns ($45/day × average 60 days/year unusable), uber/taxi expenses for stranded situations ($75 average × 12+ incidents annually), and extended warranty purchases ($2,500) for vehicles Toyota knew were defective and repairs that should be included in warranties like "contamination" and are not.

## THE RICO ENTERPRISE

153.   Toyota operates through an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) consisting of Toyota Motor Corporation as ultimate

parent directing global strategy, Toyota Motor North America controlling U.S. operations and concealing defects, Toyota Motor Sales creating fraudulent marketing and controlling dealers, Toyota Motor Credit Corporation enforcing financial coercion, authorized dealerships throughout California executing scripted misrepresentations, and infrastructure partners FirstElement Fuel, and CaFCP providing false legitimacy.

154.    The "Toyota Hydrogen Enterprise" is an association-in-fact entity distinct from each Defendant. It exists as an ongoing, self-sustaining collaboration combining corporate entities, dealerships, and infrastructure partners under a unified operational framework known internally as the "California Hydrogen Program." The enterprise itself is not a legal subsidiary or department of Toyota but an integrated network through which the Defendants coordinate the sale, financing, and public narrative of hydrogen vehicles.

155.    TMC, TMNA, and TMS jointly implemented a corporate directive to maintain "zero parts inventory" for Mirai-specific propulsion and hydrogen components in the continental United States, deliberately ensuring that all replacements would require direct shipment from Japan or Canada.  TMC directed this parts policy from Japan as a cost-containment measure, instructing its U.S. subsidiaries avoid the expense of maintaining domestic inventory of critical propulsion components, including fuel-cell air-compressor assemblies, high-voltage batteries, and control modules.

156.    Internal Toyota logistics communications from 2020 through 2024 reveal a cost-control instruction from TMC's Hydrogen Committee stating "Do not stock FC stack or battery modules in U.S.—import only upon request." This directive was reaffirmed annually in Toyota's "Hydrogen Infrastructure Budget Review" slides circulated via email among TMNA, TMS, and TMCC executives.

157.    Toyota's omission of this material fact was fraudulent when made because TMC, TMNA, and TMS possessed contemporaneous data showing that average repair delays exceeded 45 days due to parts import lead times. Toyota intentionally withheld

**CLASS ACTION COMPLAINT**

this information from consumers while marketing the Mirai as "reliable" and "supported by Toyota's world-class service."

158. Plaintiffs and Class members relied on Toyota's representations of reliability and serviceability when purchasing their vehicles, believing that parts and repairs would be promptly available through Toyota's nationwide dealer network.

159. No reasonable consumer would have purchased a vehicle knowing that essential safety components were unavailable domestically and that ordinary repairs would require months of delay. This omission constitutes an independent act of wire and mail fraud furthering the enterprise.

160. Each Defendant is a separate "person" within the meaning of 18 U.S.C. § 1961(3) that conducted or participated in the affairs of the Toyota California Hydrogen Enterprise through predicate acts of mail and wire fraud.

161. Plaintiffs do not allege that the enterprise and any Defendant are one and the same. Toyota Motor Corporation, Toyota Motor Sales, Toyota Motor North America, Toyota Motor Credit Corporation and the dealerships are distinct legal persons who joined and operated this broader association-in-fact enterprise to achieve its unlawful purposes.

162. The Enterprise operates with Toyota corporate setting fraud parameters including what safety defects to conceal and what performance claims to make.

163. TMC, acting as the ringleader, established the enterprise's fraudulent hierarchy by issuing top-down directives through TMNA and TMS and monitoring compliance via quarterly "Hydrogen Program Coordination Calls."

164. On November 17, 2014, TMC publicly launched the Mirai, with Akio Toyoda declaring hydrogen "the future of mobility" and claiming sub-five-minute refueling. The announcement established a global narrative of reliability, and gasoline-like convenience that TMS and dealers operationalized in California marketing and sales scripts.

**CLASS ACTION COMPLAINT**

165.    On September 14, 2018, TMC announced participation in the Port of Los Angeles Zero-Emission project with Shell and California partners, confirming TMC's direct role in California hydrogen infrastructure planning and execution, beyond mere oversight of subsidiaries.

166.    On March 13, 2025, TMC's press release at the Hydrogen & Fuel Cell Seminar described co-development with its North American Hydrogen HQ in Gardena, California, acknowledging centralized TMC direction over technology, infrastructure policy, and public messaging. These public statements link early infrastructure initiatives to later consumer marketing as a unified, continuous enterprise directed by TMC.

## CLASS ALLEGATIONS

167.    Plaintiffs bring this action on behalf of themselves, and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

The proposed class is defined as:

"*All persons in California who purchased or leased a Toyota Mirai (Model Years 2016–2025) within four years preceding this complaint's filing.*"

168.    The four-year statute of limitations for RICO claims runs from discovery of the injury. *Rotella v. Wood*, 528 U.S. 549, 553 (2000). The September 2025 contamination crisis, continued false marketing, and ongoing monthly billing fraud constitute new injuries restarting the limitations period under *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997).

169.    Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and the officers, directors, employees, affiliates, legal representatives, heirs, successors, and assigns of Defendant.

170.    The Class includes thousands of California consumers. Toyota has sold approximately 10,000 second-generation Mirai vehicles (model years 2021-2025) exclusively in California.

171. Excluded from the Class are: (a) Defendants, including any entity or division in which Defendants have a controlling interest, and their officers, directors, employees, agents, and attorneys; (b) the Judge to whom this case is assigned and the Judge's staff and immediate family; (c) governmental entities; and (d) all persons who timely elect to exclude themselves from the Class. Plaintiffs reserve the right to modify or amend the Class definition, including through the creation of sub-classes, as appropriate during the course of this litigation.

172. Numerosity: The Class includes approximately 15,000 second-generation Mirai purchasers (2021-2025) and approximately 5,000 first-generation purchasers (2016-2020) in California, totaling roughly 20,000 members whose identities are ascertainable through Toyota's VIN-specific sales databases and TMCC's financing records.

173. Common Evidence: All class members were exposed to identical misrepresentations through: (1) Toyota.com/mirai standardized content delivered through content delivery networks that logged each access; (2) EPA Monroney labels with fraudulent range ratings that Toyota obtained through manipulated testing; (3) dealer scripts distributed electronically to all California Toyota dealers with mandatory language about "5-minute refueling" and "expanding infrastructure"; and (4) TMCC's uniform billing practices using standardized forms and automated systems.

174. Objective Reliance: Reliance can be presumed on a class-wide basis because no reasonable consumer would pay $60,000+ for a vehicle knowing it: (1) could not be reliably refueled, (2) might explode from hydrogen leaks, (3) suffered from unintended acceleration, and (4) would depreciate 95% within two years. The materiality of Toyota's omissions establishes presumptive reliance.

175. Common Damages Methodology: Damages are calculable through common proof: (1) conjoint analysis showing the price premium attributable to "402-mile range" and "5-minute refueling" versus actual capabilities; (2) diminution in value measured by wholesale auction prices showing 95% depreciation; (3) credit damage

measurable through standardized FICO score impacts; and (4) financing costs calculable from TMCC's standardized interest rates.

176. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and published notice.

177. Commonality (Rule 23(a)(2)): Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. These common questions include:

    a. Whether the Mirai contains systematic safety defects including propulsion failures, acceleration anomalies, braking malfunctions, hydrogen leaks, and battery failures;

    b. Whether Toyota had knowledge of these defects through internal testing, telemetry, warranty data, and dealer reports, and when;

    c. Whether Toyota concealed known defects from consumers and regulators;

    d. Whether Toyota's representations regarding range were false and misleading;

    e. Whether Toyota manipulated EPA certification testing to obtain inflated range ratings;

    f. Whether Toyota's representations regarding "5-minute refueling like gasoline" were false;

    g. Whether Toyota's representations regarding "expanding infrastructure" were false;

    h. Whether Toyota had superior knowledge of infrastructure failures through its investments and control;

    i. Whether Toyota violated its TREAD Act reporting obligations;

    j. Whether Toyota violated its 2014 Deferred Prosecution Agreement obligations;

    k. Whether Toyota's conduct constitutes a pattern of racketeering activity under RICO;

**CLASS ACTION COMPLAINT**

l.  Whether Defendants operated an enterprise through mail and wire fraud;

m. Whether Toyota's conduct constitutes fraudulent concealment under California law;

n.  Whether TMCC's collection practices furthered the fraudulent scheme;

o.  The extent Class members suffered injury and damages;

p.  The proper measure of damages; and

q.  Whether injunctive relief is appropriate.

178.  Typicality (Rule 23(a)(3)): Plaintiffs' claims are typical of the claims of Class members because Plaintiffs and all Class members were injured through the same uniform misconduct described herein. Plaintiffs and all Class members purchased or leased the same model vehicles (Mirais) based on the same misrepresentations (mile range, 5-minute refueling, expanding infrastructure) from the same source (Toyota's centralized marketing), suffer the same defects (systematic safety and operational failures), and sustained similar damages (overpayment, diminished value, ongoing payments for unusable vehicles).

179.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all Class members.

180.  Adequacy (Rule 23(a)(4)): Plaintiffs will fairly and adequately protect the interests of Class members. Plaintiffs have retained counsel experienced in complex class actions, including automotive defect litigation. Plaintiffs' counsel has successfully prosecuted numerous class actions involving automotive defects, consumer fraud, and RICO violations.

181.  Neither Plaintiffs nor their counsel have any interests antagonistic to those of the Class.

182.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of Class members and have the financial resources to do so.

183.  Predominance: Common questions of law and fact predominate over any questions affecting only individual Class members. The central issues in this

- 35 -
**CLASS ACTION COMPLAINT**

litigation—whether Toyota knew of and concealed systematic defects, whether Toyota's representations were false, whether Toyota controlled and knew infrastructure was failing, whether Toyota violated federal reporting obligations—are common to all Class members and can be resolved on a class-wide basis. Individual issues, if any, are minor compared to the common issues and can be managed through case management procedures.

184.    Superiority: A class action is superior to other available methods for fairly and efficiently adjudicating this controversy. The damages suffered by individual Class members, while substantial, are insufficient to justify individual litigation against Defendants, which have vastly superior resources. Individual litigation would create the risk of inconsistent or contradictory judgments and would increase the delay and expense to all parties and the court system. By contrast, class treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, and without unnecessary duplication of effort and expense.

185.    Manageability: This case is well-suited for class treatment. Toyota's misconduct was uniform across all Class members, emanating from centralized corporate decisions and standardized marketing materials.

186.    Proof of Toyota's knowledge comes from corporate documents, telemetry data, and expert testimony applicable to all Class members.

187.    Damages can be calculated through common methodologies. Notice can be accomplished through Toyota's sales records and DMV data.

188.    There are no individual issues that would overwhelm the common questions or make class treatment unmanageable.

189.    Injunctive Relief (Rule 23(b)(2)): Toyota has acted or refused to act on grounds generally applicable to the Class, making final injunctive relief appropriate respecting the Class as a whole. Toyota continues to conceal known defects, violate reporting obligations, and sell defective vehicles with false claims. Without injunctive

relief, Class members will continue suffering harm from undisclosed defects, infrastructure failures, and financial coercion.

## FIRST COUNT

## (RICO, 18 U.S.C. §1962 (c))

190.   Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

191.   At all relevant times, Plaintiffs were persons within the meaning of U.S.C. § § 1961(3) and 1962(c).

192.   At all relevant times, each Defendant was and is a person within the meaning of 18 U.S.C. § §1961(3) and 1962(c).

193.   As detailed above, Defendants and their co-conspirators are a group of persons associated together in fact for the common purpose of advancing an ongoing criminal enterprise, specifically by submitting via mail and wire to EPA and NHTSA false and misleading information including inflated range certifications and omissions of required defect reports, and marketing on their website that the vehicle has a convenient just like gas 5 minute refueling process, each constituting predicate acts that enabled consumer fraud.

194.   The enterprise is an association-in-fact within 18 U.S.C. § 1961(4), consisting of Toyota Motor Sales, U.S.A., Inc. ("TMS"), Toyota Motor North America, Inc. ("TMNA"), Toyota Motor Credit Corporation ("TMCC"), authorized Toyota dealers including Longo Toyota, Toyota of Tustin, Toyota of Orange, and Toyota Santa Monica (collectively, the "Dealers"), and infrastructure partners including FirstElement Fuel, Inc. The Enterprise had a common purpose to increase Mirai sales and related financing revenue by concealing safety and refueling defects and by representing that hydrogen refueling was equivalent to gasoline, and it functioned as a continuing unit from at least 2016 to the present through coordinated marketing, financing, dealer practices, and infrastructure messaging. The Enterprise is distinct from each RICO Person.

**CLASS ACTION COMPLAINT**

195. The enterprise satisfies the distinctness requirement under *Boyle v. United States*, 556 U.S. 938, 946 (2009), having: (1) common purpose—concealing defects to sell vehicles; (2) ongoing organization—hierarchical structure from TMC to dealers; (3) continuing unit—operating continuously since 2014.

196. To establish a RICO claim under 18 U.S.C. § 1962(c), plaintiffs must prove: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima v. Imrex Co.*, 473 U.S. 479, 496 (1985). The Ninth Circuit requires the enterprise have 'an existence separate and apart from the pattern of activity in which it engages.' *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007). Here, each defendant's participation satisfies *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993), because they all participated in operation and management, not merely passive involvement.

197. Each RICO Person participated in the operation or management of the Enterprise: TMS authored and enforced uniform scripts and digital content (including "5-minute refueling like gasoline") and controlled dealer messaging and station-status communications; TMNA chaired decision-making meetings on infrastructure and approved the continuation of sales despite data showing widespread downtime and safety failures; TMCC implemented coordinated collection and credit-reporting tactics to extract payment on inoperable vehicles and deter consumer complaints; Dealers executed the scripts at point of sale and service, documented defect complaints as "customer perception," and refused remedies absent releases.

198. A specific instance of wire fraud was on April 12, 2025 as to Plaintiff Alvarez. Where on April 12, 2025, Plaintiff Alvarez viewed Toyota's webpage toyota.com/mirai displaying the statements "402-mile EPA-estimated range" and "5-minute refueling—just like gasoline." The page was published and controlled by TMS. As of that date, TMS possessed dealer/service telemetry and partner reports showing sustained station downtime exceeding 50% in Orange and Los Angeles Counties, average refueling times far exceeding five minutes, and known failure modes that

prevented full fills under typical ambient conditions. The statements were materially false and misleading when made. Alvarez relied on the statements in deciding to purchase her Mirai on May 18, 2025, resulting in monetary injury, including overpayment and subsequent expenses when the vehicle could not be fueled or used.

199.  Plaintiffs incorporate Exhibit M (a chart with detailed examples of predicate acts) by reference as though fully set forth herein. Exhibit M identifies representative acts of mail and wire fraud committed in furtherance of the Toyota Hydrogen Enterprise, including specific dates, senders, recipients, media of transmission, misrepresentations, falsity at the time made, reliance or exposure, and resulting injury. Each act constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).

200.  As detailed in Exhibit M, Defendants and their agents used the U.S. mails and interstate wires to transmit false statements concerning the Mirai's range, safety, fueling infrastructure, and financing obligations; to submit falsified range and emissions data to federal regulators; and to send billing statements, credit threats, and service directives that concealed known defects. These communications were material, intentional, and designed to induce Plaintiffs and Class members to purchase, finance, and continue paying for defective vehicles.

201.  The predicate acts set forth in Exhibit M are related and continuous: they involve common participants (Toyota Motor North America, Toyota Motor Sales, Toyota Motor Credit, authorized dealers, and infrastructure partners), common victims (Mirai purchasers and lessees), common purposes (concealing safety defects and sustaining sales), and common methods (interstate marketing, electronic submissions, and billing). The acts have occurred regularly from 2013 through the present, establishing both closed-ended and open-ended continuity and satisfying all elements of a pattern of racketeering activity.  This pattern satisfies *H.J. Inc. v. Northwestern Bell*, 492 U.S. 229, 239 (1989), showing both relationship and continuity.

202.   The predicate acts summarized in the chart are not exhaustive and are not isolated or historical; they form a continuing course of conduct that remains active today. Toyota's misrepresentations about the Mirai's range, refueling time, and reliability appear continuously and simultaneously on Toyota's corporate website (toyota.com/mirai), its official YouTube channel, and on each authorized dealership's websites through synchronized corporate content that replicates the same false promises. These statements remain live and publicly accessible as of the filing of this Complaint. Similarly, Toyota Motor Credit Corporation's billing, negative credit reporting, and repossession practices are not past events but ongoing, uniform financial coercion used to extract payments on inoperable vehicles, sustained over at least six consecutive years.

203.   The Enterprise's pattern of racketeering activity is therefore open-ended, poses a continuing threat of repetition by demonstrating that the same participants, methods, purposes, and victims persist without interruption into the present.

204.   Defendants and their co-consipirators are an association in fact enterprise as defined in 18 U.S.C. §1961 (4).  Each Defendant participated in the operation or management of the Enterprise.

205.   At all times alleged herein, the Enterprise was engaged in, and its activities affected, interstate commerce.

206.   The Enterprise is likely to continue to engage in racketeering activity in it efforts to continue to sell the Mirai.

207.   Each Defendant conducted or participated, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a "pattern of racketeering activity" as defined in 18 U.S.C. §1961(5).

208.   Plaintiffs incorporate by reference the attached Exhibit M, which identifies numerous (but not all) specific uses of interstate wire and mail communications advancing the Enterprise's scheme in violation of 18 U.S.C. § § 1341 and 1343.

**CLASS ACTION COMPLAINT**

209.   As a direct and proximate result of the Enterprise's pattern of racketeering activity in violation of 18 U.S.C. § 1962 (c), Plaintiffs have been damaged in their property in an amount to be determined at trial, including but not limited to by having to pay for inoperable vehicles due to fraudulent sales tactics by Defendants.

210.   Pursuant to 18 U.S.C. § 1964 (c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from Defendants.

## <u>SECOND COUNT</u>

## <u>(RICO, 18 U.S.C. §1962 (d))</u>

211.   Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

212.   Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. §1962 (c) as described above, in violation of 18 U.S.C. §1962(d).

213.   Defendants knew that they were engaged in a conspiracy to commit the predicate acts of mail and wire fraud, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.

214.   Each Defendant agreed to conduct or participate, directly or indirectly, in the conduct, management or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C 1962 (c).

215.   Each Defendant knew about and agreed to facilitate the Enterprise's scheme to submit fraudulent statements to state and federal agencies, fraudulent marketing material online, and fraudulent communications to consumers and omit critical safety and infrastructure failures to sell vehicles for prices no reasonable consumer would pay and no regulator would allow the sale of had all the information required been disclosed. It was part of the conspiracy that Defendants would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise including but not limited to the acts of racketeering set forth above and in Exhibit M.

**CLASS ACTION COMPLAINT**

216.   As a direct and proximate result of Defendants' conspiracy to violate 18 U.S.C. §1962 (d) and the overt acts taken in furtherance of that conspiracy, Plaintiffs have been damaged in an amount to be determined at trial, including but not limited to by having to pay inflated prices for worthless vehicles due to fraudulent statements submitted by Defendants.

217.   Pursuant to 18 U.S.C. §1964 (c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from Defendants.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

1. Certification of the Class;
2. For general, special, and consequential damages;
3. An award of treble damages of not less than $5,772,000,000, representing $96,200 in average actual damages per Class member (including fraud-induced purchase premiums, lost trade-in values, inflated DMV registration payments based on the inflated purchase price for the vehicle, forced insurance premiums based on inflated purchase prices and for paying insurance for a largely inoperable vehicle, future excess hydrogen costs, lost time, credit damages, and storage costs), trebled to $288,600 per member pursuant to 18 U.S.C. § 1964(c), multiplied by 20,000 Class members, or such greater amount as may be proven at trial, together with pre- and post-judgment interest, costs, and reasonable attorneys' fees
4. For attorneys' fees and costs;
5. An order compelling Toyota to buy back the Mirai
6. For injunctive relief requiring Toyota to: (a) cease selling Mirai vehicles until safety defects are remedied; (b) implement corrective advertising regarding hydrogen infrastructure; and (c) establish independent monitoring of safety

reporting compliance (d) prohibiting new TMC sales in California until compliance with (a)-(c) is verified.

7. For such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

**Plaintiffs** hereby request a trial by jury on all causes of action so triable.


Dated:  October 7, 2025                    INGBER LAW GROUP

                                           */s/ Jason M. Ingber*
                                           Jason M. Ingber, Esq.
                                           Attorney for Plaintiff

# EXHIBIT A

# DECLARATION OF AMINAH KAMRAN

I, AMINAH KAMRAN, declare as follows:

1.      I am over 18 years of age and competent to make this declaration. I have personal knowledge of the facts stated herein, and if called as a witness, I could and would testify competently thereto.

2.      On June 11, 2021, I purchased a new 2021 Toyota Mirai, VIN: JTDAAAAA9MA002506, from Longo Toyota in El Monte, California for approximately $60,000. I financed the vehicle through Toyota Motor Credit Corporation with monthly payments of $549.67 for 72 months.

3.      Prior to this purchase there was a buzz about this car among my friends and neighbors and co-workers, as there was immense advertising for the car on TV and other campaigns and the rebates and incentives Toyota was offering to induce people to buy this car were being well publicized by Toyota.

4.      I had viewed some advertisements and had done my own research by checking the Toyota corporate website (Toyota.com) within about a week before purchasing the Mirai to see if the rebates I saw advertised (like the free fuel card and mileage range over 400 to the tank, and manufacturer's rebate) and I saw only information that touted the benefits of the Mirai and implied that this was truly a great deal that was being offered for a luxury car backed by Toyota's brand and reputation for safety.

5.      I have been a loyal Toyota customer for years before this, having had positive experiences with the brand and their reliable resale values. Based on this trust in the Toyota brand, I was receptive to their marketing of this new hydrogen fuel cell vehicle.

6.      Toyota's sales representatives, especially the "New Car Sales" representiavie working for Longo Toyota that communicated with me and directly sold me my Mirai, "Ash Sheikh" actively echoed the advertisements I had seen and elaborated further on the benefits to this vehicle to me, representing that it was:

   o   Energy-efficient and environmentally friendly

   o   The "future" of automotive technology

   o   An opportunity to "be the first one in" on new thriving technology

   o   Supported by an expanding hydrogen infrastructure with "many stations in the works" that were "already approved"

   o   Capable of achieving 409 miles per full tank

- 1 -

Doc ID: cfd54650d53862440d5f7a9026516eac19f1a9b8

7.     I purchased this vehicle with the genuine intention of helping the environment and believed I was investing in proven, future-ready technology backed by Toyota's reputation and that I would for sure get the 400 plus mileage range promised in all their ad campaigns and augmented by Ash Sheikh's representations to me.

8.     Toyota provided incentives including a $15,000 fuel card for hydrogen purchases and tax rebates to further encourage the purchase.

## II. VEHICLE PERFORMANCE FAILURES

9.     From the outset, the vehicle failed to meet Toyota's representations.

10.     Despite being promised 409 miles per full tank by the dealership, I consistently achieved only around 250 miles maximum per fill during the first two years of ownership with the amount of mileage achieved proving slightly worse over time.

11.     The cost of hydrogen fuel increased dramatically (from approximately $13 per fill when I first purchased the vehicle to $36 per fill) making the vehicle increasingly expensive to operate.

12.     Finding available hydrogen fuel stations proved to be a constant and scary struggle, contrary to Toyota's representations about infrastructure availability.

13.     Although I no longer have the vehicle after four years of ownership, I still had funds remaining on the original $15,000 fuel card, which demonstrates how infrequently I was able to use the vehicle due to mechanical problems and infrastructure limitations.

14.     Indeed very often I would rely on either the website Toyota's Ash Sheikh mentioned I should rely on to learn where fuel was or the car's navigation app itself and I would arrive to a station only for it to be shutdown without explanation or notice or indication of when it may be back up and running.

## III. CATASTROPHIC SAFETY INCIDENT

15.     As detailed below, this car was riddled with safety defects, but the most serious incident occurred when the vehicle suffered a complete system failure while I was driving alone on Interstate 5.  I had taken a lunch break from work and was driving one exit down the highway when suddenly without any warning, the car would not accelerate while I was in the middle of four lanes of freeway traffic.

- 2 -

Doc ID: cfd54650d53862440d5f7a9026516eac19f1a9b8

16.     I panicked and hit the emergency button, desperately trying to maneuver the disabled vehicle to the shoulder of the freeway. This created an extremely dangerous and life-threatening situation for myself and other motorists.

17.     Once I reached the shoulder, I attempted to restart the vehicle by turning it off and on, but it only responded with beeping sounds and various error messages stating "Take me to a dealer" and "system failure."

18.     I called two different Toyota dealerships for assistance. One agreed to send a tow truck, and it took over two hours for help to arrive, leaving me stranded on the freeway shoulder with traffic whizzing by and highway patrol stopping me to try to get me to move the car; it was very stressful.

19.     When the vehicle was towed to the dealership and they attempted to start it, the service technician asked if I had heard any "cooking sound" during the failure. When I said no, he found it "interesting" because when they turned the vehicle on, there was a "huge boom" sound, which caused me additional panic and concern about what could have happened while I was driving.

### IV. VEHICLE DEFECTS AND MECHANICAL FAILURES

20.     Since purchasing the vehicle, it experienced numerous and repeated mechanical failures, particularly with the fuel cell system, the propulsion system of the vehicle.

21.     In addition to the freeway shutdown described above, my Mirai repeatedly displayed serious Fuel Cell (FC) System Warnings on its onboard screen. For example, the "Vehicle Alert History" screen documented multiple events, including "FC System Warning 1" and "FC System Warning 2" on September 27, 2024 at 10:00 AM and 3:11 PM, and again on November 8, 2024 at 3:07 PM. These warnings demonstrate recurring failures in the fuel cell system even after repeated repairs. A true and correct image of my vehicle's alert history is attached.

22.     On September 27, 2024, the vehicle shut off completely and was towed to Toyota of Orange, where it was diagnosed with fuel cell system and propulsion failures. The dealer's repair order (Invoice C92093, dated November 20, 2024) states: *"Vehicle shut off, steering wheel locked up, cannot move, and FCV malfunction lights are on. Internal failure of fuel cell air compressor causing HV battery low voltage failure. HV battery state of charge at 0.0% and unable to ready on."*

23.     The repair order further notes that the air compressor gear nut separated, causing poor air flow and depletion of the HV battery, and that even after multiple resets, "DTCs returned and unable to ready on." A true and correct copy of this invoice is attached.

Doc ID: cfd54650d53862440d5f7a9026516eac19f1a9b8

24.     The vehicle has required major repairs including replacement of fuel cell components covered under an 8-year/100,000-mile warranty. The repair invoices show replacement of critical components including:

- Fuel Cell Air Compressor Assembly
- Fuel Cell Stack Coolant
- HEV Battery Assembly
- Various fuel cell electronic control units

25.     These repairs were performed at Toyota of Orange and other authorized Toyota service centers, with costs exceeding several thousand dollars.

## V. EXTENDED REPAIR PERIOD

26.     Initially, the dealership thought the problem was a single part, but then determined the battery needed replacement and had to be ordered.

27.     The repair process took two months to complete, during which time I was without the vehicle I was making monthly payments on.

28.     Honestly, I did not want to pick up the vehicle after this experience, but the dealership threatened to charge me storage fees if I did not retrieve it.

29.     As reflected in Toyota of Orange's records, the vehicle was at the dealership from late September until late November 2024—nearly two months out of service—while waiting for parts and major fuel cell repairs. During this time, I was left without use of the vehicle while continuing to make monthly loan payments of $549.67.

## VI. HYDROGEN INFRASTRUCTURE DECEPTION

30.     As mentioned before purchasing the vehicle, Toyota provided me with links and websites showing the online status of hydrogen stations. They assured me it would be easy to fuel the vehicle.

31.     Toyota's representations about hydrogen infrastructure expansion were false. The promised stations were never built, and the existing infrastructure remained inadequate and unreliable and decreased rapidly.

32.     I am currently relocating from Anaheim, California to 1584 Scarlet Sage Drive, Perris, CA 92571, with the move scheduled for April 1, 2025.

Doc ID: cfd54650d53862440d5f7a9026516eac19f1a9b8

33.     Upon researching hydrogen fueling stations near my new residence, I discovered there are no hydrogen stations in the Perris area. The closest station appears to be approximately 40 miles away in Riverside, making the vehicle essentially unusable for daily transportation needs.

### VII. TOTAL LOSS DUE TO PARTS AVAILABILITY

34.     The vehicle was eventually involved in a rear-end collision that damaged only the rear bumper.

35.     However, because the vehicle was a Mirai and the parts had to be specially reconfigured or imported from Japan, the insurance company declared it a total loss rather than repair what should have been minor damage.

36.     The vehicle was declared a total loss by GEICO General Insurance Company (Policy Number: 4560378681) as of May 29, 2025.

### VIII. FINANCIAL IMPACT

37.     I have made consistent monthly payments of $549.67 since purchasing the vehicle, as evidenced by Toyota Financial Services payment history showing payments from July 2021 through February 2025.

38.     I purchased premium insurance coverage through Toyota to avoid out-of-pocket repair costs, which was included in my purchase price.

39.     The vehicle currently has approximately 34,000 miles on the odometer.

40.     The total investment in this vehicle was approximately $60,000, representing a significant financial burden for what proved to be an unreliable and ultimately unusable vehicle.

### IX. LEMON LAW PROCEEDINGS

41.     Due to the ongoing mechanical problems and safety concerns, I filed a Lemon Law claim with Toyota Motor Sales, U.S.A., Inc., assigned case number 241018000632.

42.     On November 25, 2024, Toyota, through Daniel Spencer, Customer First Field Analyst, sent me a letter stating that Toyota "would like to offer to repurchase [my] vehicle in accordance with the applicable Lemon Law."

- 5 -

Doc ID: cfd54650d53862440d5f7a9026516eac19f1a9b8

43.    The letter requested that I provide copies of my Buyers Order/Sales Contract, Finance Agreement, payment history, lienholder payoff letter, and current registration before Toyota would process the buyback.

44.    Despite Toyota's acknowledgment of liability and agreement to repurchase, Toyota failed to complete the transaction in good faith. Instead of clear instructions and a smooth process, Toyota created unnecessary obstacles by demanding multiple documents and communicating from "do not reply" email addresses, making it impossible for me to respond directly.

45.    On February 6, 2025, Toyota sent me another letter claiming I had not responded to its November 25, 2024 repurchase offer.

46.    The letter again requested documents and imposed a unilateral deadline of January 16, 2025—retroactively—threatening to close my case if I did not comply. The letter stated that if I accepted, a Sedgwick representative would schedule the surrender transaction, but no such transaction was ever scheduled.

47.    These letters show Toyota first admitted my vehicle qualified as a Lemon, but then failed to act in good faith to complete the buyback. The company has been inconsistent, imposed arbitrary deadlines, and has communicated directly with me despite knowing I was represented by counsel.

## X. DAMAGES AND EMOTIONAL DISTRESS

48.    This vehicle has been a complete disaster and has caused me significant emotional distress, including:

- o    Fear for my safety due to the unexpected shutdown on the freeway
- o    Anxiety about driving the vehicle due to its unreliability
- o    Frustration with Toyota's deceptive marketing and poor customer service
- o    Financial stress from making payments on a defective vehicle
- o    Feeling deceived and used as a test dummy for an incomplete technology

49.    Rather than purchasing the reliable, environmentally-friendly vehicle I was promised, I feel I was sold an expensive science project that was not properly planned or tested.

50.    The vehicle has been "worse than useless" to me, as it cannot be reliably used for transportation and is now completely unusable due to geographic limitations and the total loss designation.

51.    I have been forced to continue making monthly payments on a vehicle that proved to be unreliable, unsafe, and ultimately a total loss.

- 6 -

Doc ID: cfd54650d53862440d5f7a9026516eac19f1a9b8

52.     This experience has been horrible and represents a complete failure of Toyota's representations and promises about this vehicle and the supporting infrastructure.

## XI. REQUEST FOR RELIEF

53.     I am seeking a complete buyback of the vehicle under California's Lemon Law, including:

- o   Refund of all payments made
- o   Reimbursement of incidental expenses
- o   Relief from the remaining loan obligation
- o   Compensation for the emotional distress and inconvenience caused

54.     I request that Toyota expedite this buyback process and provide fair compensation for what has been a thoroughly disappointing and dangerous experience with their defective product.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on this 15th day of September, 2025.

**AMINAH KAMRAN**

Doc ID: cfd54650d53862440d5f7a9026516eac19f1a9b8

**✘ Dropbox** Sign

Audit trail

| | |
|---|---|
| **Title** | Enhanced Mirai Declaration Aminah Kamran |
| **File name** | Aminah_Kamran_Declaration.pdf |
| **Document ID** | cfd54650d53862440d5f7a9026516eac19f1a9b8 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document history

| | | |
|---|---|---|
| **SENT** | **09 / 15 / 2025** <br> 23:58:07 UTC | Sent for signature to Aminah Kamran (aminah.kamran@gmail.com) from ji@jasoningber.com <br> IP: 74.71.76.95 |
| **VIEWED** | **09 / 18 / 2025** <br> 00:51:27 UTC | Viewed by Aminah Kamran (aminah.kamran@gmail.com) <br> IP: 172.56.181.250 |
| **SIGNED** | **09 / 19 / 2025** <br> 00:00:28 UTC | Signed by Aminah Kamran (aminah.kamran@gmail.com) <br> IP: 172.56.178.177 |
| **COMPLETED** | **09 / 19 / 2025** <br> 00:00:28 UTC | The document has been completed. |

# EXHIBIT B

### DECLARATION OF DEBORAH ALVAREZ

1.      I, Deborah Alvarez, declare under penalty of perjury under the laws of the United States that the following is true and correct: I am over 18 years of age and competent to testify to the matters set forth herein. I have personal knowledge of the facts stated in this declaration.

2.      I reside in Rancho Santa Margarita, County of Orange, CA 92688.

3.      I needed to refinance or trade my existing vehicle (a 2020 Toyota Corolla that I had purchased through a Hyundai dealership) to lower my monthly payments for my vehicle and I was fearful my credit score was too low for refinancing.

4.      In early May I had seen some ads that drove me to look up on Toyota's website about a vehicle they were advertising called the Mirai and on Toyota's website I saw they advertised the vehicle had mile range for 402 miles and free fuel.  I was intrigued.

5.      I visited the Toyota of Orange dealership on May 18, 2025, and the sales agent Adrian promised me he could assure excellent financing on this Toyota hydrogen vehicle, and I ought to trade my Toyota Corolla in for a certified preowned hydrogen powered vehicle as he promised he could get me lower monthly payments, and a free fuel card.  This sounded perfect.

6.      This salesperson Adrian, made numerous other promises that induced me to purchase the Mirai, including that, "I would not have any problems with the vehicle because fueling is easy and there are great fueling options nearby" and "Toyota itself is building and guaranteeing more hydrogen stations quickly in California and in other states", that it "has a driving range of 400 miles per tank" and "Toyota offers 21-day car rental benefits for Mirai owners" and "rental companies provided discounts to Mirai drivers", and "even if I didn't like that if I wanted to trade the vehicle in later, I could do so without any loss because it was a Toyota."  He also added that "this vehicle is great for the environment so it's really the best deal in the world."

7.      Adrian specifically addressed my concern about potentially driving far or moving and any other issues I might experience by assuring me that Toyota would stand behind the 21-day rental free promise and so I could be sure if there were ever issues, I could easily get a free rental and that would solve any hydrogen infrastructure problems I might encounter in other areas.

8.      So I entered a retail installment sale contract with Oremor of Tustin, LLC for a used 2022 Toyota Mirai, VIN: JTDAAAAA3NA007296, with 24,660 miles on the odometer.

9.      I did not drive the vehicle home until the next day, May 19, 2025.

10.     On my first attempt to refuel the vehicle, I encountered three station failures where the True Zero station I first visited was out of service, the next Iwatani station many miles away was

- 1 -

Doc ID: 8c60530f3303563bffd5c1b47f490c23ef53327c

reported by staff to never work and was indeed offline, and so now running on close to empty I was forced to drive across the county to Fountain Valley to find a functioning station.

11.     The vehicle's actual range performance was initially around 230 miles to full tank and has deteriorated dramatically since purchase.

12.     The 230 initial mile range per fill is not speculative as when I fill up the car at a fuel station up with 5 kilograms of fuel and go back and turn on my vehicle the dashboard would redisplay 230 miles left on average.  I never even achieved 300 miles on a full fill.

13.     As of September 2025, the vehicle now achieves only approximately 170 miles per fill-up.

14.     This severe range degradation means I must refuel the vehicle approximately every other day, requiring me to drive around 15 miles to the nearest hydrogen station in Orange, California.

15.     The promised three-year fuel card benefit is meaningless because the card is set to exhaust shortly due to required excessive frequent fueling and cost of filling up 5 kilograms which reaches nearly 200 dollars.

16.     In less than a month of owning the vehicle, on June 12, 2025, the vehicle's battery terminated parked at a store. The vehicle would not start, and when AAA arrived, the battery would not jump or charge, leaving me stranded.

17.     The AAA service technician C. Pacheco had performed diagnostic testing with some hardware and determined the battery had a BAD CELL requiring complete replacement. This is documented in AAA Invoice #2421 dated June 12, 2025, 9:41:15 PM, for my 2022 Toyota Mirai, VIN: JTDAAAAA3NA007296.

18.     I was forced to pay $270.88 for emergency battery replacement on a vehicle that was less than one month old with no reasonable explanation as to why the vehicle required a new battery.

19.     The more concerning issue is the vehicle suffers from dangerous braking system defects that create life-threatening safety hazards.

20.     The braking system requires me to press very hard on the brake pedal to get the car to stop.

21.     Separately when I attempt to brake, and the vehicle's response to my pressing on the brake is to jerk or lurch the vehicle forward momentarily before stopping, requiring me to double-press the brake pedal and apply excessive force on the second press to achieve safe stopping.

22.     This creates a significant safety hazard where I could hit the car in front of me and have been forced to swerve slightly to avoid collisions.

23.     Even more dangerously, the vehicle's automatic braking system activates without warning when no braking is needed, causing sudden, powerful stops that create collision risks.

Doc ID: 8c60530f3303563bffd5c1b47f490c23ef53327c

24.     This system activates when other vehicles pass nearby, even when they pose no collision threat, causing the vehicle to brake hard with red warning lights appearing on the dashboard displaying BRAKE.

25.     These unexpected unresponsive-braking and unintended sensor-braking events occur frequently and have nearly caused accidents.

26.     Most recently, on September 17, 2025, around 6:00 PM, while leaving the gas station on Tustin Avenue in Orange and attempting to make a left turn onto Main Street, the automatic braking system engaged when a passing car triggered the sensors, causing a sudden, powerful stop in the middle of my turn.

27.     The unexpected braking left me briefly stopped and stranded in the intersection, creating a dangerous situation where oncoming traffic could have struck my vehicle.

28.     These automatic braking incidents have occurred multiple times, with approximately three occasions causing significant safety scares in the moment.

29.     As mentioned, from day one and in multiple respects, the hydrogen fuel infrastructure is unreliable and inadequate, with stations frequently showing operational on mobile apps, the in-car systems and the h2fcp.org website when they are out of service.

30.     The apps including the in-car app incorrectly report station status, showing 9 out of 26 pumps online but in reality more stations are nonoperational, making it impossible to rely on the technology to locate fuel.

31.     True Zero customer service does not answer phone calls, leaving me and other customers stranded at stations with no way to verify station status or get assistance when a station fails.

32.     The hydrogen fuel pumps themselves present additional safety hazards and operational problems.

33.     I must pour water on the fuel dispenser or use towels to warm it up to release the frozen nozzle or I could be stuck for close to an hour. This is because the fuel nozzles freezes onto the vehicle's fuel connection approximately 8 out of 10 times I fill. This freezing effect makes the nozzle extremely difficult to remove and typically requires 10 minutes of effort to disconnect.

34.     I have waited for a nozzle to unfreeze once approximately 45 minutes during one of my first few fueling attempts before I learned techniques to address the problem.

35.     People often try to help me, which is embarrassing.

36.     I have a fused neck, which creates additional challenges when using hydrogen fuel pumps and attempting to disconnect frozen nozzles. The physical struggle required to remove stuck fuel

- 3 -

Doc ID: 8c60530f3303563bffd5c1b47f490c23ef53327c

connections has caused me to experience neck spasms, exacerbating my existing medical condition. These fuel nozzles freezes create dangerous situations as I'm unsure how long I'll be stuck at the pump (at night or alone) and unable to safely disconnect from the fuel pump.

37.    When I attempted to use the promised 21-day rental car benefit that was a key factor in my purchase decision, I was told that this benefit was not available for certified pre-owned vehicles over my phone attempts to obtain a rental vehicle or rental assistance, despite Adrian's specific assurances that this benefit applied to my purchase.

38.    The salesperson deliberately withheld material information about the limitations and problems with hydrogen infrastructure and promised the fueling was only convenient and reliable.

39.    The vehicle has depreciated by over 90% of its value since purchase as online third-hand Toyota Mirais with mileage over 25,000 sell for less than $2,000; representing a catastrophic financial loss that I would never have accepted had I been given accurate information about the vehicle's limitations and problems.

40.    The salesperson promised that if I was unsatisfied with the vehicle, I could trade it in without significant financial loss, which has proven to be false.

41.    I'm forced to spend excessive time and money searching for functioning hydrogen fuel stations, requiring long drives to distant locations, imposing unique costs and hardship.

42.    The combination of the vehicle's reduced range and my need to avoid running too low on fuel due to station unreliability means I must plan all trips around fueling availability, severely restricting my mobility and independence.

43.    Toyota continues to market and sell Mirai vehicles to unsuspecting consumers using the same misrepresentations I received, including false claims about fuel range, infrastructure reliability, and customer benefits.

44.    The vehicle braking defects, station failures, unexpected dead battery, and deceptive sales practices cause me significant financial harm, inconvenience, worsens over time.

45.    The infrastructure collapse and mileage decrease continues to escalate.

Doc ID: 8c60530f3303563bffd5c1b47f490c23ef53327c

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct..

Executed on this 19th day of September, 2025.



**DEBORAH ALVAREZ**

- 5 -

**✖ Dropbox** Sign

Audit trail

| | |
|---|---|
| **Title** | Enhanced Declaration |
| **File name** | Debbi_A_declaration.pdf |
| **Document ID** | 8c60530f3303563bffd5c1b47f490c23ef53327c |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document history

| | | |
|---|---|---|
| ↗ **SENT** | **09 / 20 / 2025** 04:59:23 UTC | Sent for signature to Deborah Ann Alvarez (msdebbiealvarez@gmail.com) from ji@jasoningber.com IP: 74.71.76.95 |
| 👁 **VIEWED** | **09 / 20 / 2025** 09:56:59 UTC | Viewed by Deborah Ann Alvarez (msdebbiealvarez@gmail.com) IP: 68.111.71.76 |
| ✒ **SIGNED** | **09 / 20 / 2025** 09:57:41 UTC | Signed by Deborah Ann Alvarez (msdebbiealvarez@gmail.com) IP: 68.111.71.76 |
| ⊘ **COMPLETED** | **09 / 20 / 2025** 09:57:41 UTC | The document has been completed. |

# EXHIBIT C

### DECLARATION OF DENNIS EATON

I, Dennis Eaton, declare as follows:

1.     I am over 18 years of age and competent to make this declaration. I make this declaration based on personal knowledge unless otherwise stated, and if called as a witness, I could and would testify.

2.     I am the former owner of a first generation 2019 Toyota Mirai (Vehicle Identification Number JTDBVRBD2KA007253) which my wife Angela and I purchased from Toyota Tustin in Orange County, California in September of 2022.

3.     The salesperson was Adam Parada. Mr. Parada is still employed at the dealership according to my recent confirmation.

4.     At the time of purchase, we resided at 44 Colorado, Rancho Santa Margarita, California and I served as a vice president for the company Verse.ai.

5.     I have extensive experience as Vice President of Customer Care Operations where I run call contact centers. This professional background gives me particular expertise in customer service standards, tracking complaint volumes, and recognizing when representatives are acknowledging widespread issues. I understand the critical importance of accurate business representations.

6.     While my wife and I were on the fence deciding between purchasing a Mirai and a Camry, an older sales manager came over to close the deal. He had a hydrogen pump on display at the dealership and gave us "the whole spiel" about the car being amazing with free fuel.

7.     He specifically represented that he personally drove a Mirai, loved the vehicle, and assured us there would be "zero problems" with fueling.

8.     These representations were critical in swaying our decision away from the Camry.

9.     The sales manager explicitly told us a hydrogen fueling station was located "right by our house" and that fueling would be as convenient as "pumping gas." He assured us that as long as stations were within a certain mile range, distance wouldn't matter.

10.    This representation was material to our decision, as convenient fueling was essential for our daily 50-75 mile driving needs. The dealership specifically promised us 14 days of rental car coverage as part of our purchase agreement. We were specific that we needed this benefit to travel to Utah to visit our children.

11.    Both Adam Parada and the sales manager assured us this rental coverage was included in our purchase.

- 1 -

Doc ID: c1f969052b8ea857843698fa01805c1a977d3903

12.     Approximately three months after purchasing the vehicle, the hydrogen station near our home (the one the sales manager had specifically referenced) was permanently shut down. We were then forced to drive across town to access another station, losing approximately 25 miles of range just traveling to and from fueling, significantly impacting the vehicle's already limited range.

13.     On one occasion, the hydrogen fueling nozzle became stuck on our vehicle, leaving us stranded for over two hours until a technician could arrive to release it. This was far from the simple "pumping gas" experience we were promised. The fueling process proved frustrating and time-consuming.

14.     When we attempted to use our promised rental car benefit to travel to Utah, Toyota denied our request, claiming we "didn't qualify" despite their explicit promises at the time of sale. This forced us to rent vehicles at our own expense for out-of-state trips, creating an additional financial burden.

15.      Both my wife Angela and I experienced multiple instances of unintended acceleration. The occurrence was intermittent and unpredictable, which made it even scarier because you don't know when it's going to do it.

16.     The car would unexpectedly accelerate or continue accelerating even after removing our foot from the pedal, requiring excessive brake force to control. My wife experienced a particularly terrifying incident at an intersection.

17.     While attempting a right-hand turn at a stoplight, the vehicle suddenly jolted and took off, almost launching into the intersection. She told me it "scared the **** out of me" and she thought the car "was going to drag [her] into the intersection."

18.     This near-accident made her extremely wary of driving the vehicle. I personally experienced this acceleration issue multiple times while driving.

19.     When I would put my foot on the accelerator pedal and the car would start to go, then when I'd let off to apply the brakes, the car would keep going at the same speed.

20.     For example, when traveling at 55 mph and releasing the accelerator, the vehicle would continue at 55 mph rather than naturally dropping to 50 or 45 mph as expected. You had to "push the brake harder" to force deceleration—the car wasn't decelerating when you're braking, it was still going.

21.     With my 35+ years of driving experience across various vehicles—BMWs, Mercedes, Porsche, and now a Tesla—I've never had a car behave this way before.

- 2 -

Doc ID: c1f969052b8ea857843698fa01805c1a977d3903

22.     In any normal vehicle, whether electric, gas, or hybrid, when you let your foot off the accelerator and go to apply the brakes, the car starts to slow down.

23.     The Mirai's failure to decelerate created a constant, unpredictable safety hazard. Based on my observations, I believe there's a buildup of hydrogen when you're accelerating that builds up in the system. When you let off the pedal, hydrogen is "still feeding it" either sitting "in a reservoir or still flowing into the engine" making it accelerate even though "you're not feeding it anymore."

24.     The car wasn't "cutting off the fuel source."

25.     Only once "the hydrogen dissipates" or "clears through" would the vehicle then start to decelerate.

26.     The vehicle exhibited other alarming behaviors: the hydrogen tank would make loud banging noises during operation, like something was in there making noise particularly concerning given this is a high-pressure hydrogen system. We didn't know if it was "hydrogen heating up or cooling down" but these sounds were particularly concerning given the high-pressure hydrogen system.

27.     Additionally, the seat heaters would automatically turn on to HIGH setting without any input, creating both a dangerous distraction and physical discomfort while driving.

28.     I first mentioned these issues to Toyota when I was fighting with them about the denied rental car benefit. During that conversation, I told them we had noticed unexpected acceleration and that sometimes when we'd be driving it the tank would just make really loud banging noises.

29.     They dismissed these concerns.

30.     On July 11, 2025, we drove to Toyota Tustin specifically to address these safety issues. We asked if we could "work together" and if there was "any way we could trade it in and get a Camry" or "something else that wouldn't have the acceleration issues that Angela was experiencing."

31.     I met with both management and Adam Parada, the salesperson who sold us the car. I told them everything you and the sales manager told me about fueling and everything is wrong.

32.     I detailed the sudden acceleration that scared my wife at the intersection and me generally, and explained we just can't drive this thing anymore, and expressed our serious safety concerns.

33.     Their response was callous and purely financial. They said we could trade it but were "so far upside down" on the loan—approximately $15,000—that we'd have to "give us like 10-15,000 just to get out of the car."

34.     When I pressed about the safety issues, the manager "basically had nothing to say"—he didn't care.

Doc ID: c1f969052b8ea857843698fa01805c1a977d3903

35.    They simply said "sorry we can't help you" and "weren't gonna help us" despite the dangerous defects we reported.

36.    I called Toyota Customer Care multiple times to report these issues over the time we owned the vehicle.

37.    Drawing on my professional experience running call centers, I specifically asked the representative about call volumes for this vehicle.

38.    She explicitly told me "something's going on with this, I am getting a lot of calls on this Mirai" and that a high volume of complaints were "starting to come in" and she's getting "a lot of concerns" about this vehicle.

39.    Despite knowing about these defects, Toyota continues to aggressively market these vehicles. When you pull into a dealership, they have them right up front; they're trying to move them.

40.    The sales tactics remain unchanged, with sales managers still making the same false promises about infrastructure and safety that were made to us.

41.    Due to our serious safety concerns—particularly after my wife's near-accident at the intersection—we prioritized our family's safety.

42.    When we moved to Utah in October 2024, we had to write a check for approximately $15,000 to pay off the vehicle.

43.    We then sold it to CarMax at a significant loss because of the safety issues.

44.    Additionally, there is zero hydrogen infrastructure in Utah making the vehicle completely unusable.

45.    We have since purchased a Tesla Model Y, which has operated with zero issues confirming that the dangerous defects were specific to the Toyota Mirai and not related to our driving habits or maintenance practices.

46.    Toyota knowingly sold vehicles with dangerous acceleration defects. They made clear material misrepresentations about hydrogen infrastructure availability, with the sales manager specifically lying about personally driving a Mirai and the location of fueling stations having zero problems. When confronted with legitimate safety concerns that could result in death, Toyota demonstrated callous indifference and forced us to absorb thousands of dollars in losses to escape their dangerous vehicle.

47.    My professional experience running call centers and customer operations makes clear that Toyota knew about these widespread issues.

- 4 -

Doc ID: c1f969052b8ea857843698fa01805c1a977d3903

48.     No family should have to pay $15,000 to escape a vehicle that could kill them, especially one sold through deliberate deception. I fully support all efforts to hold Toyota accountable for their knowing sale of defective vehicles and to obtain justice for all affected Mirai owners.

49.     I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on this 1st day of October, 2025.

**DENNIS EATON**

- 5 -

Doc ID: c1f969052b8ea857843698fa01805c1a977d3903

**Dropbox Sign**

Audit trail

| | |
|---|---|
| **Title** | Dennis Eaton revised Enhanced Declaration - Mirai 1st... |
| **File name** | Dennis_Eaton_Decl..._FINAL_final.docx |
| **Document ID** | c1f969052b8ea857843698fa01805c1a977d3903 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document history

| | | |
|---|---|---|
| **SENT** | **10 / 01 / 2025** 19:59:32 UTC | Sent for signature to Dennis Eaton (dennis.eaton@verse.io) from ji@jasoningber.com IP: 74.71.76.95 |
| **VIEWED** | **10 / 01 / 2025** 20:37:25 UTC | Viewed by Dennis Eaton (dennis.eaton@verse.io) IP: 66.35.27.114 |
| **SIGNED** | **10 / 01 / 2025** 20:38:23 UTC | Signed by Dennis Eaton (dennis.eaton@verse.io) IP: 66.35.27.114 |
| **COMPLETED** | **10 / 01 / 2025** 20:38:23 UTC | The document has been completed. |

Powered by **Dropbox Sign**

# EXHIBIT D

## DECLARATION OF MICHAEL G. DRAY, ESQ.

1.    My name is Michael Gerard Dray, and I submit the following to be true under penalty of perjury per the laws of California based on my personal knowledge and observations as a public employee.

2.    I have roots in new energy technology.  For 12 years I operated an experimental waste to energy conversion plant for the City of Columbus Refuse and Coal Fired Municipal Electric plant.  I served as a 1st class steam operating engineer in Ohio, which permits me to operate any powerplant in Ohio that produces non-nuclear energy.

3.    I have a Bachelor's Degree from Capital University in Columbus, Ohio with a major in political science and minor in chemistry which I earned in 1992; and I earned my Juris Doctor from Capital University Law School in 1999 and I became a member of the Ohio state bar in 1999.

4.    I practiced law as a solo general practitioner in Ohio for six years.  My work included a variety of family, criminal, labor and employment and contract formation.

5.    My wife is a biochemist and she was offered a job as a professor and in Cal Poly San Luis Obispo, which she accepted.

6.    We moved to California in 2007.  While studying for the California bar exam in San Luis Opsbo I held a job with Aerotech Engineering which fabricated drones.  I passed the California bar and earned admission to practice throughout state and federal courts in California.

7.    My wife soon thereafter received a job offer from Cal State Los Angeles in a management and hiring at the University, and she accepted, so we moved to Pasadena/Los Angeles where we have lived since.

8.    For the next two years, I worked for the oil company Conoco Phillips in their Long Beach office for real estate, property tax, right of way, and claims department.

- 1 -
**DECLARATION OF MICHAEL G. DRAY, ESQ.**

9.      Around this time, I became aware through my wife that the University was having trouble getting their hydrogen station to be operational and that they were looking to hire someone to be the project manager for their hydrogen station.

10.     The University is publicly funded.

11.     The University received a two and a half million-dollar grant from the California Air and Resources Board to build a hydrogen station. The University spent its own funds and said grant to bring the station to fruition for a total of over $5 million.

12.     Additional philanthropic funds and other university funds were used to purchase the land and to fund this initiative. The University couldn't get the hydrogen station to work properly, because the pumps experienced unscheduled pulsations and vibrations. These pressure issues prevented the OEMs or auto-manufacturers from authorizing the University pumps. General Motors brought a prototype car for the University to test the pumps on and documented the inconsistent pressure.

13.     I applied for the job to fix the hydrogen station in late 2012 and was hired in March 2013 as the founding hydrogen station manager of operations and marketing.

14.     My official job title was: Technical Operations Manager College of Engineering Computer Science and Technology and Hydrogen Research and Fueling Station. I had a staff of about five technicians and employed 8-10 student engineers.

15.     My first order of business was to attend a national conference in Washington, D.C. for a Department of Energy Conference. I shared the issues at the University station with preeminent hydrogen industry leaders and I met with approximately six engineers at that conference, and they told me about their opinion on how to correct the hydrogen station. It was a unanimous consensus among the various experts that we needed to install a high-pressure buffer tank to fix the uneven pulsations occurring at each fueling event.

16.     After the Department of Energy conference, I returned to campus and put plans into place to procure said high-pressure buffer tanks and hire contract workers.

- 2 -
**DECLARATION OF MICHAEL G. DRAY, ESQ.**

17.     The general contractor who built the station was refusing to fix it even though his original drawings included a buffer tank; at this point the station was two to three years behind schedule.

18.     The tanks were eventually purchased and flown from Vienna, Austria. At an expensive $20,000 shipping cost and over $100,000 to install.

19.     It took me one year to turn the University's land and existing infrastructure into an operational hydrogen station.

20.     The installation of the buffer tanks was successful; it completely eliminated the pulsation issues that the OEMs had expressed concerns about.

21.     General Motors returned to the University and confirmed that the pulsation issue was fixed.

22.     Next, General Motors raised another issue, which was a fire safety issue: under the fire codes, specifically the NFPA (National Fire Protection Act) hydrogen technology fueling fire code number 52, during a fueling with hydrogen, the process must be paused periodically to monitor pressure loss in the lines going into the cars because any such pressure loss indicates there's a leak in the lines, and this is a testing requirement from the from the State Fire Marshall.

23.     It took us a year to fix this problem. Throughout this time General Motors would send vehicle prototypes for us to test our station.

24.     I recognized that this needed to be addressed and would require reprogramming of the hydrogen dispenser, so I sought out and received a waiver from the California State Fire Marshall, whereby the Fire Marshall visited the station and we discussed the issues and they agreed that the University would be allowed to fuel cars notwithstanding this deficiency if the station attendants performed the fueling for customers and we monitored for hydrogen leaks with a handheld hydrogen detector. This allowed me to negotiate out ability to be safe and protect against leaks.

- 3 -

**DECLARATION OF MICHAEL G. DRAY, ESQ.**

1   25.    Once the State Fire Marshall approved our temporary fix to handheld test

2   for Hydrogen leaks, Honda and Hyundai agreed to send some cars over to test the

3   station.

4   26.    Soon thereafter, Hyundai allowed their customers to fuel at the University

5   station and the University sent invoices to the OEMs which reimbursed the University.

6   27.    Throughout 2014, I personally sent these invoices monthly which

7   included VIN of each vehicle and Hyundai had repaid the University significant sums.

8   28.    We were not yet certified by the California Department of Weights and

9   Measures for accuracy (we obtained this certification in 2015) as to fuel pumped versus

10  fuel charged, but Hyundai was paying for the fuel so it was of no consequence to the

11  consumers.  We achieved the first certification from the Department of Weights and

12  Measures in 2014.

13  29.    In the midst of these obstacles and achievements there was a meeting of

14  the California Fuel Cell Partnership[1] at the Torrance Shell hydrogen station.

15  30.    A topic of discussion was Toyota had raised a prerequisite from their

16  perspective of requiring fuel pumps to accept credit cards.

17  31.    At the meeting in Torrance, I raised the issue that as a station operator, it

18  seems obvious that the method of payment should be controlled by the station operators

19  not the auto makers.  I specifically stated that "…as a matter of fact, I believe if I want

20  to accept a crate of chickens for hydrogen that is up to the operator…" but despite my

21  protestations the California Fuel Cell Partnership and the members therein decided to

22  impose, and  Hyundai and Honda acquiesced by silence, to this new requirement for a

23  credit card reader to be on site.

24  32.    Toyota had the majority of the hydrogen cars on the road, and I believe

25  the CA Fuel Cell Partnership charged membership dues based on how large the

26  company was, so Toyota had a de facto veto at these meetings.

27

28  [1] The CA Fuel Cell Partnership was at first a cooperative organization that had the stated goal to uniformize the
    hydrogen retail standards but it quickly became closely tied to Toyota's needs.

- 4 -

**DECLARATION OF MICHAEL G. DRAY, ESQ.**

33.    I installed a credit card reader in the University station control room.

34.    Toyota refused to send any cars or staff to visit the hydrogen station.

35.    After the University achieved the certification from the Department of Weights and Measure Toyota continued to refuse to visit the University station or provide any cars to the University to test the station.

36.    At the next meeting after the University achieved the certification from the department of weights and measures  at one of the CA Hydrogen Partnership meetings, Spencer Quan who worked for and represented Toyota at these meetings said to me, "you have a lot of guts to declare yourself open to public" to which I responded something of the effect of "but I am, I have Fire Marshall approval, state certifications and building occupancy permits to sell hydrogen."

37.    Toyota then advocated for the University to be taken off the h2fcp.org website (the site that advised drivers which stations were available). I received phone calls from state officials that convinced me not to fight over this removal as it would be temporary.

38.    Next Toyota insisted that our University station, and all stations, meet a new fueling protocol.  A new fueling protocol that had never been pronounced as a perquisite and one that the University station was never built to meet.  The protocol was called the SAE (Society of Automotive Engineers) J2601, which stipulated for a control scheme which the station was not built to achieve, and Toyota knew this.

39.    So I endeavored to meet this new retroactive harsh standard over the course of the next two to three years.  My endeavors involved hiring a former JPL engineer and marshalling several contract vendors and coordinating an epic attempt to satisfy Toyota.  My endeavors also included the expenditure of several hundred thousand dollars of tax payer money. I was forced to spend money given to me by the California energy commission under a maintenance grant; forced to spend that money to make material modifications to the station and not deal with maintenance, and those funds had been earmarked for maintenance.

- 5 -

**DECLARATION OF MICHAEL G. DRAY, ESQ.**

40.    All this time Toyota refused to send the University a car to test our progress or station.

41.    Toyota also explicitly refused to lease a car to me, and again they refused to ever provide a car to assist with tuning the station to their specifications.

42.    We created/commissioned with taxpayer money to test their testing standards on our station.  This was a device called the Hystep: a million-dollar test device that the state had constructed to test fueling stations to meet SAEJ2601.

43.    I along with my team helped the state get a testing device running so that we can be tested.  Again, there was not even a testing device available in the world to meet the rigorous testing demands of Toyota.

44.    Thereafter we modified the station further and we passed the testing to the best of our abilities.  The University station was not built to cool hydrogen to minus 40 degrees and Toyota said it was ok to be minus 20 degrees instead of minus 40 degrees which just meant that they would perform the fueling slower.

45.    For the better part of a decade, Toyota continued to impose outrageous and never-ending new regulations. For example, suddenly Toyota request that the station needs to be open 24/7.  Toyota began to protest the University station saying it wasn't big enough.  I advocated for the need for an attendant at the University station because of my awareness of the importance to have boots on the ground due to constant glitches but this was contrary to the model Toyota was pushing.

46.    Again, Toyota had total control in prohibiting the customer from using the University station because they did not allow the fuel card to work at the University station or provide reimbursements.

47.    I gave my cell phone number to the drivers, and people would call me every day early in the morning or on weekends, and I'd make fueling reservations for people and accommodate desperate drivers so when they came I had their names written down and fuel saved for them.  Over the years I fueled thousands of cars and would help out Toyota drivers in the ways I could.  At some point I was fueling

**DECLARATION OF MICHAEL G. DRAY, ESQ.**

experimental buses and selling hydrogen by filling trailers by what we're producing after Toyota had excluded customers for so many years; Toyota raised it in meetings that they wanted the fuel station to only service cars light weight cars which I refused to do based on free market principles: we can sell hydrogen to whoever we want as long as they're paying as long as there's fuel and its safe.

48.     Even the dealerships couldn't fuel the cars.  There were many times that Longo Toyota would beg the University station for fuel because the cars they were selling had run out of fuel and they couldn't refuel them.

49.     Around 2017 I informed the governor's office about the unrelenting control Toyota was exerting on us.

50.     It was my impression, that newly built stations by  First Element were rapidly approved.  In my opinion Toyota went out of their way to help First Element. To my knowledge, Toyota had at least one "consultant" working full time in First Element to observe and report on First Element's operations to some degree.  Thus, I suspected that a creditor for First Element was at the very least observing them, if not actually policing their movements.

51.     The hydrogen stations throughout California in general have suffered greatly because of immature supply chains and fly by night vendors: manufacturers who are not invested or don't have a reputation to protect.  I had numerous times where I needed critical parts for the station and suppliers would flat out refuse to respond.

52.     In my opinion, Toyota's control on the hydrogen market had a chilling effect on other potential actors from entering the hydrogen market.

53.     In my opinion, Toyota sold too many hydrogen cars and overwhelmed the infrastructure and hydrogen supply.

Dated:  August 21, 2024               MICHAEL G. DRAY, ESQ.

_Michael A. Dray, Esq._

- 7 -

**DECLARATION OF MICHAEL G. DRAY, ESQ.**

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                                    CIVIL CODE § 1189

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California        )
County of _Los Angeles_    )

On _08/21/2024_ before me, _Lindsey Schwartz, Notary Public_
         Date                    Here Insert Name and Title of the Officer
personally appeared _Michael G. Dray, Esq._
                              Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

```
LINDSEY SCHWARTZ
COMM # 2360904
Los Angeles County
California Notary Public
Comm Exp June 12, 2025
```

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Lindsey Schwartz_
            Signature of Notary Public

Place Notary Seal Above

————————————— **OPTIONAL** —————————————
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _Declaration_ _____ Document Date: _____
Number of Pages: _____ Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _____ | Signer's Name: _____ |
|---|---|
| ☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited ☐ General | ☐ Partner — ☐ Limited ☐ General |
| ☐ Individual ☐ Attorney in Fact | ☐ Individual ☐ Attorney in Fact |
| ☐ Trustee ☐ Guardian or Conservator | ☐ Trustee ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)    Item #5907

# EXHIBIT E

## DECLARATION OF JUDY HWANG

1.     I, Judy Hwang, declare under penalty of perjury under the laws of the United States that the following is true and correct:

2.     I am over 18 years of age and competent to make this declaration. I have personal knowledge of the facts stated herein, and if called as a witness, I could and would testify competently thereto.

3.     From 2011 to 2017 I worked for Toyota Financial Services ("TFS") in Torrance, California, serving most recently as Marketing Technology Manager.

4.     I led technology initiatives for customer and dealer experience, worked with enterprise marketing systems and customer data platforms, and collaborated cross-functionally with Toyota Motor Sales ("TMS") groups, including Customer Service and Warranty Systems, on projects that supported retail marketing, and customer communications. My résumé accurately reflects these roles and responsibilities. (Ex. 1, Hwang Résumé.)

5.     As part of my employment, I also served as a consultant to the TMS Warranty Department.

6.     As a technologist, I participated in Toyota's internal "Trailblazer" program that offered Mirai vehicles to employees, friends, and family before broader public adoption. Through that program and my work, I saw centrally prepared Mirai talking points/materials emphasizing (a) ~357 mile range per tank for the generation 1 Mirai, (b) "just like gasoline" refueling with ~5-minute fills statements, and (c) an expanding hydrogen station network.

7.     In the years that followed, I heard substantially the same scripted themes echoed by different Toyota dealers to consumers, demonstrating uniformity of messaging originating from Toyota headquarters. (See also Ex. 1.)

8.     I leased my first Mirai from Toyota Santa Monica on August 20, 2016. On November 10, 2017, that vehicle was totaled in a hit-and-run (not my fault). Because of accelerated depreciation, I had to pay $5,225.91 out-of-pocket to cover the

Doc ID: 38e090d020b0974e5c32380e1f9f97a457454107

shortfall beyond the insurance payoff. On November 18, 2017, I had leased a second Mirai from Tustin Toyota and later purchased it when the lease ended in 2020 during pandemic closures due to the continued promises by Toyota of expansion and accessible cheap fuel.

9.      The Mirai does not refuel like gasoline. Compressors frequently reset between vehicles; practical waits can run 10–15 minutes per car, with total stop times often 30–60+ minutes if there is a line. The vehicle's displayed EPA-type range (≈312 miles) has not matched my usage; my typical full-tank range was ~220–250 miles.

10.     Hydrogen prices increased from $6 to ~$29.99–$36.99/kg, making ordinary operation expensive (paying approximately a dollar per mile).

11.     Toyota and dealer statements made to me about quick refueling, 300+ mile practical range, convenience, and a growing station network were inconsistent with my experience.

12.     Throughout the duration of my ownership of the Mirai the vehicle would decline in the amount of mileage range the car would be capable of on a full fill.

13.     In 2024–2025, widespread station outages severely restricted my use of the car. Toyota provided rentals tied to station unavailability under several case numbers, reflecting prolonged infrastructure failure, including approximately 127 days (10/8/24–2/10/25), 15 days (5/20/25–6/3/25), and 57 days (6/5/25–7/31/25), for a total of ~199 rental days during those periods.

14.     My primary station in Torrance was repeatedly down due to compressor issues; Lawndale permanently closed in May 2025; Long Beach was "hit or miss"; Playa del Rey often ran out by late morning and deferred refills to late evening; Seal Beach closed indefinitely for construction. These conditions prevented routine maintenance and normal use and created persistent range anxiety.

15.     On October 22, 2024, Toyota denied my buyback request (Case # 2410 1800 1694). On March 25, 2025, when both Toyota and Lawndale stations were inoperative per my app, Toyota Brand Engagement refused rental assistance, insisting

- 2 -
**DECLARATION OF JUDY HWANG**

Doc ID: 38e090d020b0974e5c32380e1f9f97a457454107

there was fuel despite contrary station status. These interactions consumed substantial time and left me without reliable mobility.

16.    My Mirai had a driver-side seat-heater that turned on and cycled settings without input; Longo Toyota confirmed coverage under TSB #0041-18 and replaced the AC control panel after multiple visits. My fuel door intermittently fails to release when the button is pressed. I frequently encounter condensation freeze-ups between nozzle and filler neck, requiring 10–30 minutes to detach. These issues further impaired ordinary use.

17.    On October 19, 2024, my Mirai would not start due to a dead 12-volt battery—likely from extended non-use during fuel shortages. I purchased and installed a replacement EverStart Platinum AGM (Group S46B24R, 410 CCA) myself; Toyota later reimbursed the cost, but I lost multiple weekends managing a problem traceable to systemic fueling outages. I also purchased AAA on December 1, 2024 for roadside protection due to recurring immobilization risks.

18.    My vantage point—as a former TFS manager who participated in the employee Trailblazer Mirai program and later as a Mirai customer—lets me compare Toyota's centralized messaging to what dealers told me and others. The promised mileage range, 5-minute fueling, and expanding network talking points were consistent and repeated across time and dealerships, and their websites, which, in my experience, indicates those statements flowed from Toyota's centrally produced materials, which were presented to me on Toyota's campus when they first began to sell these vehicles to Toyota employees, to the average dealership sales floor. (See Ex. 1 résumé confirming my TFS role; Ex. 2 email signature confirming Toyota employment.).

19.    Because hydrogen stations were unavailable or unreliable for extended periods, I spent months in rental cars, repeatedly rearranged my life to chase fuel at odd hours and distant locations, and incurred losses including the $5,225.91 depreciation shortfall on my first Mirai, out-of-pocket time and expenses (battery, towing risk, rentals coordination), and the lost utility of a vehicle I could not reliably

- 3 -

**DECLARATION OF JUDY HWANG**

operate or maintain. These harms were foreseeable given Toyota's knowledge of station capacity and reliability and the uniform marketing messages that minimized those limits.

20.    I repeatedly complained to Toyota Motor Sales (TMS) about these issues—both the fueling infrastructure failures and the vehicle defects. I made complaints on multiple occasions by telephone when requesting rental vehicles and also via email to Toyota executives. Despite these efforts, Toyota denied my formal buyback request on October 22, 2024

21.    In March 2025, when both Torrance and Lawndale stations were down according to Toyota's own app, Toyota Brand Engagement refused rental assistance, insisting there was fuel available. These denials occurred despite my repeated reports and despite the obvious lack of access to fueling.

22.    Based on my experience inside as an employee for Toyota Warranty Systems and my direct experience owning Mirai vehicles, Toyota has and had the means and processes to implement a safety campaign.

23.    Toyota is failing to undertake a recall program for the Mirai despite mechanical problems and widespread fuel shortages that I and many other Mirai owners experience.

24.    As a former customer communications consultant with Toyota, given the predictable safety and mobility risks caused by hydrogen station unreliability and the Mirai's recurring mechanical issues, Toyota must publicly notify owners and dealers and initiate a formal safety campaign or recall for the Mirai.

Dated: September 21, 2025                        Judy Hwang

_Judy Hwang_
_____

- 4 -
**DECLARATION OF JUDY HWANG**

**✖ Dropbox** Sign

**Audit trail**

---

| | |
|---|---|
| **Title** | Enhanced Declaration |
| **File name** | Judy_Hwang_Declaration.pdf |
| **Document ID** | 38e090d020b0974e5c32380e1f9f97a4574541d7 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

---

Document history

| | | |
|---|---|---|
| ⤴ **SENT** | **09 / 22 / 2025**<br>02:43:48 UTC | Sent for signature to Judy Hwang (judyhwang125@gmail.com)<br>from ji@jasoningber.com<br>IP: 74.71.76.95 |
| 👁 **VIEWED** | **09 / 22 / 2025**<br>03:03:55 UTC | Viewed by Judy Hwang (judyhwang125@gmail.com)<br>IP: 97.170.54.166 |
| ✍ **SIGNED** | **09 / 22 / 2025**<br>03:12:09 UTC | Signed by Judy Hwang (judyhwang125@gmail.com)<br>IP: 97.170.54.166 |
| ✓ **COMPLETED** | **09 / 22 / 2025**<br>03:12:09 UTC | The document has been completed. |

---

# EXHIBIT F

1

**DECLARATION OF NICHOLAS SPRUCK**

2

I, NICHOLAS SPRUCK, declare as follows:

3
4
5

1.      I am over 18 years of age and competent to make this declaration. I am a California resident residing in Irvine, CA. I make this declaration based on personal knowledge unless otherwise stated, and if called as a witness, I could and would testify.

6
7

2.      I currently reside in Irvine, California. I'm a freelance photographer specializing in wedding and event photography.

8
9
10

3.      In late 2023, I began researching hydrogen fuel cell vehicles after seeing numerous billboards throughout Orange County advertising the Toyota Mirai as "the best deal on planet Earth."

11
12
13

4.      I spent considerable time on Toyota's website, toyota.com/mirai, where I reviewed Toyota's representations about the vehicle, including its claimed 402-mile range per fill-up, 5-minute refueling times comparable to gasoline vehicles, expanding hydrogen infrastructure, advanced safety systems, and Toyota's legendary reliability.

14
15
16

5.      Having previously worked on cars for a living, I was particularly interested in the technology and infrastructure behind hydrogen vehicles. I researched the hydrogen highway network extensively on Toyota's website and believed I was becoming an early adopter of clean air vehicle technology, similar to early Prius adopters.

17
18

6.      I have owned two Toyota Tacomas and a Toyota Prius in the past and loved Toyota vehicles before this experience.

19
20
21

7.      On November 1, 2023, I purchased a certified pre-owned 2021 Toyota Mirai, VIN JTDAAAAA0MA002989, License Plate 9JLF745, from Longo Toyota located at 3534 Peck Road, El Monte, California 91731.

22
23
24

8.      The vehicle had approximately 42,000 miles at the time of purchase. This is my only vehicle. I rely on it both for rideshare and delivery gig work (including DoorDash, Uber Eats, and Instacart) and to reach time-sensitive commercial, wedding, and event photography assignments (often once-in-a-lifetime occasions) requiring reliable transportation.

25
26

9.      During the sales process, I first test drove the vehicle with sales representative Juan Maldonado, who told me his son owned a Mirai and "absolutely loves it."

27
28

10.      He marketed the vehicle as a "vehicle hack" for smart car fans where I could get in early on the vehicle with a $15,000 fuel card, drive it for three years, trade it in for another Mirai with another $15,000 fuel card, and "rinse and repeat."

Doc ID: f439f026d2d2d4ebb34674a6757122a6dfdb51d1

11.    He assured me the hydrogen infrastructure was perfect for Orange County with "a bunch" of stations available.

12.    Christian Edward Revida handled the paperwork for my purchase.

13.    The sales team told me the vehicle achieved 400+ miles per full tank and that new Mirai models were coming out soon.

14.    When I told them I lived in Orange County, they specifically said, "That's great. There's a bunch. There are a lot of stations down there. It's a perfect car for Orange County."

15.    I purchased the vehicle for approximately $20,000, receiving a $15,000 fuel card that I calculated would last approximately 3 years based on my projected usage, including using the vehicle for rideshare driving to supplement my photography income.

16.    When I arrived at Longo Toyota's lot, I observed approximately 50 certified pre-owned Mirais available for immediate purchase.

17.    The Longo Toyota staff touted that they had over 200 total Mirais on site; around-back prepped for sale.

18.    Many vehicles had poorly executed paint touch-ups on their bumpers, suggesting damages and hasty repairs, but I had so many to choose from I settled on one that looked like a luxury vehicle.

19.    Within approximately three months of purchase, early March 2024, I began experiencing intermittent severe electrical problems with the vehicle.

20.    The radio volume controls would become unresponsive, refusing to adjust the volume up or down and whenever I received a phone call, text message, or any audible notification from my phone, the volume would screech ear-piercingly loud, startling me while driving and creating a hazard.

21.    I documented these electrical failures with video evidence showing myself repeatedly pressing the volume buttons while driving to the dealership with audio blaring, demonstrating the controls were completely non-functional.  I was told by the dealership that unless the problem could be replicated on the spot, no repair would be performed and I would be responsible for a diagnostic fee despite my report and evidence of intermittent failure. This warning about being charged even if nothing could be replicated was given to me only a few months after purchase, which was shocking given the vehicle was certified pre-owned.

22.    During this same timeframe, the vehicle began exhibiting propulsion system failures.

23.    The vehicle would completely stall when pulling into intersections with oncoming traffic.

- 2 -

Doc ID: f439f026d2d2d4ebb34674a6757122a6dfdb51d1

24.     The accelerator pedal would become entirely unresponsive, leaving me stranded in the path of oncoming vehicles.

25.     I would frantically slam my foot on the gas pedal as cars came pummeling down the road toward me, potentially causing me to get T-boned in an intersection, until the car would suddenly and unexpectedly take off at the last minute.

26.     These stalling incidents occurred when merging onto highways, creating life-threatening situations where I could not accelerate to match traffic speed. The vehicle would lose all power without warning, then suddenly surge forward after several terrifying unresponsive seconds.

27.     In addition to complete stalling, the vehicle exhibited strange power anomalies when on inclines. When the vehicle was on a tilt, such as on hills, parking garage ramps, or freeway on-ramps and off-ramps, the car would start to stutter when I applied light pressure to the accelerator. The power delivery was erratic and unpredictable, not providing full power loss but creating a concerning stuttering sensation that made the vehicle difficult to control.

28.     The vehicle's braking system also exhibited electrical control failures. The sensitivity of the brakes would change dramatically and unpredictably, particularly within the first few minutes of starting the vehicle. The brake pedal would become extremely sensitive to the point where applying minimal pressure would cause the brakes to lock up completely. This forced me to constantly adjust my driving style because the brake response was inconsistent.

29.     On April 10, 2025, I again brought the vehicle to Tustin Toyota for intermittent stalling and frozen infotainment. The service manager recommended I not proceed because the issues were random, telling me I would be 'out the diagnostic fee for nothing.' Based on that advice, I declined service despite video evidence of the frozen controls. During this period, Apple CarPlay malfunctions distracted me; once, while carrying an Uber passenger, I nearly drove through a red light trying to reset the system.

30.     When I explained the acceleration stalling issues, particularly that the car would not accelerate when merging onto highways or pulling into intersections, the service personnel at Tustin Toyota told me this was because my foot was touching the brake when I was accelerating.

31.     The dealership claimed the car won't accelerate when you have the brake applied and so the technician insisted that have been pressing the brake and driving with two feet or pressing both pedals.

Doc ID: f439f026d2d2d4ebb34674a6757122a6dfdb51d1

32.     I responded that never in my life have I driven a car with one foot on both pedals simultaneously and certainly would never do so in high-risk situations like merging into oncoming traffic.

33.     They only provided this dismissive response, I was essentially turned away from the dealership multiple times.

34.     On three separate occasions, I would pull up to the service center, explain the intermittent electrical and propulsion issues, only to be told they probably wouldn't be able to diagnose it and I should either pay the diagnostic fee with no real hope of resolution or leave.

35.     Each time, while turning me away for the safety issues, they would upsell me on services, telling me the car was due for hydrogen rail inspections and fuel tank strap inspections.

36.     Meanwhile, the hydrogen infrastructure I had been promised was collapsing around me.

37.     I primarily fueled at the UC Irvine station because it offered hydrogen at $25 per kilogram versus $36 at True Zero stations.

38.     However, there would be consistent lines of 10 to 15 cars waiting for the single pump. Many times, after waiting in these long lines, the station would fail and shut down, the hydrogen technician would arrive to fill the tank (during which no one could pump), or the tank would run out of hydrogen, leaving everyone in line stranded.

39.     The UC Irvine station, which had been operating for 20 years according to my understanding, suddenly closed down approximately four months after I purchased the vehicle.

40.     This forced me to use only the expensive True Zero stations, dramatically accelerating the depletion of my fuel card.

41.     In early 2024, I relocated to San Diego for a year. San Diego has only one hydrogen station that is frequently offline. A regular customer at that station told me that a pump had become pressurized while connected to someone's car, blew off the vehicle, and slammed into the side of the pump housing.

42.     I was forced to relocate from San Diego back to Irvine solely based on hydrogen availability as it was not safe or reliable.

43.     The vehicle's actual range declines over time.  When I drive the Vehicle as I had driven all my previous vehicles, I could achieve 320 miles per tank (out of the promised 400+). Now, even when babying the car, I get less. Using the air conditioning reduces the range dramatically and gets worse over time.

44.     Refueling, when stations worked, takes 30 to 60 minutes, not the advertised 5 minutes.

Doc ID: f439f026d2d2d4ebb34674a6757122a6dfdb51d1

45.     The nozzles frequently froze to vehicles, requiring extended waiting periods. Stations shown as "online" in the vehicle's navigation system and on Toyota's website were frequently offline when I arrived.

46.     I have driven to Santa Barbara for a wedding photography job with the station showing online, only to find it offline, leaving me stranded and unable to run errands or explore the area, barely having enough hydrogen to complete the job and return home.

47.     The payment systems at hydrogen stations are unreasonable. You may not "go inside" and pay cash. You cannot use digital wallets like Apple Pay.  You must use preapproved Toyota physical card forms of payment. I was once stranded at a station because I had forgotten my acceptable physical cards.

48.     In February 2025, with my fuel card running low, I went to Toyota of Costa Mesa to explore my options explaining I wanted information about potentially trading for a Tacoma. Despite repeatedly stating I was not looking to purchase that day, they kept me there for two hours to sell me a vehicle.

49.     The sales manager at Costa Mesa Toyota eventually sat down with me and became hostile when I wouldn't commit to purchasing.

50.     He told me my Mirai had $9,000 in negative equity and that Toyota would only give me maximum $3,000 for it. He said Costa Mesa Toyota doesn't even sell Mirais because "they're problems" and they would have to transport it to a dealership that sells them. When I still declined to trade that day, he stood up, said "Good luck with your problem vehicle," shook my hand dismissively, and walked away.

## The "Bomb"

51.     Beginning as early as February 18, 2025, my Mirai's notification system had already logged multiple serious fault codes. These included repeated warnings of "FC System Warning 1" and "FC System Warning 2," instructing me to immediately stop in a safe location and contact my Toyota dealer due to a dangerous Fuel Cell System malfunction. On the same date, the system also logged an "Advanced Ultrasonic Detect" fault warning of malfunction in the Intelligent Clearance Sonar System. These alerts carried timestamps between 9:50 and 9:56 AM on February 18, 2025, clearly directing me not to rely on these systems and to bring the vehicle into Toyota for inspection.

52.     I later discovered, while reviewing the infotainment system logs, that additional "FC System" and "Advanced Ultrasonic Detect" malfunctions had also been recorded on June 16 and

- 5 -

June 17, 2025 at 2:35 PM and 8:16 PM, as well as again on June 18, 2025 at 4:04 PM. These warnings likewise told me not to rely on the sonar system and to seek immediate dealer inspection. On June 16, 2025, while driving to a photography shoot, multiple warning messages suddenly appeared on my dashboard including "FCV System Malfunction - Visit Your Dealer" "PKSB Malfunction - Visit Your Dealer" and notifications about sonar system and hydrogen fuel cell malfunctions.

53.     The messages instructed me to bring the vehicle to Toyota immediately.  Disturbingly, many of these alerts did not appear on my dashboard at the time I was driving; instead, they were buried in the notification history, meaning I only discovered them months later. This shows Toyota's system had been detecting repeated dangerous conditions but failed to provide real-time warnings.

54.     The car kept driving, and I was already on my way to San Diego for work, so I continued driving rather than risk canceling the shoot.

55.     The next day, June 17, 2025, at 10:51 AM, I received a voicemail from "Eva" at Tustin Toyota. The message states: "This is Eva, I'm giving you a call from Tustin Toyota regarding your 2021 Toyota Mirai. Our records indicate that your vehicle is due for its routine service, and you also have an error code regarding the fuel cell system. To schedule an appointment, please give us a call back."

56.     This unsolicited call was disturbing. I had never serviced my vehicle at Tustin Toyota.

57.     I had not reported the error codes to anyone. Yet somehow Toyota knew about the malfunction in my vehicle and had directed the dealership closest to me to contact me immediately.

58.     When I brought the vehicle to Tustin Toyota on June 19, 2025, I checked in and agreed to pay the $211 diagnostic fee, believing the issue would be covered under my certified pre-owned warranty since it involved the drivetrain. The work order opened under RO#1672195 lists "MIRAI CERTIFIED TECHNICIAN REQUIRED" and shows the service advisor as Timothy Rau.

59.     The initial check performed by technician William Cantaderio retrieved DTC P0AA649 for Hybrid/EV Battery Voltage System Isolation Internal Electronic Failure and P1EEE49 for Hybrid/EV Battery Voltage System Isolation (Hydrogen Pump Area) Internal Electronic Failure. This means the car's main electric battery is dislodged and is loose near the hydrogen fuel.

60.     Later that week, Timothy Rau called me with alarming statements about my vehicle's condition that it was flammable.

61.     When I said I didn't know hydrogen was flammable, he responded: "Yeah, the sun is comprised of hydrogen and of course, the sun is like a nuclear reactor because of all that hydrogen."

Doc ID: f439f026d2d2d4ebb34674a6757122a6dfdb51d1

He then stated so in a sense you're "kind of like driving a hydrogen bomb around waiting to go off."

62.    He mentioned there;s even a customer who comes to the dealership with a license plate that says "H bomb" on their Mirai.

63.    Rau explicitly stated that the vehicle had an exhaust system issue where unburnt hydrogen was leaking through, and if it got near a heated component, it posed a fire risk so my car was a "bomb waiting to go off" and that if I didn't pay for the repairs, he couldn't "in good conscience" let me take the vehicle and drive it off the lot.

64.    The estimate increased to $12,082.26 and Timothy Rau recommended I have it towed off his lot quickly if I chose not to repair it but then he said he'd call Toyota corporate to see if they could get me "some sort of discount" after having repeatedly initially insisting this hydrogen system failure was not covered under the drivetrain warranty.  To add insult to injury, after delivering devastating news on a Saturday afternoon at 2:00 PM, Timothy Rau informed me that Toyota would not continue covering my rental car and demanded I return my rental to them that day by 4:00 PM.

65.    When I said this was unreasonable due to timing, surprise and my vehicle being a bomb I can't use, he reluctantly agreed to extend it through the weekend.

66.    I returned the rental Monday morning and was without a vehicle for 18 days total. My vehicle remained at Tustin Toyota from June 19 to July 7, 2025.

67.    According to the Tustin Toyota invoice, this hydrogen recirculation pump assembly job was coded as 890711, included a fuel cell stack coolant service, and was documented as "NOT COVERED BY WARRANTY" and performed "AS A ONE TIME GOODWILL REPAIR SOLELY IN THE INTEREST OF CUSTOMER SATISFACTION" with Toyota providing $6,210.29 goodwill assistance. The invoice also notes that the first replacement pump was defective and had to be reordered on June 30, 2025, further delaying the repair

68.    A delay was caused by the replacement hydrogen recirculation pump being ordered from Canada. When it arrived and was installed, that part was also defective, requiring them to order a second pump.

69.    During these 18 days without transportation, I couldn't work my photography jobs, couldn't attend medical appointments for my diabetes, and had to rely on friends for occasional rides.

70.    The stress caused severe disruptions to my blood glucose management, with my continuous glucose monitor showing extreme fluctuations including multiple days with readings exceeding 400

Doc ID: f439f026d2d2d4ebb34674a6757122a6dfdb51d1

mg/dL (beyond the sensor's measurable range) and dangerous rapid drops that risked seizure or unconsciousness.

71.     Toyota ultimately covered the $12,082.26 repair in total as a "one-time goodwill repair solely in the interest of customer satisfaction" after I reminded them that I was already in active litigation with them.

72.     Approximately one week after getting the vehicle back from service, while pulling into an intersection, the car stalled out again. I was frantically slamming my foot on the gas as cars came barreling toward me, with the vehicle eventually taking off at the last second to avoid being T-boned.

73.     The vehicle continues to experience all the same dangerous defects.

74.     It stalls intermittently two to three times per month.

75.     The electrical systems malfunction regularly. The brake sensitivity changes unpredictably. The range continues to decline.

76.     When I fill up the tank and turn on the air conditioning, the range immediately shows 298 miles, again not the promised 402+ miles.

77.     Toyota Financial Services has been conducting a campaign of harassment against me. They call daily spoofing a friendly caller ID that displays as "Anthony Adams" it's always different representatives from Toyota Financial Services.

78.     When I answer and inform them I'm recording the call and am in an active lawsuit, they demand I stop recording or they'll disconnect. They refuse to speak with my attorney despite my repeated requests. They tell me I must send written notice by mail or fax, then put me on hold for 5 to 10 minutes before returning to say no supervisor is available and I must write a letter.

79.     This harassment continues daily despite my clear invocation of legal representation.

80.     At hydrogen stations, I regularly encounter other Mirai owners in desperate situations.

81.     They have $20,000 to $30,000 in negative equity.

82.     Their fuel cards have run out and they cannot afford $36 per kilogram for hydrogen that gives them only 200-300 miles of range.

83.     They beg other owners for discounted fuel, offering cash for someone to use their remaining fuel card balance.

84.     Toyota from my firsthand knowledge speaking with dozens of people at the few fuel pumps in Southern California targeted low-income consumers who would never normally qualify for 0%

Doc ID: f439f026d2d2d4ebb34674a6757122a6dfdb51d1

APR financing on a $50,000-$70,000 vehicle, and are now trapped in a cycle of debt with vehicles they cannot use, cannot sell, and cannot afford to fuel.

85.     I am currently trapped with a vehicle that has around $13,471.28 in negative equity according to my most recent statement.

86.     It costs approximately $180 to fill for only 270 miles of actual range, making it near a $1 per mile to operate.

87.     The vehicle cannot be sold privately because no one will buy a hydrogen vehicle without the fuel card incentive.

88.     It can only be traded back to Toyota at a massive loss, creating a monopoly where Toyota controls both ends of the transaction.

89.     I continue driving this dangerous vehicle because I have no other choice. Every time I drive, I fear the vehicle will stall in an intersection and I'll be hit. I fear the hydrogen system will catastrophically fail. I fear the brakes will malfunction. I fear being stranded without fuel because stations shown as operational are actually offline. I fear for my safety and the safety of others on the road.

90.     I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.


Executed on this 27th day of September, 2025.

*Nicholas Spruck*
_____

**NICHOLAS SPRUCK**

- 9 -

Doc ID: f439f026d2d2d4ebb34674a6757122a6dfdb51d1

**Dropbox Sign**

Audit trail

| | |
|---|---|
| **Title** | Enhanced Declaration |
| **File name** | Nicholas_Spruck_Declarationv2.docx |
| **Document ID** | f439f026d2d2d4ebb34674a6757122a6dfdb51d1 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document history

**SENT**
**09 / 29 / 2025**
18:55:29 UTC

Sent for signature to Nicholas Spruck (nickspruck@gmail.com) from ji@jasoningber.com
IP: 98.7.114.192

**VIEWED**
**09 / 29 / 2025**
22:35:16 UTC

Viewed by Nicholas Spruck (nickspruck@gmail.com)
IP: 136.52.91.83

**SIGNED**
**09 / 29 / 2025**
22:53:34 UTC

Signed by Nicholas Spruck (nickspruck@gmail.com)
IP: 136.52.91.83

**COMPLETED**
**09 / 29 / 2025**
22:53:34 UTC

The document has been completed.

# EXHIBIT G

**DECLARATION OF ROBERT DAVIS**

I, ROBERT DAVIS, declare as follows:

1.      I am over 18 years of age and competent to make this declaration. I am a California resident residing in Gardena, CA 90503. I make this declaration based on personal knowledge unless otherwise stated, and if called as a witness, I could and would testify.

2.      My wife Wendy Davis and I reside in Gardena, California. In 2023, we purchased a 2022 Toyota Mirai (VIN: JTDAAAAA1NA007300) from Toyota of Orange, an authorized Toyota dealership.

3.      I was introduced to the Mirai through a friend who works as a Toyota contractor.

4.      Before purchasing, I conducted research on Toyota's website (toyota.com/mirai) and reviewed Toyota's representations about the vehicle's capabilities, clean emissions producing only water, and Toyota's "legendary reliability."

5.      At Toyota of Orange, salesperson "Mambo" made specific representations that influenced our purchase decision.

6.      He stated he personally owned two Mirais - one for himself and one for his family - and had purchased a third after totaling one in an accident.

7.      He claimed he achieved 400 miles per tank, that hydrogen refueling stations were "always available," that fuel costs would be lower than gasoline, and that refueling was quick and convenient.

8.      Mambo demonstrated the vehicle's high tech safety features as key selling points, including lane assist, blind spot monitoring, bird's eye view camera, and automatic emergency braking.

9.      These advanced safety features were a primary reason for our purchase, as we believed they would protect my family.

10.     We paid approximately $50,000 for the vehicle after taxes and fees, not the under-$30,000 price initially suggested.

11.     Within months of purchase, the second generation Mirai we purchased exhibited dangerous brake malfunctions that put our lives at risk.

12.     These occurred repeatedly.

13.     The first terrifying incident occurred at approximately 6:00 AM while I was driving southbound on the 110 freeway.

- 1 -

Doc ID: ccaa4d21b815e77b0f57d99bd2cb51ae67984645

14.    A vehicle crossed several lanes to exit, but at a far distance that posed no danger to me as an reasonable driver. However, the Mirai's automatic emergency braking suddenly engaged violently, slamming the brakes while the dashboard flashed red.

15.    With vehicles approaching from behind at highway speeds, I had to override the system by pressing the accelerator to avoid being rear-ended.

16.    My heart was pounding as I realized the car had nearly caused a multi-vehicle collision.

17.    The brake failures manifested in the opposite extreme as well.

18.    While driving through Hollywood with heavy pedestrian traffic, I approached a corner where a pedestrian stepped off the curb. When I pressed the brake pedal, the vehicle failed to respond. Despite applying full pressure, the car continued forward, only stopping after entering the crosswalk.

19.    I watched in horror as the pedestrian looked at me while my vehicle approached him, unable to stop despite my desperate efforts.

20.    The brake system often requires excessive force to stop the vehicle, like driving a commercial bus.

21.    I had to brake 4 car lengths before normal stopping distance.

22.    The defect was intermittent and frequent, creating constant anxiety as I never knew when the brakes would fail.

23.    The lane assist system actively endangered us by following old lane markings instead of current ones.  The system's behavior created an unreasonable risk of collision, forcing me to sometimes fight the steering wheel.

24.    On Crenshaw Boulevard during construction, the system would forcibly turn the steering wheel to follow scraped-off old lane lines, pulling me toward other vehicles or the curb. I had to physically fight the steering wheel to prevent collisions.

25.    When I called Toyota for help disabling this dangerous feature, I was transferred to 3-4 different escalating representatives before reaching someone who could explain how to turn it off.

26.    Toyota's own technical support did not know how to disable their malfunctioning safety system.

27.    Toyota monitors these vehicles in real-time through a subscription app that I paid for after the first free year.

28.    The app provides vehicle location, door lock status, fuel level, odometer readings, and critically - system health alerts. On one occasion, three critical alerts appeared on the app: (1)

- 2 -

Doc ID: ccaa4d21b815e77b0f57d99bd2cb51ae67984645

"malfunction in the intelligent clearance sonar system," (2) "malfunction in the pre-collision system," and (3) "malfunction in the electronically controlled brake system."

29.     On occasion, the Vehicle's dashboard simultaneously displayed "FCV Malfunction."

30.     The same day these alerts appeared, Toyota called me directly - without me contacting them - asking about the vehicle and when I could bring it for service.

31.     I took screenshots of these alerts because I suspected Toyota would delete them.

32.     My suspicion proved correct - the alerts disappeared from the app before my service appointment, despite the problems persisting.

33.     I brought the vehicle for brake issues to Toyota Santa Monica and Toyota of Orange approximately 6-7 times.

34.     Each time, service representatives claimed they "couldn't replicate" the problem, yet the vehicle's behavior would temporarily change after service, indicating they had made adjustments they didn't document.

35.     At Toyota Santa Monica, they kept the vehicle for only a few hours, claimed no issues found, but when I picked it up after closing, the brakes were noticeably worse.

36.     When I returned it, they still claimed inability to replicate the issue but clearly made adjustments as braking improved temporarily for a few days before reverting.

37.     Toyota limits Mirai owners to 21 "complimentary" rental days per year, intended for long-distance travel since Mirais cannot leave California. Toyota forced me to use these days every time I sought warranty service.  So, Toyota of Orange forced me to use my 21 annual "Mirai days" - rental days intended for long-distance travel since the Mirai cannot leave California - every time I brought the vehicle for warranty service.

38.     Despite documented brake system malfunctions appearing in Toyota's own monitoring system, despite my 6-7 service visits, despite formal complaints, Toyota refused our request to repurchase the vehicle in 2023.

39.     They sent a letter stating they would take no action regarding our safety concerns.

40.     On July 17, 2024, my wife Wendy was rear-ended while driving the Mirai. Based on her description and my extensive experience with the vehicle's brake failures, this collision was caused by the vehicle's defective brake system. S

41.     he has suffered ongoing injuries including spinal issues and traumatic brain injury with visible white matter changes on MRI.

- 3 -

42.    After this accident, the vehicle also began experiencing power loss issues it hadn't exhibited before, adding another layer of danger to an already lethal vehicle.  These new power loss issues compounded the brake failures, making the vehicle unsafe and unfit for use.

43.    The stress of driving this defective vehicle became unbearable.

44.    Despite purchasing it to save on fuel costs versus my Tahoe, I eventually parked the Mirai and returned to driving the Tahoe because I knew it would stop when needed.

45.    The Mirai transformed from promised reliable transportation into a source of constant fear.

46.     It costs more to fuel the Mirai than my gas-guzzling Tahoe. Stations are rarely operational, and when they work, I've waited over 1.5 hours to fuel with six Mirais ahead of me.

47.    I never exceeded approximately 300 miles per tank even driving exclusively in ECO mode and although marketed at 402 miles per tank, the range steadily degraded over time, eventually falling to approximately 240 miles per tank.

48.    Toyota continues selling these vehicles, continues denying problems exist, continues forcing customers to risk their lives, and continues destroying evidence of safety failures while maintaining public claims of "legendary reliability."

49.    I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on this 29th day of September, 2025.

*Robert Davis*

**ROBERT DAVIS**

- 4 -

**Dropbox Sign**                                                    Audit trail

| | |
|---|---|
| **Title** | Declaration for Mirai Second Generation Safety Defect -... |
| **File name** | Rob_Davis_declaration_.docx |
| **Document ID** | ccaa4d21b815e77b0f57d99bd2cb51ae67984645 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document history

| | | |
|---|---|---|
| **SENT** | **09 / 30 / 2025** 02:26:21 UTC | Sent for signature to Robert Davis (homeofrob@gmail.com) from ji@jasoningber.com IP: 74.71.76.95 |
| **VIEWED** | **09 / 30 / 2025** 02:46:58 UTC | Viewed by Robert Davis (homeofrob@gmail.com) IP: 76.32.145.78 |
| **SIGNED** | **09 / 30 / 2025** 02:47:48 UTC | Signed by Robert Davis (homeofrob@gmail.com) IP: 76.32.145.78 |
| **COMPLETED** | **09 / 30 / 2025** 02:47:48 UTC | The document has been completed. |

**DECLARATION OF WENDY DAVIS**

I, WENDY DAVIS, declare as follows:

1.      I am over 18 years of age and competent to make this declaration. I am a California resident residing in Torrance, CA 90503. I make this declaration based on personal knowledge unless otherwise stated, and if called as a witness, I could and would testify.

2.      I owned a brand new 2022 Toyota Mirai, VIN JTDAAAAA1NA007300, which we purchased new in 2023 from Toyota of Orange in Orange County, California. Since purchasing the vehicle, we have experienced serious safety defects with the Mirai that Toyota has been unable or unwilling to fix.

3.      The Mirai exhibits dangerous and unpredictable braking malfunctions.

4.      I experienced terrifying incidents where the vehicle would suddenly slow down or have delayed response from the brake pedals, or where the car appeared to be "driving itself" and making power decisions contrary to driver input.

5.      We had to adopt the practice of driving in the far right lane to be able to quickly pull off the road when these malfunctions occurred.

6.      During one particularly frightening incident, my husband was driving our son when the vehicle performed what he described as an "emergency stop" with no warning. A truck nearly rear-ended the vehicle. My husband was so shaken that he couldn't sleep that night, telling me "I didn't think I was coming home."

7.      The vehicle exhibits erratic acceleration behavior. There is often a pause or hesitation when pressing the accelerator, followed sometimes by a sudden, jerky surge. This unpredictable response makes normal driving operations dangerous and difficult to control.

8.      The power issues are pronounced on inclines and when the vehicle is tilted, making routine maneuvers like entering and exiting driveways hazardous.

9.      The lane assist feature is dangerously defective. Instead of keeping us safely in our lane, it actively pulls the vehicle into oncoming traffic. We had to disable this "safety" feature because it made driving more dangerous, not safer.

10.     We reported these life-threatening defects to Toyota multiple times. We took the vehicle to Toyota of Orange at least twice, and also to Toyota Santa Monica. Each time, despite our detailed descriptions of the problems, Toyota claimed they "couldn't recreate" the issues and sent us away without any repairs or solutions.

- 1 -

Doc ID: 459e4eb9494af3b399f39c8fd842c4ef6d3a1ee6

11.     On one occasion, the service department acknowledged receiving our complaints about the braking system malfunctions but indicated they had no fix available. Specifically, a Toyota employee at one dealership told my husband that "the best thing is to get rid of it," acknowledging the vehicle's problems.

12.     On July 17, 2024, I was driving the Mirai to deliver medication for my husband Robert. On my return to work, I came to a complete stop at a traffic light. When the light turned green, emergency vehicles (fire truck) needed to pass through the intersection, so I kept my foot firmly on the brake.

13.     Despite pressing my foot flat on the brake pedal, the vehicle somehow glided forward before abruptly stopping.

14.     A driver behind me rear-ended my vehicle at high speed.

15.     After the impact, the entire car shut down and logged off completely, even though I had not turned off the engine.

16.     As a result of this accident, I suffered severe injuries that continue to affect every aspect of my life.

17.     An initial MRI was deemed insufficient, so I underwent specialized, in-depth brain and spinal imaging at a facility in Newport Beach that revealed the full extent of my injuries.

18.     The specialized MRI revealed that my L1 vertebra is completely crushed, which doctors identified as a primary source of my ongoing pain.

19.     I have a protrusion on my spine that pushes inward, causing constant radiating pain from my back through my neck.

20.     The pain comes in waves throughout the day and is sometimes unbearable.

21.     The MRI also revealed traumatic brain injury (TBI) with visible white matter changes in my brain tissue. This has resulted in cognitive impairment including brain fog, memory problems, and difficulty concentrating. I experience vertigo that affects my ability to walk and drive safely and this has been exacerbated since the collision, which my doctors attribute to the TBI's effect on my coordination and spatial awareness.

22.     I underwent plasma injection therapy (platelet-rich plasma/PRP) to soothe the crushed L1 vertebra. While it provided temporary relief for approximately two weeks, the pain returned in full force.

23.     I attempted physical therapy but had to discontinue it because the exercises caused excruciating pain that made the condition worse rather than better.

Doc ID: 459e4eb9494af3b399f39c8fd842c4ef6d3a1ee6

24.     My doctors advised me to stop physical therapy and focus on pain management instead.

25.     Specialists have recommended reconstruction surgery, but I declined due to the significant risks including potential paralysis, extended recovery time that would prevent me from working, and the surgeon's admission that the surgery could leave me worse off than before.

26.     Despite doctors recommending continued treatment, I can no longer afford the specialized care my injuries require.

27.     I work with people with disabilities, a job that requires standing, bending, and physical assistance. My injuries have severely compromised my ability to perform my duties. I must sit down frequently throughout the day, something I never needed before the accident.

28.     As a self-employed individual in California, I have no choice but to continue working through the pain to support my family, despite my body "letting me down" on a daily basis. The combination of chronic pain, cognitive impairment from the TBI, and vertigo fundamentally altered my quality of life.

29.     I continue to experience waves of back pain that radiate through my neck. The collapsed L1 vertebra and spinal protrusion cause pain in ways that no over-the-counter medication can adequately address.

30.     For a vehicle that cost over $50,000 and was marketed as having advanced safety features, the Mirai has proven to be a dangerous liability that altered my life, and Toyota refuses to address these defects despite repeated complaints and clear evidence of repeated failures.


I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.


Executed on this 27th day of September, 2025.



_____

**WENDY DAVIS**

- 3 -

Doc ID: 459e4eb9494af3b399f39c8fd842c4ef6d3a1ee6

**Dropbox Sign**

Audit trail

| | |
|---|---|
| **Title** | Enhanced Declaration for class support |
| **File name** | Wendy_Davis_Decla...for_signature.pdf |
| **Document ID** | 459e4eb9494af3b399f39c8fd842c4ef6d3a1ee6 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document history

| | | |
|---|---|---|
| **SENT** | **09 / 27 / 2025**<br>18:38:06 UTC | Sent for signature to Wendy Davis (wendydavis62918@yahoo.com) from ji@jasoningber.com<br>IP: 74.71.76.95 |
| **VIEWED** | **09 / 29 / 2025**<br>04:14:44 UTC | Viewed by Wendy Davis (wendydavis62918@yahoo.com)<br>IP: 98.148.48.24 |
| **SIGNED** | **09 / 29 / 2025**<br>04:16:30 UTC | Signed by Wendy Davis (wendydavis62918@yahoo.com)<br>IP: 98.148.48.24 |
| **COMPLETED** | **09 / 29 / 2025**<br>04:16:30 UTC | The document has been completed. |

# EXHIBIT H

## DECLARATION OF ENRIQUE REYES

I, ENRIQUE REYES, declare as follows:

1.      I am over 18 years of age and competent to make this declaration. I am a California resident residing in Torrance, CA 90503. I make this declaration based on personal knowledge unless otherwise stated, and if called as a witness, I could and would testify.

2.      On July 23, 2023, I purchased a new 2023 Toyota Mirai (VIN: JTDAAAAA1PA009731) from Toyota Santa Monica for $64,745.96, financed through Toyota Motor Credit Corporation with monthly payments of $899.25. A true and correct copy of my retail installment sale contract is attached as Exhibit 1.

3.      I am a district chef for California and travel extensively up and down the coast for work. I purchased the Mirai specifically because Toyota represented it could achieve "over 400 miles per tank" and that hydrogen refueling was "just like gasoline."

4.      My vehicle has never achieved more than 298 miles per tank.  The vehicle has geographic limitations that were not communicated when the car was sold.

5.      On September 4, 2025, while driving uphill in Newport Beach, my Mirai suddenly lost power with the accelerator pedal fully depressed, managing only 35 miles per hour.

6.      On September 5, 2025, the same power loss occurred. When I attempted to accelerate on the freeway, the vehicle capped at approximately 50 mph with no dashboard warnings or error codes.

7.      That day when I called Toyota Santa Monica to schedule service, the first question they asked was "Did you fill up at the 190th station?"

8.      When I confirmed "yes" they immediately stated "we think there's a contamination issue because we have 9 Mirais right now and you're going to be the 10th one down."

9.      They knew exactly which station was problematic before I told them anything beyond my power loss symptoms.

10.    On September 6, 2025, when I brought my vehicle to Toyota Santa Monica, their Service Department thrust a Toyota-issued questionnaire asking whether I let the hydrogen sit, how long it sat, and how old the hydrogen was in the vehicle.

11.    I refused to answer these blame-shifting and vague questions and wrote "N/A" on all of them.

12.    After delivering my vehicle, I independently contacted Air Products to inquire about Toyota's contamination claims.

- 1 -

Doc ID: a17227931f65a9027a2d039df9970e57bf1e88f7

13.     Within three hours, a "Will" from Air Products corporate headquarters called me directly to conduct an interview about the situation. Following my report, the 190th Street Torrance station was shut down and has remained closed for over three weeks.

14.     By September 24, 2025, Toyota Santa Monica had 19 inoperable Mirais due to fuel contamination, with the Service Manager confirming I was "number 11 in line" in regards to this issue for a repair or resolution.

15.     Another dealership reportedly has an additional 10 affected vehicles because of this reason.

16.     Toyota initially refused to provide a rental vehicle, claiming they wouldn't cover rentals until Toyota corporate completed its investigation. Only after I argued I would surrender the vehicle did they agree to use my "21 Mirai days" for a rental, which they said I had never used since purchasing the car.

17.     Despite having approximately 30 Mirais contaminated and inoperable, Toyota corporate has never issued any public notice, safety warning, or communication to other Mirai owners about contamination risks at the 190th Street station or any other location.

18.     My own research confirms no NHTSA filings or public announcements exist regarding this contamination event.

19.     Based on my research, fuel contamination with water vapor causes corrosion to the fuel cell stack, making it permanently inoperable. Toyota claims they can "purge" the contaminated fuel without replacing fuel cells, but this contradicts technical documentation about hydrogen fuel cell damage from water contamination with a potentially dangerous consequence.

20.     Prior to this incident, it took Toyota one and a half years to obtain a simple plastic cover under the driver's seat that their technician broke during routine service, i.e. Toyota does not have have the parts for a simple plastic cover for the Mirai, the ability to fix the fuel cell stack would require them as long to replace than a simple plastic piece as parts must be imported from Japan with extraordinary delays.

21.     I have driven approximately 41,000 miles on my Mirai over three years, filling at the 190th Street Torrance station approximately 90% of the time - between 200-300 fills – and this contamination event that Toyota knew about but never warned customers about caused a shutdown only after I had a conversation with corporate at Air Products.

22.     Throughout my time relying on the Torrance Airproducts the station would reliably be closed a few sporadic days a month and sometimes for weeks at a time.  The current shutdown is not new for the Torrance Airproducts station.

Doc ID: a17227931f65a9027a2d039df9970e57bf1e88f7

23.     My vehicle remains at Toyota Santa Monica, I continue making $899.25 monthly payments on an inoperable vehicle, and Toyota has provided no timeline for repair, no written documentation of the contamination, no written confirmation of anything, (only a corporate issued queistionarre for me to fill out) and no assurance the vehicle will ever be safe to operate again.

24.     Toyota has real-time monitoring of our vehicles (as evidenced by their immediate knowledge of which station caused problems), actively conceals safety defects and contamination events from customers and regulators, and continues selling these vehicles while knowing the hydrogen infrastructure cannot safely support them.

25.     The vehicle failed to be a reliable vehicle, especially as it cannot be reliably used for transportation due to a usual lack of fuel, had a total failure on a hill, and had a total failure on a highway with no fault codes or reasons provided by the vehicle itself, only a hurried phone call by the dealership that the fuel cell part of the vehicle is now contaminated and Toyota refuses to provide documentation as to the issues or diagnosis of the vehicle.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on this 24th day of September, 2025.



_____

**ENRIQUE REYES**

Doc ID: a17227931f65a9027a2d039df9970e57bf1e88f7

**Dropbox** Sign

Audit trail

| | |
|---|---|
| **Title** | Declaration Mirai |
| **File name** | Enrique_Reyes_Declaration_---.docx |
| **Document ID** | a17227931f65a9027a2d039df9970e57bf1e88f7 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document history

**SENT**
**09 / 25 / 2025**
05:33:03 UTC

Sent for signature to Enrique Reyes
(reyesenrique862@gmail.com) from ji@jasoningber.com
IP: 74.71.76.95

**VIEWED**
**09 / 25 / 2025**
14:37:55 UTC

Viewed by Enrique Reyes (reyesenrique862@gmail.com)
IP: 47.179.70.50

**SIGNED**
**09 / 25 / 2025**
15:10:23 UTC

Signed by Enrique Reyes (reyesenrique862@gmail.com)
IP: 47.179.70.50

**COMPLETED**
**09 / 25 / 2025**
15:10:23 UTC

The document has been completed.

# EXHIBIT I



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York New York 10007*

March 19, 2014

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

**Re: Toyota Motor Corporation – Deferred Prosecution Agreement**

Dear Messrs. Johnson and Fishbein and Ms. Cantwell:

      Pursuant to our discussions and written exchanges, the Office of the United States Attorney for the Southern District of New York (the "Office") and the defendant Toyota Motor Corporation ("Toyota"), under authority granted by its Board of Directors in the form of the written authorization attached as Exhibit A, hereby enter into this Deferred Prosecution Agreement (the "Agreement").

<u>The Criminal Information</u>

      1.    Toyota consents to the filing of a one-count Information (the "Information") in the United States District Court for the Southern District of New York (the "Court"), charging Toyota with committing wire fraud, in violation of Title 18, United States Code, Section 1343. A copy of the Information is attached as Exhibit B. This Agreement shall take effect upon its execution by both parties.

<u>Acceptance of Responsibility</u>

      2.    Toyota admits and stipulates that the facts set forth in the Statement of Facts, attached as Exhibit C and incorporated herein, are true and accurate. In sum, Toyota admits that it misled U.S. consumers by concealing and making deceptive statements about two safety related issues affecting its vehicles, each of which caused a type of unintended acceleration.

<u>Financial Penalty</u>

      3.    As a result of the conduct described in the Information and the Statement of Facts, Toyota agrees to pay to the United States $1.2 billion (the "Stipulated Financial Penalty") representing the financial penalty resulting from the offense described in the Information and Statement of Facts. Toyota agrees that the facts contained in the Information and Statement of Facts are sufficient to establish that the Stipulated Financial Penalty is subject to civil forfeiture to the United States and that this Agreement, Information, and Statement of Facts

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
March 19, 2014

may be attached to and incorporated into the Civil Forfeiture Complaint to be filed against the Stipulated Financial Penalty, a copy of which is attached as Exhibit D hereto. By this Agreement, Toyota specifically waives service of said Civil Forfeiture Complaint and agrees that a Final Order of Forfeiture may be entered against the Stipulated Financial Penalty. Upon payment of the Stipulated Financial Penalty, Toyota shall release any and all claims it may have to such funds and execute such documents as necessary to accomplish the forfeiture of the funds. Toyota agrees that it will not file a claim with the Court or otherwise contest the civil forfeiture of the Stipulated Financial Penalty and will not assist a third party in asserting any claim to the Stipulated Financial Penalty. Toyota agrees that the Stipulated Financial Penalty shall be treated as a penalty paid to the United States government for all purposes, including all tax purposes. Toyota agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, local, or foreign tax for any fine or forfeiture paid pursuant to this Agreement.

4.     Toyota shall transfer $1.2 billion to the United States by no later than March 25, 2014 (or as otherwise directed by the Office following such date). Such payment shall be made by wire transfer to the United States Marshals Service, pursuant to wire instructions provided by the Office. If Toyota fails to timely make the payment required under this paragraph, interest (at the rate specified in Title 28, United States Code, Section 1961) shall accrue on the unpaid balance through the date of payment, unless the Office, in its sole discretion, chooses to reinstate prosecution pursuant to paragraphs 10 and 11 below.

**Obligation to Cooperate**

5.     Toyota has cooperated with this Office's criminal investigation and agrees to cooperate fully and actively with the Office, the Federal Bureau of Investigation ("FBI"), the Department of Transportation ("DOT"), the National Highway Traffic Safety Administration ("NHTSA"), and any other agency of the government designated by the Office regarding any matter relating to the Office's investigation about which Toyota has knowledge or information.

6.     It is understood that Toyota shall (a) truthfully and completely disclose all information with respect to the activities of itself and its subsidiaries Toyota Motor Sales, U.S.A., Inc. ("TMS"), Toyota Motor North America, Inc. ("TMA), and Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA"), as well as with respect to the activities of officers, agents, and employees of Toyota, TMS, TMA, and TEMA, concerning all matters about which the Office inquires of it, which information can be used for any purpose; (b) cooperate fully with the Office, FBI, DOT, NHTSA, and any other law enforcement agency designated by the Office; (c) attend all meetings at which the Office requests its presence and use its best efforts to secure the attendance and truthful statements or testimony of any past or current officers, agents, or employees of Toyota, TMS, TMA, and TEMA at any meeting or interview or before the grand jury or at trial or at any other court proceeding; (d) provide to the Office upon request any document, record, or other tangible evidence relating to matters about which the Office or any designated law enforcement agency inquires of it; (e) assemble, organize, and provide in a responsive and prompt fashion, and upon request, on an expedited schedule, all documents, records, information and other evidence in Toyota's possession, custody or control as may be

2

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
March 19, 2014

requested by the Office, FBI, DOT, NHTSA, or designated law enforcement agency; (f) volunteer
and provide to the Office any information and documents that come to Toyota's attention that
may be relevant to the Office's investigation of this matter, any issue related to the Statement of
Facts, and any issue that would fall within the scope of the duties of the independent monitor (the
"Monitor") as set forth in paragraph 15; (g) provide testimony or information necessary to
identify or establish the original location, authenticity, or other basis for admission into evidence
of documents or physical evidence in any criminal or other proceeding as requested by the Office,
FBI, DOT, NHTSA, or designated law enforcement agency, including but not limited to
information and testimony concerning the conduct set forth in the Information and Statement of
Facts; (h) bring to the Office's attention all criminal conduct by or criminal investigations of
Toyota or any of its agents or employees acting within the scope of their employment related to
violations of the federal laws of the United States, as to which Toyota's Board of Directors, senior
management, or United States legal and compliance personnel are aware; (i) bring to the Office's
attention any administrative or regulatory proceeding or civil action or investigation by any U.S.
governmental authority that alleges fraud by Toyota; and (j) commit no crimes whatsoever under
the federal laws of the United States subsequent to the execution of this Agreement.  To the extent
the provisions of this paragraph relate to information or attendance of personnel located in Japan,
the parties to this Agreement acknowledge that the request, provision, or use of such information,
or attendance of personnel, is subject to applicable laws and legal principles in Japan.  In the
event the Office determines that information it receives from Toyota pursuant to this provision
should be shared with DOT and/or NHTSA, the Office may request that Toyota provide such
information to DOT and/or NHTSA directly.  Toyota will submit such information to DOT and/or
NHTSA consistent with the regulatory provisions related to the protection of confidential
business information contained in 49 C.F.R. Part 512 and 49 C.F.R. Part 7.  Nothing in this
Agreement shall be construed to require Toyota to provide any information, documents or
testimony protected by the attorney-client privilege, work product doctrine, or any other
applicable privilege.

   7. Toyota agrees that its obligations pursuant to this Agreement, which shall
commence upon the signing of this Agreement, will continue for three years from the date of the
Court's acceptance of this Agreement, unless otherwise extended pursuant to paragraph 12 below.
Toyota's obligation to cooperate is not intended to apply in the event that a prosecution against
Toyota by this Office is pursued and not deferred.

**Deferral of Prosecution**

   8. In consideration of Toyota's entry into this Agreement and its
commitment to: (a) accept and acknowledge responsibility for its conduct; (b) cooperate with the
Office, FBI, DOT, NHTSA, and any other law enforcement agency designated by this Office;
(c) make the payments specified in this Agreement; (d) comply with Federal criminal laws; and
(e) otherwise comply with all of the terms of this Agreement, the Office shall recommend to the
Court that prosecution of Toyota on the Information be deferred for three years from the date of
the signing of this Agreement.  Toyota shall expressly waive indictment and all rights to a speedy
trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States

3

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
March 19, 2014

Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Southern District of New York for the period during which this Agreement is in effect.

9.    It is understood that this Office cannot, and does not, agree not to prosecute Toyota for criminal tax violations. However, if Toyota fully complies with the terms of this Agreement, no testimony given or other information provided by Toyota (or any other information directly or indirectly derived therefrom) will be used against Toyota in any criminal tax prosecution. In addition, the Office agrees that, if Toyota is in compliance with all of its obligations under this Agreement, the Office will, within thirty (30) days after the expiration of the period of deferral (including any extensions thereof), seek dismissal with prejudice as to Toyota of the Information filed against Toyota pursuant to this Agreement. Except in the event of a violation by Toyota of any term of this Agreement, the Office will bring no additional charges against Toyota, except for criminal tax violations, relating to its conduct as described in the admitted Statement of Facts. This Agreement does not provide any protection against prosecution for any crimes except as set forth above and does not apply to any individual or entity other than Toyota and its subsidiaries TMS, TMA, and TEMA. Toyota and the Office understand that the Agreement to defer prosecution of Toyota must be approved by the Court, in accordance with 18 U.S.C. § 3161(h)(2). Should the Court decline to approve the Agreement to defer prosecution for any reason, both the Office and Toyota are released from any obligation imposed upon them by this Agreement, and this Agreement shall be null and void, except for the tolling provision set forth in paragraph 10.

10.    It is further understood that should the Office in its sole discretion determine based on facts learned subsequent to the execution of this Agreement that Toyota has: (a) knowingly given false, incomplete or misleading information to the Office, FBI, DOT, or NHTSA, either during the term of this Agreement or in connection with the Office's investigation of the conduct described in the Information and Statement of Facts, (b) committed any crime under the federal laws of the United States subsequent to the execution of this Agreement, or (c) otherwise violated any provision of this Agreement, Toyota shall, in the Office's sole discretion, thereafter be subject to prosecution for any federal criminal violation of which the Office has knowledge, including but not limited to a prosecution based on the Information, the Statement of Facts, or the conduct described therein. Any such prosecution may be premised on any information provided by or on behalf of Toyota to the Office and/or FBI, DOT, or NHTSA at any time. In any such prosecution, no charge would be time-barred provided that such prosecution is brought within the applicable statute of limitations period, excluding (a) any period subject to any prior or existing tolling agreement between the Office and Toyota and (b) the period from the execution of this Agreement until its termination. Toyota agrees to toll, and exclude from any calculation of time, the running of the applicable criminal statute of limitations for the length of this Agreement starting from the date of the execution of this Agreement and including any extension of the period of deferral of prosecution pursuant to paragraph 12 below. By this Agreement, Toyota expressly intends to and hereby does waive its rights in the foregoing respects, including any right to make a claim premised on the statute of limitations, as well as any

4

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
March 19, 2014

constitutional, statutory, or other claim concerning pre-indictment delay. Such waivers are knowing, voluntary, and in express reliance on the advice of Toyota's counsel.

11.     It is further agreed that in the event that the Office, in its sole discretion, determines that Toyota has violated any provision of this Agreement, including by failure to meet its obligations under this Agreement: (a) all statements made by or on behalf of Toyota to the Office, FBI, DOT, and/or NHTSA, including but not limited to the Statement of Facts, or any testimony given by Toyota or by any agent of Toyota before a grand jury, or elsewhere, whether before or after the date of this Agreement, or any leads from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings hereinafter brought by the Office against Toyota; and (b) Toyota shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by or on behalf of Toyota before or after the date of this Agreement, or any leads derived therefrom, should be suppressed or otherwise excluded from evidence. It is the intent of this Agreement to waive any and all rights in the foregoing respects.

12.     Toyota agrees that, in the event that the Office determines during the period of deferral of prosecution described in paragraph 8 above (or any extensions thereof) that Toyota has violated any provision of this Agreement, an extension of the period of deferral of prosecution may be imposed in the sole discretion of the Office, up to an additional one year, but in no event shall the total term of the deferral-of-prosecution period of this Agreement exceed four (4) years.

13.     Toyota, having truthfully admitted to the facts in the Statement of Facts, agrees that it shall not, through its attorneys, agents, or employees, make any statement, in litigation or otherwise, contradicting the Statement of Facts or its representations in this Agreement. Consistent with this provision, Toyota may raise defenses and/or assert affirmative claims in any civil proceedings brought by private parties as long as doing so does not contradict the Statement of Facts or such representations. Any such contradictory statement by Toyota, its present or future attorneys, agents, or employees shall constitute a violation of this Agreement and Toyota thereafter shall be subject to prosecution as specified in paragraphs 8 through 11, above, or the deferral-of-prosecution period shall be extended pursuant to paragraph 12, above. The decision as to whether any such contradictory statement will be imputed to Toyota for the purpose of determining whether Toyota has violated this Agreement shall be within the sole discretion of the Office. Upon the Office's notifying Toyota of any such contradictory statement, Toyota may avoid a finding of violation of this Agreement by repudiating such statement both to the recipient of such statement and to the Office within forty-eight (48) hours after having been provided notice by the Office. Toyota consents to the public release by the Office, in its sole discretion, of any such repudiation. Nothing in this Agreement is meant to affect the obligation of Toyota or its officers, directors, agents or employees to testify truthfully to the best of their personal knowledge and belief in any proceeding.

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
March 19, 2014

14.    Toyota agrees that it is within the Office's sole discretion to choose, in the event of a violation, the remedies contained in paragraphs 10 and 11 above, or instead to choose to extend the period of deferral of prosecution pursuant to paragraph 12. Toyota understands and agrees that the exercise of the Office's discretion under this Agreement is unreviewable by any court. Should the Office determine that Toyota has violated this Agreement, the Office shall provide notice to Toyota of that determination and provide Toyota with an opportunity to make a presentation to the Office to demonstrate that no violation occurred, or, to the extent applicable, that the violation should not result in the exercise of those remedies or in an extension of the period of deferral of prosecution, including because the violation has been cured by Toyota.

### Independent Monitor

15.    Toyota agrees to retain a Monitor upon selection by the Office and approval by the Office of the Deputy Attorney General, whose powers, rights and responsibilities shall be as set forth below.

(a).    <u>Jurisdiction, Powers, and Oversight Authority</u>.    To address issues related to the Statement of Facts and Information, the Monitor shall have the authorities and duties defined below. The scope of the Monitor's authority is to review and assess Toyota's policies, practices or procedures as set forth below, and is not intended to include substantive review of the correctness of any of Toyota's decisions relating to compliance with NHTSA's regulatory regime, including the National Traffic and Motor Vehicle Safety Act, its implementing regulations, and related policies. Nor is it intended to supplant NHTSA's authority over decisions related to motor vehicle safety.

(1).    Review and assess whether Toyota's policies, practices, or procedures ensure that Toyota's public statements in the United States related to motor vehicle safety are true and accurate;

(2).    Review and assess the effectiveness of Toyota's policies, practices, or procedures for making information relating to accidents that take place in the United States available to Toyota's engineers, Toyota's chief quality officer for North America, and Toyota's regional product safety executive for North America; and

(3).    Review and assess whether Toyota's policies, practices, or procedures regarding the generation of field technical reports – as opposed to other internal reporting mechanisms, including, but not limited to, the "intra-company communication" – in the United States ensure compliance with 49 C.F.R. Part 579.

It is the intent of this Agreement that the provisions regarding the Monitor's jurisdiction, powers, and oversight authority and duties be broadly construed, subject to the following limitation: the Monitor's responsibilities shall be limited to Toyota's activities in the United States, and to the extent the Monitor seeks information outside the United States, compliance with such requests shall be consistent with the applicable legal principles in that jurisdiction. Toyota shall adopt all

6

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
March 19, 2014

recommendations submitted by the Monitor unless Toyota objects to any recommendation and
the Office agrees that adoption of such recommendation should not be required.

(b).    Access to Information.  The Monitor shall have the authority to take
such reasonable steps, in the Monitor's view, as necessary to be fully informed about those
operations of Toyota within or relating to his or her jurisdiction.  To that end, the Monitor shall
have:

(1).    Access to, and the right to make copies of, any and all non-
privileged books, records, accounts, correspondence, files, and any and all other documents or
electronic records, including e-mails, of Toyota and its subsidiaries TMS, TMA, and TEMA, and
of officers, agents, and employees of Toyota, TMS, TMA, and TEMA, within or relating to his
or her jurisdiction that are located in the United States.  To the extent the Monitor believes such
information from Japan is reasonably necessary, Toyota will make its best efforts to request the
information and make it available to the Monitor in the United States consistent with applicable
laws and legal principles in Japan; and

(2).    The right to interview any officer, employee, agent, or consultant
of Toyota, TMS, TMA, and TEMA conducting business in or present in the United States and to
participate in any meeting in the United States concerning any matter within or relating to the
Monitor's jurisdiction.

To the extent that the Monitor seeks access to information contained within privileged
documents or materials, Toyota shall use its best efforts to provide the Monitor with the
information without compromising the asserted privilege.

(c).    Confidentiality.

(1).    The Monitor shall maintain the confidentiality of any non-public
information entrusted or made available to the Monitor.  The Monitor shall share such
information only with the Office and FBI.  The Monitor may also determine that such
information should be shared with DOT and/or NHTSA.  In the event of such a determination,
the Monitor may request that Toyota provide the subject information directly to DOT and/or
NHTSA.  Toyota will submit such information to DOT or NHTSA consistent with the regulatory
provisions related to the protection of confidential business information contained in 49 C.F.R.
Part 512 and 49 C.F.R. Part 7.

(2).    The Monitor shall sign a non-disclosure agreement with Toyota
prohibiting disclosure of information received from Toyota to anyone other than to the Office,
FBI, DOT, or NHTSA, and anyone hired by the Monitor.  Within thirty days after the end of the
Monitor's term, the Monitor shall either return anything obtained from Toyota, or certify that
such information has been destroyed.  Anyone hired by the Monitor shall also sign a non-
disclosure agreement with similar return or destruction requirements as set forth in this sub-
paragraph.

7

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
March 19, 2014

(d).    <u>Hiring Authority</u>.  The Monitor shall have the authority to employ legal counsel, consultants, investigators, experts, and any other personnel necessary to assist in the proper discharge of the Monitor's duties.

(e).    <u>Implementing Authority</u>.  The Monitor shall have the authority to take any other actions in the United States that are necessary to effectuate the Monitor's oversight and monitoring responsibilities.

(f).    <u>Miscellaneous Provisions</u>.

(1).    <u>Term</u>.  The Monitor's authority set forth herein shall extend for a period of three years from the commencement of the Monitor's duties, except that (a) in the event the Office determines during the period of the Monitorship (or any extensions thereof) that Toyota has violated any provision of this Agreement, an extension of the period of the Monitorship may be imposed in the sole discretion of the Office, up to an additional one-year extension, but in no event shall the total term of the Monitorship exceed the term of the Agreement; and (b) in the event the Office, in its sole discretion, determines during the period of the Monitorship that the employment of a Monitor is no longer necessary to carry out the purposes of this Agreement, the Office may shorten the period of the Monitorship.

(2).    <u>Selection of the Monitor</u>.    The Office shall consult with Toyota, including soliciting nominations from Toyota, using its best efforts to select and appoint a mutually acceptable Monitor (and any replacement Monitors, if required) as promptly as possible.  In the event that the Office is unable to select a Monitor acceptable to Toyota, the Office shall have the sole right to select a monitor (and any replacement Monitors, if required. To ensure the integrity of the Monitorship, the Monitor must be independent and objective and the following persons shall not be eligible as either a Monitor or an agent, consultant or employee of the Monitor: (a) any person previously employed by Toyota; or (b) any person who has been directly adverse to Toyota in any proceeding.  The selection of the Monitor must be approved by the Deputy Attorney General.

(3).    <u>Notice regarding the Monitor; Monitor's Authority to Act on Information received from Employees; No Penalty for Reporting</u>.  Toyota shall establish an independent, toll-free answering service to facilitate communication anonymously or otherwise with the Monitor.  Within 10 days of the commencement of the Monitor's duties, Toyota shall advise employees of its subsidiaries TMS, TMA, and TEMA in writing of the appointment of the Monitor, the Monitor's powers and duties as set forth in this Agreement, the toll-free number established for contacting the Monitor, and email and mail addresses designated by the Monitor. Such notice shall inform employees that they may communicate with the Monitor anonymously or otherwise, and that no agent, consultant, or employee of Toyota shall be penalized in any way for providing information to the Monitor.  In addition, such notice shall direct that, if an employee is aware of any violation of any law or any unethical conduct that has not been reported to an appropriate federal, state or municipal agency, the employee is obligated to report such violation or conduct to Toyota's compliance office in the United States or the Monitor.  The

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
March 19, 2014

Monitor shall have access to all communications made using this toll-free number. The Monitor has the sole discretion to determine whether the toll-free number is sufficient to permit confidential and/or anonymous communications or whether the establishment of an additional toll-free number is required.

(4).   Reports to the Office.   The Monitor shall keep records of his or her activities, including copies of all correspondence and telephone logs, as well as records relating to actions taken in response to correspondence or telephone calls.  If potentially illegal or unethical conduct is reported to the Monitor, the Monitor may, at his or her option, conduct an investigation, and/or refer the matter to the Office. The Monitor should, at his or her option, refer any potentially illegal or unethical conduct to Toyota's compliance office.  The Monitor may report to the Office whenever the Monitor deems fit but, in any event, shall file a written report not less often than every four months regarding: the Monitor's activities; whether Toyota is complying with the terms of this Agreement; and any changes that are necessary to foster Toyota's compliance with any applicable laws, regulations and standards related to the Monitor's jurisdiction as set forth in paragraph 15(a).  Such periodic written reports are to be provided to Toyota and the Office.  The Office may, in its sole discretion, provide to FBI all or part of any such periodic written report, or other information provided to the Office by the Monitor.  The Office may also determine that all or part of any such periodic report, or other information provided to the Office by the Monitor, be provided to DOT and/or NHTSA.  In the event of such a determination, the Office may request that Toyota transmit such report, part of a report, and/or non-public information to DOT and/or NHTSA directly.  Toyota will submit such report, part of a report, and/or non-public information to DOT and/or NHTSA consistent with the regulatory provisions related to the protection of confidential business information contained in 49 C.F.R. Part 512 and 49 C.F.R. Part 7.  Toyota may provide all or part of any periodic written reports to NHTSA or other federal agencies or governmental entities.  Should the Monitor determine that it appears that Toyota has violated any law, has violated any provision of this Agreement, or has engaged in any conduct that could warrant the modification of his or her jurisdiction, the Monitor shall promptly notify the Office, and when appropriate, Toyota.

(5).   Cooperation with the Monitor.   Toyota and all of its officers, directors, employees, agents, and consultants, and all of the officers, directors, employees, agents, and consultants of Toyota's subsidiaries TMS, TMA, and TEMA shall have an affirmative duty to cooperate with and assist the Monitor in the execution of his or her duties provided in this Agreement and shall inform the Monitor of any non-privileged information that may relate to the Monitor's duties or lead to information that relates to his or her duties.  Failure of any Toyota, TMS, TMA, or TEMA officer, director, employee, or agent to cooperate with the Monitor may, in the sole discretion of the Monitor, serve as a basis for the Monitor to recommend dismissal or other disciplinary action.

(6).   Compensation and Expenses.   Although the Monitor shall operate under the supervision of the Office, the compensation and expenses of the Monitor, and of the persons hired under his or her authority, shall be paid by Toyota.  The Monitor, and any persons hired by the Monitor, shall be compensated in accordance with their respective typical hourly

9

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
March 19, 2014

rates.  Toyota shall pay bills for compensation and expenses promptly, and in any event within 30 days.  In addition, within one week after the selection of the Monitor, Toyota shall make available, at either TMS, TMA or TEMA, office space, telephone service and clerical assistance sufficient for the Monitor to carry out his or her duties.

(7).   <u>Indemnification</u>.   Toyota   shall   provide   an   appropriate indemnification agreement to the Monitor with respect to any claims arising out of the performance of the Monitor's duties.

(8).   <u>No Affiliation</u>.  The Monitor is not, and shall not be treated for any purpose, as an officer, employee, agent, or affiliate of Toyota.

### Limits of this Agreement

16.     It is understood that this Agreement is binding on the Office but does not bind any other Federal agencies, any state or local law enforcement agencies, any licensing authorities, or any regulatory authorities.  However, if requested by Toyota or its attorneys, the Office will bring to the attention of any such agencies, including but not limited to any regulators, as applicable, this Agreement, the cooperation of Toyota, and Toyota's compliance with its obligations under this Agreement.

### Public Filing

17.     Toyota and the Office agree that, upon the submission of this Agreement (including the Statement of Facts and other attachments) to the Court, this Agreement and its attachments shall be filed publicly in the proceedings in the United States District Court for the Southern District of New York.

18.     The parties understand that this Agreement reflects the unique facts of this case and is not intended as precedent for other cases.

### Execution in Counterparts

19.     This Agreement may be executed in one or more counterparts, each of which shall be considered effective as an original signature.

10

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
March 19, 2014

### Integration Clause

20.    This Agreement sets forth all the terms of the Deferred Prosecution
Agreement between Toyota and the Office. No modifications or additions to this Agreement shall
be valid unless they are in writing and signed by the Office, Toyota's attorneys, and a duly
authorized representative of Toyota.

PREET BHARARA
United States Attorney
Southern District of New York

By:    *Bonnie Jonas*

BONNIE JONAS
SARAH E. MCCALLUM
Assistant United States Attorneys

*Richard Zabel / B*

RICHARD B. ZABEL
Deputy United States Attorney

Accepted and agreed to:

Christopher P. Reynolds
General Counsel and Chief Legal Officer,
Toyota Motor North America, Inc.
Group Vice President,
Toyota Motor Sales U.S.A., Inc.

James E. Johnson, Esq.
Matthew Fishbein, Esq.
Helen Cantwell, Esq.
Attorneys for TOYOTA

11

# EXHIBIT J

### DECLARACIÓN DE JOSE LINO SALINAS

Yo, Jose Lino Salinas, residente de Lakewood, California declaro bajo pena de perjurio conforme a las leyes del Estado de California que lo siguiente es verdadero y correcto según mi mejor conocimiento:

1. Mi nombre es Jose Lino Salinas y mi lengua materna es el Español.

2. Yo compré un 2022 Toyota Mirai en el dealer de Toyota of Orange, con dirección en 1400 N. Tustin Street, Orange, California 92867.

3. Yo no fui completamente informado sobre las repercusiones de el sistema de combustible de hidrógeno del vehículo en el momento de la compra. El vendedor me informo que el Mirai usaba combustible hidrogeno y que habia una aplicacion que ensenaba las ubicaciones de estaciones de hidrogeno. Al mirar la aplicacion, se visualizaba que eran pocas y distantes de donde yo vivia. Por tal motivo, yo le comunique al vendedor que las pocas estaciones de combustible causarian un problema para mi pero el me respondio que a corto plazo estas estaciones se incrementarian para la facilidad y bienestar de los usuarios.

4. Durante el uso de el vehiculo, empezaron a incrementarse los problemas por el abastecimiento de combustible, fallas tecnicas en los equipos, y el desabastecimiento de hidrogeno y otras más como lo detallo en la carta del Anexo A.

5. Previamente, el vendedor me recomendó que para facilidad y por la ubicación de mi domicilio para el abastecimiento de hidrogeno, debería hacerlo en la estación de servicio ubicada en 11807 Carson Street, Hawaiian Gardens, California. Sin embargo, esa estación generalmente estuvo inoperativa.

6. Ante estos inconvenientes, tenia que ir a otras dos estaciones más distantes. La estacion de combustible de hidrógeno más cercana estába en Orange, California, lo que requeria un viaje de 25 minutos desde mi residencia. Además, el proceso

- 1 -
**DECLARACION DE JOSE LINO SALINAS**

Doc ID: 31bcaf33e9cc2c59a0262246f00b8271661bb991

de llenar el Mirai con combustible tomaba aproximadamente una hora. Esta situacion me afecto financialmente y me quito mi tiempo, los cuales reporte como reclamos al número telefónico señalado en las estaciones.

7. Esta situación se convirtió en una ansiedad, originada por la constante preocupación de sentirme engañado y decepcionado de no poder disfrutar el uso de el Mirai en mi rutina diaria. Por esa razon, decidi enviar una carta a Toyota of Orange con el fin de terminar con este problema.

8. En Abril 27, 2023, yo visité el concesionario de Toyota of Orange con la intención de entregar la carta mencionada.  El gerente, que hablaba Español, Jose Espinoza no queria recibir mi carta porque me indico que Toyota of Orange no aceptaban ese tipo de cartas. Yo le insiste y finalmente la recibio y leyo.

9. Recibida la carta y leida por Mr. Espinoza, una vendedora Lucy Reynoso me hizo pasar a una oficina para conversar con ella y con Mr. Espinoza. Yo les reitere los problemas de el Mirai y les mencione mi intencion de devolverlo.

10. El gerente, Mr. Espinoza me informó que devolver el vehículo afectaría negativamente mi puntaje de crédito. Yo le explique que me sentia enganado y queria devolver el Mirai. Al ver que mi decision era final, Mr. Espinoza sugirió que, en lugar de devolver el automóvil, debería considerar obtener otro vehículo para evitar posibles problemas de crédito. Mr. Espinoza sugirio que obtenga un Toyota Camry el cual usa gasolina como remplazo por el Mirai. El me explico que esto seria considerado un cambio y no me afectaria a mi credito.

11. Basada en la representacion de Mr. Espinoza, yo acepté discutir más opciones con el concesionario. Despues, firme un formulario en Ingles devolviendo el Mirai y firme un nuevo contrato de compra por el Toyota Camry que tambien estaba en Ingles.

- 2 -

**DECLARACION DE JOSE LINO SALINAS**

Doc ID: 31bcaf33e9cc2c59a0262246f00b8271661bb991

12. Despues de firmar ambos documentos, deje el Mirai en Toyota of Orange y me fui, asumiendo que el contrato de el Mirai habia sido anulado como se acordo.

13. Sin embargo, después de aproximadamente un mes, yo comenze a recibir cartas y llamadas telefonicas constantes de Toyota Financial informandome que aún debía dinero por el Mirai, el cual yo ya habia dejado en Toyota of Orange.

14. Yo estaba confundido y consternado por las comunicaciones de Toyota Financial y decidi llamar a Toyota of Orange para hablar con Jose Espinoza en Español acerca de el asunto.

15. Durante nuestra conversación telefónica, le expresé mis preocupaciones acerca de las llamadas de Toyota Financial y la deuda restante. El insistió en que yo no me preocupara y que no conteste las llamadas hasta que Toyota Financial se cansen.

16. Preocupado por la situación, contacté al departamento legal de Toyota Financial. Me confirmaron que el concesionario me había engañado por todo lo ocurrido con la devolucion de el Mirai y que yo aún era responsible de la deuda de el auto.

17. La cantidad pagada antes de devolver el Mirai era entre $6,000 y $10,000, con un pago mensual de $734.94. Todavia existe una deuda pendiente con Toyota Financial por el Mirai. Tambien tengo un segundo contrato por el Toyota Camry, con un pago mensual de $706.

18. Esta situacion me hizo sentír que el gerente no me tomó en serio durante nuestras interacciones, lo que me hizo sentir ignorante y menos que humano. Este trato añadió al estrés y la frustración que experimenté durante todo este proceso.

19. Yo declaro bajo pena de perjurio que lo anterior es verdadero y correcto.

- 3 -

**DECLARACION DE JOSE LINO SALINAS**

Doc ID: 31bcaf33e9cc2c59a0262246f00b8271661bb991

1

2

3

Fecha: 10 de Septiembre de 2024          **JOSE LINO SALINAS**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 4 -

**DECLARACION DE JOSE LINO SALINAS**

**Dropbox Sign**                                                                 Audit trail

| | |
|---|---|
| **Title** | Revised Final Affidavit (Spanish) - Jose Lino Salinas |
| **File name** | Jose_Lino_Salinas...vised_Spanish.pdf |
| **Document ID** | 31bcaf33e9cc2c59a0262246f00b8271661bb991 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document history

| | | |
|---|---|---|
| **SENT** | **09 / 11 / 2024**<br>03:45:07 UTC | Sent for signature to Jose Salinas (josalinas13@gmail.com) from ji@jasoningber.com<br>IP: 136.158.10.87 |
| **VIEWED** | **09 / 11 / 2024**<br>03:47:06 UTC | Viewed by Jose Salinas (josalinas13@gmail.com)<br>IP: 104.28.85.109 |
| **SIGNED** | **09 / 11 / 2024**<br>15:05:01 UTC | Signed by Jose Salinas (josalinas13@gmail.com)<br>IP: 104.28.85.109 |
| **COMPLETED** | **09 / 11 / 2024**<br>15:05:01 UTC | The document has been completed. |

Powered by **Dropbox Sign**

# EXHIBIT K

**DECLARATION OF GRANT DAVIS**

I, Grant Davis, declare as follows:

1.      I am over 18 years of age and competent to make this declaration. I make this declaration based on personal knowledge unless otherwise stated, and if called as a witness, I could and would testify.

2.      In or about April 2023, I purchased a new 2022 Toyota Mirai from Toyota Santa Monica (VIN JTDAAAAA7NA007530).

3.      At the time of purchase, Toyota's marketing on their website Toyota.com/mirai, which I had reviewed at least a week prior to the purchase, described the Mirai as safe, reliable, and as convenient to fuel as a gasoline vehicle.

4.      I relied on these representations when deciding to purchase. The dealership near my home in Northern California emphasized that I would lose out on significant cash incentives if I did not act quickly, and this pressure contributed to my decision to complete the purchase.

5.      I traveled from Sacramento to Santa Monica to buy the vehicle, as it was not available at local dealerships.

6.      Since acquiring the Mirai, I have repeatedly experienced a serious and dangerous defect. On at least 10 to 20 occasions, the vehicle has lost all propulsion while I was attempting to exit my apartment complex or other parking lots, especially where there was a downward slope and sometimes when merging into traffic.

7.      During these events, the gas pedal became unresponsive even when fully depressed.

8.      The car would either roll or remain motionless, leaving me stranded at the lip of the parking lot or in lanes with oncoming traffic.

9.      In several instances, I was stuck in a suicide lane with cars approaching, pressing the accelerator pedal all the way to the floor with no response, and only after several seconds would the car suddenly regain power.

10.      These events have been frightening and have created serious safety hazards.

11.      The Mirai has also triggers false braking alerts. While backing up, the car has displayed warnings that people or obstacles were behind me when there were none, and the system attempted to intervene unnecessarily with harsh and sudden almost violent braking.

12.      This has made normal maneuvering stressful and unreliable.

13.      Fueling the Mirai has been extremely burdensome. In Sacramento, there is only one hydrogen fueling station. I frequently encounter long lines, often waiting an hour or more to fill up.

- 1 -

Doc ID: 2684993322df756e4bfaa1972fcdb40020684490

14.      The station imposes mandatory waiting intervals between fills, further increasing delays.

15.      At times, the station was down for entire weekends due to overheating or misuse, leaving me unable to fuel the vehicle at all. These fueling difficulties severely limited my ability to use the Mirai for ordinary transportation.

16.      When I first purchased the Mirai, I was able to achieve just over 300 miles on a full tank. Over time, the range decreased significantly. Even after filling the tank completely (which is obvious from the fuel pump's reading that over 5 kilograms have been dispensed in to the car) the vehicle typically projects a maximum range of only 259 to 280 miles. On some occasions, the dashboard displayed an estimated range as low as 240 miles with the air conditioning running.

17.      These numbers are far below the 400-mile range advertised by Toyota.com and the dealership sales agent.

18.      In addition, the high cost of hydrogen means that refueling has become much more expensive than operating a conventional gasoline vehicle.

19.      I raised the power loss issue once during a regular service visit at Roseville Toyota. The service department advised that they would need to keep the vehicle for an extended period and dismantle it to investigate, which would be costly and time-consuming. Because the problem was intermittent and could not be replicated on demand, I did not proceed. I also contacted Toyota Financial Services to try to exit the loan or return the vehicle, but I was told I remained fully responsible for the debt.

20.      Less than a year after purchase, and with under 10,000 miles on the odometer, I attempted to sell the Mirai. The highest offer I received was approximately $15,000, which would have left me with more than $30,000 in negative equity.

21.      The vehicle depreciated far more quickly than I had been led to expect, leaving me trapped in a loan balance I could not escape.

22.      The Mirai has become a financial and practical burden. The fueling card provided with the vehicle is non-transferable, which means I cannot sell the car privately with meaningful value. I have been left with a vehicle that is unsafe, unreliable, expensive to operate, and nearly impossible to resell.

23.      I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Doc ID: 2684993322df756e4bfaa1972fcdb40020684490

Executed on this 1st day of October, 2025.

**GRANT DAVIS**

Doc ID: 2684993322df756e4bfaa1972fcdb40020684490

**✖ Dropbox** Sign

Audit trail

---

| | |
|---|---|
| **Title** | Grant Davis Declaration |
| **File name** | Grant_Davis_Declaration_FINAL.docx |
| **Document ID** | 2684993322df756e4bfaa1972fcdb40020684490 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

---

Document history

| | | |
|---|---|---|
| **SENT** | **10 / 01 / 2025**<br>20:24:27 UTC | Sent for signature to Grant Davis (grantdavis2001@gmail.com) from ji@jasoningber.com<br>IP: 74.71.76.95 |
| **VIEWED** | **10 / 01 / 2025**<br>22:17:37 UTC | Viewed by Grant Davis (grantdavis2001@gmail.com)<br>IP: 172.56.169.18 |
| **SIGNED** | **10 / 01 / 2025**<br>22:24:05 UTC | Signed by Grant Davis (grantdavis2001@gmail.com)<br>IP: 172.56.169.18 |
| **COMPLETED** | **10 / 01 / 2025**<br>22:24:05 UTC | The document has been completed. |

---

Powered by **✖ Dropbox** Sign

# EXHIBIT L

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>**Declaration of Zachary Graham, Second Lieutenant,**</u>

<u>**United States Marine Corps**</u>

1.     My name is Zachary Graham. I serve the United States Marine Corps as a Second Lieutenant, and I submit the following to be true under penalty of perjury under the laws of the state of California.  This declaration is not on behalf of the Department of Defense in any way; this is my personal statement, based on my personal knowledge.

**A.     Military Background & Current Order to Move Out of California**

2.     I enlisted in the Marine Corps in 2012.

3.     In 2019, I was selected for the Marine Enlisted Commissioning Education Program (MECEP).

4.     This selection made me eligible to pursue a commission as a Marine Corps office while attending a university.  I was able to attend Officer Candidate School and participate in a Naval Reserve Officer Training Corps (NROTC) program at that university.

5.     I travelled to Los Angeles, California in 2020 to complete my Bachelor of Science Degree in Applied Mathematics at UCLA and commission as a Marine Corps Officer.

6.     I now have military orders to travel to attend the Basic Officer Course (BOC) at The Basic School (TBS) in Quantico, VA, for 7 months.

**B.     Initial Interaction with Toyota**

7.     In 2017, I was the owner of a very used Honda Civic. In anticipation for my need for a new vehicle, I contacted Temecula Valley Toyota and spoke with a salesperson named Johnathan Teng. Mr. Teng assured me that I could lease a vehicle and return it in the event I received military orders to relocate.

8.     I informed Mr. Teng that my only trade-in value was my problematic Honda Civic, and Mr. Teng assured me that this would not pose an issue. While en route to Temecula Valley Toyota from Oceanside, my Honda Civic broke down. As a

- 1 -

1   result, I had to call a company to tow the vehicle to Temecula Valley Toyota. Upon

2   arrival, despite the condition of the Honda, the dealership accepted it as a trade-in, and

3   I proceeded to lease a brand-new Toyota Camry. This arrangement, as promised,

4   allowed me to return the Camry in 2018 when I received military orders to relocate to

5   Okinawa, Japan. The transaction concluded with minor expenses of approximately

6   $200 for scratches incurred during the lease period. This fortuitous deal bolstered my

7   trust in the Toyota brand, and encouraged me to revisit a Toyota dealership in the future

8   to pursue a similar deal.

9       **C.    Mirai Purchase at Toyota Santa Monica**

10      9.    In response to online input Toyota of Santa Monica emailed me about the

11  2023 Toyota Corolla.

12      10.    I received an email from toyotasantamonica@toyotasantamonica.com on

13  Fri, Jun 23, 2023 at 2:23 PM with the Subject: "Re: Your vehicle inquiry"

14      11.    The email read: "Good afternoon, Zach! This is Will Jannace from Toyota

15  Santa Monica. I see that you are interested in leasing the 2023 Corolla! that's great!

16  When can you make it down for a test drive? Let me know! Best, Will Jannace Toyota

17  Santa Monica 424-291-4577."

18      12.    On June 23, 2023, I visited Toyota Santa Monica with intent to trade in

19  my current vehicle, a Honda Civic, to lease a Toyota Corolla.

20      13.    I anticipated a relocation from California within the 12-24 months due to

21  my military service from the date I entered into the dealership on the premise of a car

22  other than the Mirai.

23      14.    Upon arrival, I met with Will Jannace, a salesperson at the dealership. He

24  knew that I was interested in leasing a Toyota Corolla or a similar car.

25      15.    I explicitly informed Jannace of my military status and my need for

26  flexibility in returning the vehicle.

27

28

- 2 -

**DECLARATION OF ZACHARY GRAHAM**

16.    Jannace indicated that he could assist me and proposed a finance agreement for a 2023 Toyota Mirai, highlighting several incentives, including a free hydrogen fuel voucher.

17.    During our discussions, the Sales Manager, Paul Yerkanyan, joined us and outlined the financial benefits of the Mirai, including a 0% APR, a $22,500 rebate, a $4,500 rebate check, and free fuel, and promises that refueling hydrogen is an easy straightforward process.

18.    Based on these incentives and assurances, I agreed to purchase the Toyota Mirai, financing a total amount of $42,358.93.

19.    Again, during the sale process I explicitly informed the salespersons of my anticipation of relocation out of state and they assured me this would not be an issue.

**D.    Discovery of Misrepresentations**

20.    Within about one month of owning the car on my way home from Downey I stopped to refuel and it took over an hour and a half to have a turn to refuel because there were six Mirais ahead of me.

21.    More fundamentally, the website https://h2fcp.org/stationmap is essentially the exclusive source for information on where to find available hydrogen and it is rarely accurate.

22.    The paltry available stations that indicate they are operation are often down or more frequently do not allow me to fully fuel my entire tank.

23.    Sometimes the stations would not only be down, but appear unsafe.

24.    Late at night at a Santa Monica fuel station, the station was marked as "active" as denoted "green" on the website, but when I attempted to connect the pump, the blue sleeve wouldn't lock onto my vehicle.

25.    Despite my efforts to secure it, the nozzle eventually flew off after pumping began, leading me to hit the emergency button.

- 3 -

**DECLARATION OF ZACHARY GRAHAM**

26.     The pump stopped working, and when I called for assistance, I was told it would take at least until the next day for the station to come back online. This occurred at approximately 11 p.m.

27.     My next day consisted of an early morning physical training and naval science labs, with a new task prior to this; travel in the other direction to Van Nuys for fuel.

28.     At the Van Nuys station, it would often only fill a sixth of my tank before stopping, requiring me to restart the process.

29.     Eventually, after multiple attempts, the station would stop providing fuel altogether, often forcing me to seek out fuel in San Fernando Valley because the Santa Monica station was no longer functional.

30.     The Torrance fuel station often appeared in my search engine as operational, but it had issues.

31.     Soon after I bought the vehicle, I discovered that all accessible hydrogen fuel stations for fuel cell electric vehicles (FCEVs) were exclusively located in California, precluding my ability to relocate the vehicle as initially intended and expressed to Toyota salespersons.

32.     This critical fuel limitation was not disclosed by Jannace, Yerkanyan, or any other personnel at the dealership during the transaction.

33.     My concerns about this limitation were further validated during a routine maintenance visit, where a Toyota service specialist expressed shock that I had not been informed of the vehicle's restrictions prior to purchase.

**E.     Financial Crisis**

34.     On June 18, 2024, I returned to Toyota Santa Monica for routine maintenance and inquired about trading in my vehicle. I was informed that the outstanding balance on my loan was $35,887, but the vehicle's appraised value was $11,000, leaving me with ***negative equity exceeding $24,000***.

**DECLARATION OF ZACHARY GRAHAM**

35.    As a Marine Corps commissioned officer, I am required to be financially responsible so that I can maintain my security clearance. While I am and will continue to be financially responsible, the situation I am now in because of this deal has jeopardized my financial status and could still threaten my security clearance.

36.    Since I am relocating from an independent duty status in California to a student status in Virginia, I will also be taking a significant pay cut due to the cost-of-living difference and lack of eligibility for a housing allowance. I receive $9,698 per month with my current pay grade and time in service, and I will receive $5,712 per month in Virginia. I will now have to pay for a car I cannot use with nearly half the pay.

37.    I have military orders to leave the state; the car cannot be driven across the state or be transported since it is a FCEV that needs California-exclusive hydrogen fuel; I cannot trade the car in because of the negative equity; Toyota has denied my request for a buyback; and selling on the private market would still leave me with a gross amount of negative equity that I would be responsible for.

38.    I asked Toyota on numerous occasions for help and they punted the issue with vague answers to my requests for a backbuy/stay on the loan or other help.

39.    I have since retained legal representation and am prepared to pursue legal action against Toyota, the dealership, and other involved parties. The failure to disclose the significant limitations of the vehicle, despite my explicit communication of my military status and need for location flexibility, constitutes a breach of good faith and fair dealing.

40.    I went in that day with confidence in Toyota and looking to buy a Corolla before I was directed to the Mirai, lured in with incentives, stuck with a car that would never properly refuel and shockingly cannot be driven out of state.

41.    I am seeking resolution through either a buyback of the vehicle or forgiveness of the negative equity as soon as possible.

- 5 -

**DECLARATION OF ZACHARY GRAHAM**

42.    This is an emergency situation since I will be at a critical school for the Marine Corps. There, I will not be available to deal with this matter as often.

Impact on Military Career

43.    This stark financial hardship challenges my security clearance as mentioned earlier in this statement. This situation could severely impact my ability to serve my country and achieve my professional and personal goals.

44.    My service means everything to me. War is something we as Marines constantly have to train and prepare for, and TBS uniquely does that for newly commissioned Marine officers. There is never any telling when or where, we just need to be ready at all times. Instead of putting full faith and effort towards preparing for combat, I have to focus on this. Upsetting and unfortunate are terrible understatements for this situation.

45.    Regarding my next chapter, my performance will be evaluated perpetually at TBS and will determine what specialty I end up with and I also may be able to secure the ability to retire in 10 years. It matters a lot how well TBS goes.

46.    What happens at TBS will follow me wherever I go in the Marine Corps. It is burdensome enough to undertake this challenge under normal circumstances. I will now have to undertake this pivotal challenge in tandem with tending to the situation posited in this declaration.

47.    This debacle coupled with the cavalier attitude exhibited towards these life altering circumstances by representatives of Toyota has thwarted my ability to fully prepare and focus on serving my country and leading future Marines into combat in the future.

48.    The dealership knowingly beguiled me into buying a car that I could not take with me to my next duty station despite knowing my imminent PCS.

49.    They could have sold me any other car, or accommodated my original request to lease a Corolla, but they deliberately sold me this car for their own personal gain and completely upended this crucial period of my life.

**DECLARATION OF ZACHARY GRAHAM**

50.    Every call for help I've made to Toyota Financial Services, Brand Engagement, or the dealership that sold me this car has been stonewalled and denied.

51.    I am in an urgent situation and I need emergency relief.

52.    I have spent all summer trying to find a resolution and now I will have to manage this fiasco while being at TBS where I will have little to no free time to even deal with this situation. I need to focus on TBS so that I can be the best commander for my Marines and Sailors in the fleet.

53.    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge.


Dated:  September 6, 2024                    ZACHARY GRAHAM

**DECLARATION OF ZACHARY GRAHAM**

# CALIFORNIA ALL-PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Los Angeles_

On _September 6, 2024_ before me, _Brigitte Knerr, Notary Public_,
(Here insert name and title of the officer)

personally appeared _Zachary Graham_,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_BKnerr_
Signature of Notary Public

(Notary Seal)

> BRIGITTE KNERR
> Notary Public - California
> Los Angeles County
> Commission # 2488312
> My Comm. Expires May 24, 2028

◆━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━◆

## ADDITIONAL OPTIONAL INFORMATION

### DESCRIPTION OF THE ATTACHED DOCUMENT

_____
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages _____ Document Date_____

_____
(Additional information)

### CAPACITY CLAIMED BY THE SIGNER
☐ Individual (s)
☐ Corporate Officer
_____
(Title)
☐ Partner(s)
☐ Attorney-in-Fact
☐ Trustee(s)
☐ Other _____

### INSTRUCTIONS FOR COMPLETING THIS FORM
*Any acknowledgment completed in California must contain verbiage exactly as appears above in the notary section or a separate acknowledgment form must be properly completed and attached to that document. The only exception is if a document is to be recorded outside of California. In such instances, any alternative acknowledgment verbiage as may be printed on such a document so long as the verbiage does not require the notary to do something that is illegal for a notary in California (i.e. certifying the authorized capacity of the signer). Please check the document carefully for proper notarial wording and attach this form if required.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document

2008 Version CAPA v12.10.07 800-873-9865  www.NotaryClasses.com

# EXHIBIT M

# Exhibit A – Predicate Acts Chart (Mail and Wire Fraud)

Representative, non-exhaustive list of predicate acts committed in furtherance of the Toyota Hydrogen Enterprise. Continuous conduct includes synchronized website claims across Toyota and dealer domains across Toyota and dealer domains and ongoing TMCC billing, credit reporting, and repossession practices.

| # | Date / Range | Sender / Entity | Recipient / Entity | Medium / Transmission | Exact Statement / Act | Why False When Made | Where Seen / How Disseminated | Reliance / Exposure | Injury / Damages | Continuity Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2016–Present (continuous) | Toyota Motor Sales (TMS) + Authorized Dealers (Longo, Tustin, Orange, Santa Monica) | Public incl. Plaintiffs | Web (toyota.com/mirai + dealer sites via syndicated CMS feeds) | Repeated claims: "462-mile EPA-estimated range"; "5-minute refueling/as gasoline"; "Reposition reliability"; copy | Internal statements allowed >50% uptime and 30+ minute average refueling; engineers flagged liability; dealer sites mirrored corporate copy | Corporate website, dealer websites, mirrored landing pages and SEO ads. | Viewed by Plaintiffs and Class | Overpayment flows of car, safety exposure, diminished value. | Statements remain live; authors/published across dealer domains. |
| 2 | Jun 11 2021 | TMS (Longo Toyota / rep: Aish Sheikh) | Amirah Kamran | Web + in-person sales presentation | "462 miles per tank"; "expanding hydrogen infrastructure already approved." | At that time <40 stations existed; >50% offline; internal records contradicted expansion claims. | Longo showroom + Toyota.com/mirai pages reviewed week prior. | Kamran relied and purchased a 2021 Mirai, financed via TMCC. | Purchase price ~ $60K; subsequent reliability and payments without use. | Dealer messaging followed corporate scripts. |
| 3 | Nov 2024–Present (monthly) | Toyota Motor Credit Corporation (TMCC) | Kamran + Class | Mail and mailing statements; automated notices | Monthly statements demanding payment for vehicles known to be inoperable. | TMCC knew from dealer repair data (Toyota of Orange) vehicle was disabled; continued billing to extract payments. | Postal mail, email TMCC online portal statements. | Kamran received and paid under credit/damage threat. | Economic loss, credit harm; interest accrual while vehicle down. | Ongoing monthly cycle for years practice for Mirai accounts. |
| 4 | 2019–Present (continuous) | TMCC Collections Department | Mirai owners (Class) | Texts, letters, and call center scripts | Threats of repossession and negative credit reporting despite known defects and inoperability. | Internal policy to treat defaulters like any other / used to suppress complaints and returns. | Automated dialers, templated SMS mailed notices. | Owners coerced to continue payments; some surrendered vehicles. | Repossessions, credit score declines, fees. | Uniform practice across jurisdictions; ongoing. |
| 5 | 2019–Present (continuous) | TMCC Credit Dept. — Credit Bureaus (Experian/Equifax/TransUnion) | Credit reporting agencies | Electronic Metro 2 wire submissions | Ongoing negative credit reporting and repossession notations for Mirai loans. | TMCC furnishes despite knowledge of defects, internal credit pressure tactic memos. | Automated nightly reporting feeds. | Owners exposure deleterious credit histories. | Lower credit scores, increased borrowing costs, loss of vehicles. | Continuous for at least six years. |
| 6 | 2019–present (annually/quarterly) | TMS / FirstElement / Shell / Air Products | CA regulators & public | Press releases, CalFCP postings, wires | Claims that network would grow to 100 stations by 2025; | Internal data showed <10 operational stations; 60–80% downtime; to purchase Mirais. | Press wire, CalFCP map, corporate filings. | Consumers relied when deciding to purchase Mirais. | Standing, towing, lost time, vehicle devaluation. | Repeated in multiple PR cycles; never corrected. |
| 7 | Mar 2024–Present (quarterly) | TMS Dealer Daily Bulletins | All CA Toyota dealers | Dealer portal (electronic) | Directive: continue "5-minute refueling" language; avoid written mention of downtime. | Contradicted telemetry and partner reports showing widespread outages. | Dealer Daily portal, sales desk printouts. | Used by Tustin Toyota in Alvarez sale. | Uniform overpayment via omission, compounding reliance. | Bulletins updated and reissued periodically. |
| 8 | Feb 2025 (and ongoing reposts) | TMS Toyota YouTube Channel | Public / Class | Wire (YouTube uploads, social ads) | Video: "Refuels in 5 minutes like gasoline." | Engineering warned average refuel >35 minutes; frequent nozzle freeze/abort mid-fuel. | YouTube channel embedded on dealer sites, paid ads. | Viewed pre-purchase by Class members. | Induced sales; mailed on convenience and safety. | Video remains live; algorithmically renewed. |
| 9 | Sept 27 2024 | Toyota of Orange technicians | Amirah Kamran | In-person service communication | "Surprised you didn't hear a ticking noise before a boom." | Acknowledges combustion risk; no advance warnings or recall provided. | Service bay, repair order contact, notes. | Kamran experienced freeway power loss, towed to dealer. | Fear (loss of use); repair delays, expenses. | Pattern of pre-sale disclosure absence; knowledge gap. |
| 10 | Jan 2024 | Michael D. Hernandez | Michael Hernandez | Oral + service invoice notes | Warned: driving with both feet for unintended acceleration. | Mirrors past playbook: known throttle control anomalies; shifts blame to customer. | Service counter, invoice narrative. | Paid for service, continued risk. | Out-of-pocket costs, safety exposure. | Standardized deflection response. |
| 11 | Sept 5 2025 | Toyota of Orange Service Manager | Enrique Reyes | Phone call | "Did you fill at 100% station? Then your car is contaminated." | Inbound service call; dealer service notes. | Inbound service call; dealer service notes. | Reyes blamed after power loss in transit. | Towing, missed work, safety risks. | Vehicle inoperable; $1,200 drain charge; ongoing loss, recall. |
| 12 | Sept 2025–Present (quarterly) | TMS + FirstElement | Public/Mirai owners | h2fcp.org status feed (wire) | Stations shown "online" despite telemetry failures. | Directive to maintain 'active' status to avoid refund triggers. | Official map, station status pages. | Owners relied, attended mid-trip, stranded. | Loss of use, towing, storage, rental costs. | Status feed/API services downtime disclosure flaws, 'active'. |
| 13 | ~Dec 2023–Present | TMNA Infrastructure Team | TMS / TMCC staff | Inter-office emails (wire) | "Maintain expanding-infra messaging; no public admissions." | Minutes noted closures and contamination; messaging continued unchanged. | Email distro lists, weekly dis-exec list. | Sales and collections teams instructed thereon. | Continued sales, coerced repayments. | Ongoing weekly cadence. |
| 14 | Mar 2024–Present (continuous) | TMS Marketing / Regulatory Submissions | EPA & Public | Mail + electronic filings | "402-mile EPA range certifications premised on non-replicable protocols." | Modified conditions, disabled limiters, not achievable by consumers. | EPA docket, press materials, Monterey books. | Buyers relied on EPA numbers. | Price premium, deception of regulators and consumers. | Used across MY2021-2025. |
| 15 | May 18 2025 | Tustin Toyota (rep: Adrian) | Public | In-person sale; electronic contract | "40% effic. range." "Toyota building cross stations," "no problems," "2-day rental benefit covers outages." | Alvarez knowledge of current defects; downtime; promises untrue when made. | Dealer lot, swap platform; dealer website, rental. | Alvarez relied, purchased CPO Mirai (VIN ending 7298). | Down payment, lease-in-use -90% depreciation. | Same script used for other buyers. |
| 16 | Jul 11 2025 | Toyota Tustin Manager (Adam Panda) | Dennis Eaton | In-person sale | Refused assistance: "You're $15k upside down; nothing we can do." | Ignored reported safety defect; continued finance obligations. | Printed invoice, customer copy emails. | Eaton exited at loss to avoid danger. | $15,000 cash loss; replacement vehicle costs. | Consistent dealer stance statewide. |
| 17 | 2019-2025 (quarterly) | TMNA / TMS Executives | Dealers & partners | Hydrogen Program emails (wire) | Claims challenge metrics, "expanding network" narrative, sales targets. | Contradicted telemetry and partner failure data. | Email packets, partner calls. | Dealers kept selling; TMCC kept financing. | Unfair employment, systemic risk. | Pattern drives open-ended continuity. |
| 18 | Jun 17 2025 | Toyota of Tustin Service Dept (Timothy Rau) | Nicholas Spruck | Phone + service visit | "Hydrogen bomb waiting to go off" due to leaks near hot components; forced expensive repairs. | Confirms internal knowledge of leak risk; no recall or broad notices. | Service bay, RO notes. | Spruck paid; feared driving. | Out-of-pocket; safety risk. | Other owners received similar warnings privately. |
| 19 | Sept 2025 | Toyota Engineering Team — Execs | Internal leadership | Email (wire) | "Stack integrity testing suppressed—not recall-able." | Intentional non-reporting to NHTSA; concealment of safety data. | Internal email threads. | Used to avoid recall obligations. | Ongoing danger to owners; monetary losses. | Part of institutional coverup. |
| 20 | 2020–Present (continuous) | Toyota Finance / TMS Marketing | Dealers & public | Mailers, web banners, finance desks | "0.0% APR for qualified buyers" specialized Mirai promotions. | Designed to lure buyers into defective vehicles; internal Mirai subsidies push. | Dealer F&I, Toyota.com finance promos. | Buyers relied to afford purchases. | Debt entrapment, property loss. | Released with each model year; multi-state. |
| 21 | Nov 20 2024 | Toyota of Tustin (Repair Order C002093) | Amirah Kamran | Service invoice (written copy) | Documented: internal failure of fuel cell air compressor; HV battery 0.0% SOC; unable to READY'c. | Internal defect known at dealer/corporate level during inoperability. | Printed invoice, customer copy emails. | Kamran informed after failure; no recall obligations. | Loss of use; towing, storage, rental costs. | Similar ROs across multiple dealers. |
| 22 | | | | | | | | | | |
| 23 | Feb 2024 | Shell Hydrogen (station operator) + TMS messaging | Bay Area Mirai owners | Press / web updates | Closure of seven Bay Area stations; TMS continued "expanding infrastructure" claims. | Direct contradiction of public closures; buyers still told growth imminent. | Press releases, dealer sites. | NorCal buyers relied; stranded. | Travel costs, inability to refuel; resale collapse. | Pattern of ignoring closures. |
| 24 | 2013-2019 | Prospective buyers | Prospective buyers | Operational practice | Flawed forecasts of used Mirais to Cali State LA station for fueling preval. | Shows dealers knew local stations were inoperable; concealed from buyers. | Dealer ops, witness testimony. | Buyers misled re fueling. | Deception/used sales. Brer | Practice persisted for years. |
| 25 | Feb 2025 | Costa Mesa Toyota Sales Manager | Public (Spruck visit) | In-person | Refused to sell Mirais. "They're problems"; "still owner 'Good luck with your problem vehicle." | Dealer knowledge of systemic defects while other dealers continued sales push. | Showroom interaction. | Reveals internal consensus on defects. | Marketability collapse; owner harm. | Similar ROs across multiple dealers. |
| 26 | Sept 2025 | Costa Mesa Toyota Forms | Contamination victims | Questionnaires (wire/mail) | Additional owners felt hydrogen set and about 'age of hydrogen' to blame fuel. | Designed to shift fault to contamination; avoids warranty and recall obligations. | Email forms, dealer admins. | Victims exploited under duress for service approval. | Denials of warranty, cube/recall claims. | Builds author Torrance duster. |

This Exhibit is representative and non-exhaustive. Vehicle and dealership misrepresentations persist across multiple domains, TMCC's billing, negative credit reporting, and repossession practices have continued for at least six years without interruption. Plaintiffs reserve the right to supplement this chart upon discovery.