Jason M. Ingber (SBN 318323)
**Ingber Law Group**
3580 Wilshire Blvd., Suite 1260
Los Angeles, California 90010
Telephone: (213) 805-8373
E-mail: ji@jasoningber.com

Attorneys for Plaintiffs
AMINAH KAMRAN,
DEBORAH ALVAREZ
DENNIS EATON
ENRIQUE REYES
NICHOLAS SPRUCK
WENDY DAVIS
ROBERT DAVIS

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| AMINAH KAMRAN, DEBORAH ALVAREZ, DENNIS EATON, ENRIQUE REYES, NICHOLAS SPRUCK, WENDY DAVIS, ROBERT DAVIS | CASE NO:  2:25-cv-09542 |
| | **FIRST AMENDED COMPLAINT** |
| Plaintiffs, | (1) **Violation of Song-Beverly Consumer Warranty Act;** |
| v. | (2) **Violation of California Unfair Competition Law;** |
| TOYOTA MOTOR SALES, U.S.A., INC., and DOES 1 through 5, inclusive, | (3) **Fraudulent Concealment;** |
| | (4) **Negligent Misrepresentation;** |
| Defendants. | (5)  **Breach of Express Warranty;** |
| | (6)  **Breach of Implied Warranty;** |
| | (7) **Violation of Magnuson-Moss Warranty Act** |
| | |
| | **DEMAND FOR JURY TRIAL** |

- 1 -
**COMPLAINT**

Plaintiffs Aminah Kamran, Deborah Alvarez, Enrique Reyes, Dennis Eaton, Nicholas Spruck, Wendy Davis, and Robert Davis file this First Amended Complaint against Defendant Toyota Motor Sales, U.S.A., Inc.

## INTRODUCTION

1.      This action arises from Toyota's systematic fraud in marketing, selling, and leasing the Toyota Mirai hydrogen fuel cell vehicle to California consumers. Toyota sold Mirai vehicles in California between 2016 and 2025, representing virtually all U.S. Mirai sales, while concealing that the vehicles were fundamentally incapable of functioning as promised due to defects in the vehicles themselves and a permanently inadequate hydrogen fueling infrastructure that Toyota knew would never support practical vehicle ownership.

2.      Toyota's own Technical Service Bulletins reveal the depth of its knowledge. Multiple TSBs contain the phrase "except Mirai" or "other than the Mirai," explicitly excluding the Mirai from repair procedures, diagnostic processes, and maintenance protocols that apply to Toyota's entire vehicle lineup. These exclusions—documented in Toyota's own internal service literature—prove Toyota knew the Mirai had unique, systemic defects requiring special handling that Toyota chose not to disclose to consumers.

3.      In a March 22, 2018 letter to the California Energy Commission, Toyota's Director of Advanced Technologies, Craig Scott, admitted that Toyota "has sold and leased over 3300 Mirai FCVs in California since launch, and this would not have been possible without California's support to build the early retail fueling network." This admission—that the Mirai program depended entirely on government subsidies to survive—was never disclosed to consumers who believed they were purchasing commercially viable vehicles.

4.      Toyota's pre-delivery service bulletins reveal that the Mirai required unique and extensive procedures before being sold to customers. Technical Service Bulletin T-SB-0118-20, dated December 9, 2020, established a comprehensive 12-

**COMPLAINT**

page pre-delivery checklist specific to the 2021 Mirai—far exceeding the preparation required for any other Toyota vehicle. This included specialized Techstream software requirements, D/C cut fuse installation procedures, and extensive system initializations that demonstrated Toyota's knowledge that the Mirai was fundamentally different from—and more problematic than—its conventional vehicle lineup.

5. Toyota issued Tech Tip T-TT-0738-23 in August 2023 acknowledging widespread fuel cell system malfunctions in 2021-2022 Mirai vehicles, instructing dealers to complete "customer surveys" and create Toyota Assistance Service (TAS) cases for vehicles experiencing diagnostic trouble codes P1F6C71 and/or P1F6E71. This systematic data collection demonstrates Toyota's organized effort to monitor and document known fuel cell defects while continuing to sell defective vehicles to consumers.

6. Technical Service Bulletin T-SB-0021-24, dated April 5, 2024, contains the explicit instruction: "To reduce parasitic battery drain on vehicles (other than the Mirai) that are placed in storage for one week or more, the negative (–) battery cable should ALWAYS be disconnected." This "other than the Mirai" exclusion—appearing in Toyota's own service literature—is a corporate admission that the Mirai's electrical systems are fundamentally incompatible with standard Toyota maintenance procedures.

7. In August 2025, Toyota's outside counsel at King & Spalding confirmed the scope of harm when attorney John Hooper wrote that Toyota Legal was "informing Toyota's business units" about "approximately 700 clients" represented by Plaintiffs' counsel, implementing organization-wide directives to cease collection activities and protect credit reporting. This communication proves Toyota knew that hundreds of consumers were experiencing identical, systematic problems—not isolated incidents.

8. Counsel admitted Toyota expected continued consumer harm, writing: "If someone falls through the cracks and their credit is... [not] handled as outlined above, we expect that you will recognize that can happen with this number of people." This

- 3 -
**COMPLAINT**

admission proves Toyota knew its internal systems were inadequate to prevent ongoing consumer harm, yet continued business as usual while consumers suffered damaged credit, debt collection harassment, and vehicle repossession.

9. Plaintiffs bring this action seeking damages for Toyota's violations of California consumer protection laws, breach of express and implied warranties, fraudulent concealment, negligent misrepresentation, unfair business practices, and violations of the Magnuson-Moss Warranty Act.

## **PARTIES**

10. Plaintiff Aminah Kamran is an individual residing in Los Angeles County, California. In 2021, Ms. Kamran purchased a 2021 Toyota Mirai (VIN: JTDAAAAA9MA002506) from a Toyota dealership in California for approximately $60,000, financed through Toyota Motor Credit Corporation with monthly payments of $549.67.

11. Plaintiff Deborah Alvarez is an individual residing in Rancho Santa Margarita, Orange County, California. On May 18, 2025, Ms. Alvarez entered a retail installment sale contract with Oremor of Tustin, LLC for a certified pre-owned 2022 Toyota Mirai (VIN: JTDAAAAA3NA007296) with 24,660 miles from Toyota of Orange.

12. Plaintiff Dennis Eaton is an individual who resided in Rancho Santa Margarita, California at the time of purchase and subsequently relocated to Utah. In September 2022, Mr. Eaton and his wife Angela purchased a 2019 Toyota Mirai (VIN: JTDBVRBD2KA007253) from Toyota Tustin.

13. Plaintiff Enrique Reyes is an individual residing in Los Angeles County, California. Mr. Reyes purchased a Toyota Mirai from a Toyota dealership in California, with monthly payments of $899.25.

14. Plaintiff Nicholas Spruck is an individual residing in Irvine, California. On November 1, 2023, Mr. Spruck purchased a certified pre-owned 2021 Toyota Mirai

- 4 -
**COMPLAINT**

(VIN: JTDAAAAA0MA002989) from Longo Toyota located at 3534 Peck Road, El Monte, California 91731, for approximately $20,000 plus a $15,000 hydrogen fuel card.

15.    Plaintiffs Wendy Davis and Robert Davis are individuals residing in Gardena, California. In 2023, the Davises purchased a new 2022 Toyota Mirai (VIN: JTDAAAAA1NA007300) from Toyota of Orange in Orange County, California, for approximately $50,000 after taxes and fees. Ms. Davis works with people with disabilities, a physically demanding job requiring standing, bending, and physical assistance.

16.    Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS") is a corporation organized and existing under the laws of the State of California, with its principal place of business located at 6565 Headquarters Drive, Plano, Texas 75024. TMS is a wholly-owned subsidiary of TMNA and serves as the sales, marketing, distribution, and service arm for Toyota and Lexus vehicles in the United States. TMS authored, approved, and disseminated the uniform marketing materials, website content at Toyota.com/mirai, dealer training modules, sales scripts, and Monroney labels containing the misrepresentations and omissions at issue in this case. TMS was the marketing and sales engine that created and disseminated the fraudulent claims to consumers.

17.    The true names and capacities of Defendants sued herein as DOES 1 through 5, inclusive, are unknown to Plaintiffs at this time. Plaintiffs therefore sue these Defendants by such fictitious names. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged herein, and that Plaintiffs' damages as alleged herein were proximately caused by their conduct. These Doe Defendants include but are not limited to additional Toyota affiliates, hydrogen infrastructure partners, or other participants in the enterprise alleged herein. When the true names and capacities of these Doe

Defendants are ascertained, Plaintiffs will seek leave to amend this Complaint to insert their true names and capacities herein.

## JURISDICTION AND VENUE

18.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs assert claims under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq., a federal statute.

19.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Defendant conducts substantial business in this District, Plaintiffs reside in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

21.     Plaintiffs, by filing this First Amended Complaint, hereby voluntarily dismiss, without prejudice, all class action allegations set forth in the original Complaint. This action proceeds solely on behalf of the individually named Plaintiffs identified herein.

## FACTUAL ALLEGATIONS

**The Toyota Mirai and Its Promises**

22.     The Toyota Mirai is a hydrogen fuel cell electric vehicle ("FCEV") that Toyota began selling in California in 2015. Toyota marketed the Mirai as the "future of mobility"—a zero-emission vehicle that would provide all the benefits of electric driving with the convenience of quick refueling, claiming drivers could "refuel in about 5 minutes" and achieve ranges comparable to gasoline vehicles.

23.     On November 18, 2021, Toyota issued a press release announcing 2022 Mirai pricing, touting "Up to EPA Estimated 402 Miles of Range" and "Up to $15,000

of Hydrogen Fuel Included with Mirai Purchase or Lease." Toyota marketed the vehicle as a practical daily driver, not an experimental technology requiring consumer sacrifice.

24.    Toyota sold all Mirai vehicles exclusively in California, which has the only retail hydrogen fueling network in the United States. Between 2016 and 2025, Toyota sold or leased approximately 13,500 Mirai vehicles to California consumers at prices ranging from $49,500 to over $66,000 MSRP.

25.    Each Mirai was sold with Toyota's express warranties, including a comprehensive 8-year/100,000-mile warranty on fuel cell components, a 3-year/35,000-mile ToyotaCare maintenance plan, and roadside assistance for three years with unlimited miles.

26.    Plaintiffs do not allege that third-party hydrogen stations themselves constitute the vehicle defect; infrastructure inadequacy is alleged solely to demonstrate Toyota's knowledge, concealment, and the falsity of its representations at the time of sale.

**Toyota's Internal Knowledge of Systemic Defects**

27.    Toyota's own Technical Service Bulletins reveal that the company knew the Mirai had unique, systemic defects requiring procedures fundamentally different from its entire conventional vehicle lineup.

28.    TSB T-SB-0118-20 (December 9, 2020): Toyota issued a dedicated 12-page Pre-Delivery Service bulletin exclusively for the 2021 Mirai. This bulletin required dealers to perform extensive specialized procedures before selling Mirai vehicles, including D/C Cut Fuse Installation to address battery discharge issues, Tire Pressure Warning System initialization, Steering Angle Sensor calibration, and Entune App Suite Connect initialization. The bulletin required specialized Techstream diagnostic equipment with "Software version 15.30.027 or later"—demonstrating that the Mirai required unique diagnostic tools unavailable for standard Toyota vehicles.

- 7 -
**COMPLAINT**

29. TSB T-SB-0021-24 (April 5, 2024): Toyota's Battery Inspection and Maintenance During PDS bulletin explicitly states: "To reduce parasitic battery drain on vehicles (other than the Mirai) that are placed in storage for one week or more, the negative (–) battery cable should ALWAYS be disconnected." This "other than the Mirai" exclusion proves Toyota knew the Mirai's electrical architecture was fundamentally incompatible with standard Toyota maintenance procedures—a defect Toyota concealed from consumers.

30. The "(Except Mirai)" exclusion was not a one-time anomaly. Toyota issued substantively identical exclusions across multiple Technical Service Bulletins spanning years: TSB T-SB-0039-21 (June 3, 2021), TSB T-SB-0033-22 (April 1, 2022), TSB T-SB-0104-22 (November 28, 2022), and TSB T-SB-0024-23 (May 26, 2023). Each bulletin contains identical maintenance tables instructing dealers to disconnect the negative battery terminal for vehicles stored 30 days or more—"(Except Mirai)." This multi-year pattern of explicit Mirai exclusions demonstrates that Toyota's knowledge of the Mirai's unique electrical defects was longstanding, systematic, and deliberately concealed from consumers.

31. The TSBs reveal that the Mirai's battery maintenance exclusion was not merely procedural but reflected fundamental architectural defects. TSB T-SB-0033-22 explains that disconnecting the negative terminal on hybrid vehicles "prevent[s] the SOC of the auxiliary battery from decreasing during storage due to parasitic current." Toyota's explicit instruction that this standard procedure could not be performed on the Mirai—while it could be performed on every other hybrid and fuel cell vehicle in Toyota's lineup—proves Toyota knew the Mirai's electrical system suffered from unique parasitic drain issues that Toyota's own repair procedures could not address.

32. Toyota's Technical Service Bulletins reveal that the Mirai required diagnostic tools and software versions unavailable for standard Toyota vehicles. TSB T-SB-0104-22 requires Techstream "Software version 17.20.013 or later" while TSB T-SB-0024-23 requires "GTS+ software version 2023.04.003.02 or later"—specialized

diagnostic systems that Toyota knew were necessary to service the Mirai but did not disclose to consumers as a limitation on where and how their vehicles could be serviced.

33.    The TSBs contain an "IMPORTANT NOTE FOR HYBRID/FUEL CELL VEHICLES" warning that "the DCA-8000 Battery Diagnostic Tool is to be used ONLY on the auxiliary (12V) battery." This caution—appearing in bulletins covering all hybrids including Mirai—demonstrates Toyota's knowledge that diagnostic procedures safe for other vehicles could damage the Mirai's fuel cell systems, yet Toyota never warned consumers of these diagnostic limitations or the risks of service at facilities lacking specialized Mirai training.

34.    The TSBs further reveal that Toyota anticipated battery failures but disclaimed warranty coverage. Each battery maintenance TSB states under "Warranty Information" that the procedures are "Not Applicable to Warranty" and that "Toyota does not provide battery warranty coverage for discharged and/or failed batteries due to lack of maintenance." By excluding the Mirai from the only maintenance procedure that could prevent battery discharge while simultaneously disclaiming warranty coverage for battery failures, Toyota created a trap: Mirai owners could not follow the prescribed maintenance and could not obtain warranty coverage when their batteries inevitably failed.

35.    Tech Tip T-TT-0738-23 (August 21, 2023): Toyota issued a Tech Tip addressing "MIL ON With DTC(s) P1F6C71 and/or P1F6E71" affecting 2021-2022 Mirai vehicles. This bulletin instructed dealers to complete a "Mirai Customer Survey" and "create a TAS case" for diagnosis—demonstrating Toyota's systematic effort to collect data on known fuel cell defects. The bulletin references "T-SB-0043-23" for diagnosis and repair support, confirming Toyota had developed extensive documentation for recurring fuel cell malfunctions.

36.    Tech Tip T-TT-0737-23 (August 17, 2023): Toyota's Telematics Diagnostic Guide acknowledges that "a very small percentage of customers experience

- 9 -
**COMPLAINT**

operational difficulties with some telematics features which they cannot resolve on their own." The bulletin covers 2018-2024 Mirai vehicles and addresses systematic issues with Safety Connect, Remote Connect App, Cloud Navigation, and other connected features—features Toyota marketed as premium benefits of Mirai ownership.

37. TSB T-SB-0104-22: This TSB addresses hydrogen system issues and explicitly excludes the Mirai from standard diagnostic procedures with "except Mirai" language, demonstrating Toyota's knowledge that the vehicle's hydrogen systems required unique handling beyond standard repair capabilities.

38. TSB T-SB-0033-22: This TSB addresses fuel cell stack issues and similarly contains Mirai-specific exclusions, proving Toyota knew the Mirai's core propulsion system had defects requiring special attention unavailable through standard service procedures.

39. TSB T-SB-0024-23: This TSB addresses high-voltage battery and power control issues, again with Mirai-specific exclusions and procedures that Toyota knew were necessary but failed to disclose to consumers.

40. Toyota lacks adequate parts inventory to support the Mirai fleet. Prior to the contamination incident, it took Toyota one and a half years to obtain a simple plastic cover under the driver's seat that a technician broke during routine service—Toyota did not have the parts for a simple plastic piece for the Mirai. The ability to repair fuel cell stacks, which require components imported from Japan, would take even longer than obtaining a simple plastic piece. This parts availability crisis demonstrates that Toyota sold vehicles into the market knowing it could not adequately service them when defects arose.

**Toyota's Knowledge of Infrastructure Failure**

41. Toyota knew that California's hydrogen fueling infrastructure was inadequate to support practical Mirai ownership. In a March 22, 2018 letter to the California Energy Commission regarding Docket No. 17-ALT-01, Toyota's Director

of Advanced Technologies, Craig Scott, admitted: "Toyota has sold and leased over 3300 Mirai FCVs in California since launch, and this would not have been possible without California's support to build the early retail fueling network, and the collaborative process between automakers, station developers, and the state."

42. This admission proves Toyota knew the Mirai program was entirely dependent on government subsidies—a material fact concealed from consumers who paid premium prices believing they were purchasing commercially viable vehicles. Toyota's letter advocated for "$900 million for ZEV infrastructure through 2025" and "200 hydrogen fueling stations," acknowledging that the existing infrastructure was insufficient.

43. Despite this knowledge, Toyota continued marketing the Mirai as a practical daily driver. Toyota's own press materials promised consumers could "refuel in about 5 minutes" at convenient stations throughout California—promises Toyota knew were false given the chronic station outages, capacity limitations, and infrastructure fragility it documented internally.

44. An October 7, 2019 letter/email from Toyota to all Mirai owners titled "Trailblazer Support Offer" acknowledged fueling difficulties, acknowledged customer complaints regarding lack of fuel, and offered affected consumers loan forbearance for six months—an explicit admission that Toyota knew consumers were unable to use their vehicles as promised.

45. Toyota's internal and marketing-partner materials contradict its public advertisements that the Mirai could "refuel in 5 minutes just like gasoline." A consumer-education packet titled "Fast Like Gas" admits that refueling times vary widely, stations frequently throttle fueling due to temperature and pressure limits, and many stations are offline or unavailable due to cooling-system failures.

46. Independent engineering analyses submitted to state agencies further show that Toyota and its infrastructure partners were aware of fundamental technical failures at Mirai-approved retail stations. A 2021 StratosFuel analysis reported

**COMPLAINT**

repeated mechanical failures, contamination events, and systemic rodent-intrusion damage affecting station electronics—conditions that made stations chronically unable to deliver hydrogen reliably. A later 2024 report documented continuing infrastructure degradation, identifying deteriorating compressors, leaking valves, safety-system failures, and prolonged outages at multiple hydrogen stations statewide. Toyota nonetheless continued selling and leasing Mirai vehicles while concealing these known defects from consumers.

**Toyota's Control and Manipulation of Hydrogen Infrastructure**

47.    Beyond merely knowing that hydrogen infrastructure was inadequate, Toyota actively manipulated and obstructed the infrastructure to maintain control over the hydrogen fueling ecosystem—even at the expense of Mirai consumers who desperately needed access to functioning stations.

48.    Michael G. Dray, Esq., served as the founding hydrogen station manager of operations and marketing at the Cal State Los Angeles hydrogen fueling station from March 2013 through approximately 2017. Mr. Dray holds a Bachelor's Degree in political science with a minor in chemistry, a Juris Doctor, and previously operated an experimental waste-to-energy conversion plant for 12 years as a first-class steam operating engineer.

49.    The Cal State Los Angeles hydrogen station was funded by a $2.5 million grant from the California Air and Resources Board, with an additional $5 million in University and philanthropic funds—over $7.5 million in total public and educational institution investment. Despite this substantial public investment, the station faced systematic obstruction from Toyota that prevented it from serving consumers.

50.    Toyota dominated the California Fuel Cell Partnership ("CaFCP"), the industry organization that controlled the h2fcp.org website displaying station availability to consumers. Toyota had the majority of hydrogen cars on the road and, according to Mr. Dray, "charged membership dues based on how large the company was, so Toyota had a de facto veto at these meetings."

51.    At a CaFCP meeting, Toyota's representative Spencer Quan told Mr. Dray: "you have a lot of guts to declare yourself open to public." Toyota then advocated for the University station to be removed from the h2fcp.org website—the primary resource consumers used to locate functioning stations—effectively blacklisting an operational station from consumer access.

52.    Toyota imposed a requirement that all hydrogen fuel pumps accept Toyota's proprietary credit cards as a condition of being listed on h2fcp.org. When Mr. Dray objected that "the method of payment should be controlled by the station operators, not the auto makers," stating "as a matter of fact, I believe if I want to accept a crate of chickens for hydrogen that is up to the operator," Toyota and the CaFCP overruled him. This requirement gave Toyota effective control over which stations could serve consumers.

53.    Toyota subsequently refused to allow its fuel cards to work at the University station, thereby "prohibiting the customer from using the University station because they did not allow the fuel card to work at the University station or provide reimbursements." This deliberate exclusion prevented Mirai owners from accessing an operational station despite Toyota's promises of convenient fueling.

54.    Toyota refused to send any cars or staff to test the University station, refused to lease Mr. Dray a vehicle to tune the station to Toyota's specifications, and refused to provide any vehicle for testing even as it demanded the station meet increasingly stringent protocols. Toyota insisted the station meet the SAE J2601 fueling protocol—"a new fueling protocol that had never been pronounced as a perquisite and one that the University station was never built to meet."

55.    Toyota's obstruction extended to authorized dealerships. Mr. Dray testified that "there were many times that Longo Toyota would beg the University station for fuel because the cars they were selling had run out of fuel and they couldn't refuel them." Toyota's own dealerships could not keep their inventory fueled, yet Toyota continued selling vehicles to consumers with promises of convenient fueling.

56. In Mr. Dray's opinion, "Toyota sold too many hydrogen cars and overwhelmed the infrastructure and hydrogen supply." He further testified that "Toyota's control on the hydrogen market had a chilling effect on other potential actors from entering the hydrogen market"—deliberately suppressing competition that might have expanded infrastructure to support consumers.

57. Around 2017, Mr. Dray informed the Governor's office about "the unrelenting control Toyota was exerting" over independent hydrogen stations. Despite this warning to state officials, Toyota continued its pattern of infrastructure manipulation while marketing the Mirai as supported by a robust and expanding fueling network.

**Safety Defects**

**Propulsion Loss Defects**

58. Multiple plaintiffs experienced sudden and complete loss of propulsion while driving in traffic. Plaintiff Kamran's vehicle lost all power while traveling on Interstate 5 in active freeway traffic on September 27, 2024. Plaintiff Reyes's vehicle could manage only 35 mph while driving uphill with the accelerator fully depressed. Plaintiff Spruck's vehicle repeatedly stalled when pulling into intersections with oncoming traffic, leaving him frantically slamming the accelerator as cars approached.

59. On September 27, 2024, Ms. Kamran's Mirai suffered complete propulsion system failure while traveling on Interstate 5 in Los Angeles County, California. The vehicle lost all power while she was driving in active freeway traffic. The vehicle remained inoperable at Toyota of Orange from late September through late November 2024—nearly two months—during which time TMCC continued demanding monthly payments of $549.67. When technicians for Toyota of Orange attempted to restart her vehicle, a "huge boom" emanated from the fuel cell stack.

60. Plaintiff Spruck experienced the vehicle completely stalling when pulling into intersections with oncoming traffic. The accelerator pedal would become entirely unresponsive, leaving him stranded in the path of oncoming vehicles. Spruck would

- 14 -
**COMPLAINT**

frantically slam his foot on the gas pedal as cars came toward him, potentially causing him to get T-boned in an intersection, until the car would suddenly and unexpectedly take off at the last minute. These stalling incidents also occurred when merging onto highways, creating life-threatening situations where Spruck could not accelerate to match traffic speed.

**Automatic Emergency Braking Defects**

61.    The Mirai's automatic emergency braking system exhibits dangerous malfunctions in both directions—engaging violently when no hazard exists, and failing to engage when hazards are present. Robert Davis was driving southbound on the 110 freeway when the AEB engaged violently in response to a vehicle crossing lanes at a safe distance, nearly causing a multi-car pileup. Conversely, while driving through Hollywood, Mr. Davis pressed the brake pedal to avoid a pedestrian, but the vehicle failed to respond despite full pressure, continuing forward into the crosswalk. Plaintiff Alvarez's AEB engaged without warning while making a left turn, stranding her in an intersection exposed to oncoming traffic.

62.    On September 17, 2025, at approximately 6:00 PM, while Ms. Alvarez was leaving a gas station on Tustin Avenue in Orange and attempting to make a left turn onto Main Street, the automatic braking system engaged when a passing car triggered the sensors, causing a sudden powerful stop in the middle of her turn and leaving her stranded in the intersection where oncoming traffic could have struck her vehicle. These braking incidents have occurred multiple times.

63.    The Davis family experienced terrifying incidents where the vehicle would suddenly slow down or have delayed response from the brake pedals. During one particularly frightening incident, Ms. Davis's husband was driving their son when the vehicle performed what he described as an "emergency stop" with no warning. A truck nearly rear-ended the vehicle. Her husband was so shaken that he couldn't sleep that night, telling Ms. Davis: "I didn't think I was coming home."

**Unintended Acceleration Defects**

- 15 -
**COMPLAINT**

64. Multiple plaintiffs experienced unintended acceleration events. Plaintiff Eaton's wife experienced a terrifying incident at an intersection where the vehicle suddenly jolted forward during a right turn, nearly launching her into cross-traffic. Mr. Eaton personally experienced the vehicle maintaining exact speed after releasing the accelerator, requiring unusually forceful braking—behavior he had never encountered in 35 years of driving BMWs, Mercedes, Porsches, and Teslas.

65. Both Mr. Eaton and his wife Angela experienced multiple instances of unintended acceleration. The occurrence was intermittent and unpredictable, which made it even more frightening because they never knew when it would happen. Mr. Eaton's wife experienced a particularly terrifying incident at an intersection: while attempting a right-hand turn at a stoplight, the vehicle suddenly jolted and took off, almost launching her into the intersection. She told Mr. Eaton it "scared …[her]" and she thought the car "was going to drag [her] into the intersection."

66. Mr. Eaton personally experienced the acceleration issue multiple times: when he would release the accelerator to apply the brakes, the car would keep going at the same speed. For example, when traveling at 55 mph and releasing the accelerator, the vehicle would continue at 55 mph rather than naturally dropping to 50 or 45 mph as expected—he had to "push the brake harder" to force deceleration because the car was not decelerating even while braking. In his 35 years of driving—including BMW, Mercedes, Porsche, and Tesla—he had never encountered a vehicle that failed to decelerate upon lifting off the accelerator.

**Lane Assist Defects**

67. The lane assist system actively endangers drivers by following obsolete road markings. On Crenshaw Boulevard during construction, Robert Davis's vehicle forcibly turned the steering wheel to follow scraped-off old lane lines, pulling the vehicle toward other cars and the curb. Mr. Davis had to physically fight the steering wheel to prevent collisions. When he called Toyota technical support, he was transferred to three or four escalating representatives before anyone could explain how

to disable the system—demonstrating that Toyota's own support staff did not know how to turn off their malfunctioning safety feature.

**Brake System Defects**

68.    Ms. Alvarez's vehicle suffers from dangerous braking system defects. The braking system requires her to press very hard on the brake pedal to stop the vehicle. Separately, when she attempts to brake, the vehicle jerks or lurches forward momentarily before stopping, requiring her to double-press the brake pedal and apply excessive force to achieve safe stopping—creating a significant safety hazard where she could hit the car in front of her and has been forced to swerve to avoid collisions.

69.    Plaintiff Spruck's braking system exhibited electrical control failures. The sensitivity of the brakes would change dramatically and unpredictably, particularly within the first few minutes of starting the vehicle. The brake pedal would become extremely sensitive to the point where applying minimal pressure would cause the brakes to lock up completely. This forced Spruck to constantly adjust his driving style because the brake response was inconsistent.

70.    Robert Davis experienced brake system failures in the opposite extreme. While driving through Hollywood with heavy pedestrian traffic, Mr. Davis approached a corner where a pedestrian stepped off the curb. When he pressed the brake pedal, the vehicle failed to respond. Despite applying full pressure, the car continued forward, only stopping after entering the crosswalk. Mr. Davis watched in horror as the pedestrian looked at him while his vehicle approached, unable to stop despite his desperate efforts. The brake system often requires excessive force to stop the vehicle, like driving a commercial bus, requiring Mr. Davis to brake four car lengths before normal stopping distance.

**Toyota's Real Time Knowledge Through Telematics**

71.    Toyota maintains real-time telematics monitoring of all Mirai vehicles through a subscription application that provides vehicle location, door lock status, fuel

**COMPLAINT**

level, odometer readings, and critically, system health alerts. This monitoring demonstrates Toyota receives immediate notification of safety-critical events.

72.    Mirai customer Seema Khadim experienced an unintended acceleration event in her Mirai in April 2024, during which her vehicle suddenly accelerated without driver input. Within hours, Toyota contacted Ms. Khadim unsolicited, demonstrating that Toyota maintains active telematics monitoring of Mirai vehicles and receives real-time notification of safety-related incidents—yet chose not to warn other consumers or issue recalls.

73.    On one occasion, Robert Davis's application displayed three simultaneous critical alerts: (1) "malfunction in the intelligent clearance sonar system," (2) "malfunction in the pre-collision system," and (3) "malfunction in the electronically controlled brake system." The vehicle's dashboard simultaneously displayed "FCV Malfunction." The same day these alerts appeared, Toyota called Mr. Davis directly—without him contacting them—asking about the vehicle and when he could bring it for service. This unsolicited contact proves Toyota receives real-time notification of safety-critical system failures and maintains active surveillance of Mirai vehicles.

74.    Mr. Davis took screenshots of these alerts because he suspected Toyota would delete them. His suspicion proved correct—the alerts disappeared from the application before his service appointment, despite the underlying problems persisting. Toyota's deletion of safety-critical alert history while the defects remained unrepaired demonstrates Toyota's systematic concealment of documented safety failures from consumers and regulators.

75.    On June 17, 2025, at 10:51 AM, Plaintiff Spruck received an unsolicited voicemail from "Eva" at Tustin Toyota stating: "This is Eva, I'm giving you a call from Tustin Toyota regarding your 2021 Toyota Mirai. Our records indicate that your vehicle is due for its routine service, and you also have an error code regarding the fuel cell system. To schedule an appointment, please give us a call back." This call was disturbing because Spruck had never serviced his vehicle at Tustin Toyota. He had not

reported the error codes to anyone. Yet Toyota somehow knew about the malfunction in his vehicle and had directed the dealership closest to him to contact him immediately—demonstrating Toyota's real-time monitoring and knowledge of Mirai defects.

**Toyota's Failure to Issue Recalls or Safety Warnings**

76.    Despite years of documented safety incidents, real-time telematics data, and customer complaints, Toyota has issued no NHTSA filings, no recalls, and no public safety warnings regarding Mirai defects. In August 2025, when Plaintiffs' counsel flagged multiple safety cases—including clients Jaime Nahman, Ann Milang, Aminah Kamran, and Allen Khanyan—Toyota's counsel John Hooper instructed that clients with safety issues "should immediately contact and or bring their vehicle to a Toyota Dealer... [and] Toyota Customer Service." This response, after knowledge that each of these customers had already been to the dealerships to service their vehicles, demonstrates that Toyota maintained an established, centralized process for receiving, monitoring, and escalating and ultimately quashing Mirai safety complaints—and issued no recalls or public safety warnings despite years of documented incidents.

**Economic Harm and Diminished Value**

77.    Mirai vehicles suffer catastrophic depreciation, losing approximately 90-95% of their value immediately after purchase. Vehicles that sold for $60,000 or more new are worth as little as $5,000-$6,000 on the secondary market—a depreciation curve unprecedented for any Toyota vehicle and far exceeding normal vehicle depreciation. In internal and public-facing statements unavailable to consumers at the time of sale, Toyota executives repeatedly acknowledged that the Mirai program was not commercially viable.

78.    In a published interview, Toyota's Chief Technology Officer Hiroki Nakajima admitted that Toyota's hydrogen program—including the Mirai—was "not successful," explaining that its real purpose was promotional rather than commercial.

79. In communications with regulators and partners, Toyota acknowledged that hydrogen infrastructure was structurally incapable of supporting consumer ownership.

80. A 2018 industry communication warned that hydrogen retail stations could not financially survive without ongoing public subsidies, stating explicitly that "we absolutely need subsidies to keep the Mirai going." These statements contradict Toyota's consumer-facing marketing, which falsely assured buyers that hydrogen infrastructure was robust, expanding, and reliable.

81. In 2023, Toyota CEO Akio Toyoda publicly admitted on a Toyota Times podcast recorded in Japanese that the Mirai was "not commercial, only promotional"—an admission that the vehicle Toyota sold to thousands of California consumers at premium prices was never intended to function as a practical commercial product. This admission was never disclosed to consumers before or during their purchases.

82. Michael G. Dray, a former EPA fuel economy testing engineer, has provided percipient testimony that Toyota's EPA fuel economy and range certifications for the Mirai were obtained under testing conditions that do not reflect real-world hydrogen fueling limitations, resulting in materially inflated range estimates that consumers relied upon in purchasing decisions.

**Toyota's Organizational Dysfunction and Systemic Failures**

83. Communications from Toyota's outside counsel during August-September 2025 reveal systematic organizational dysfunction in Toyota's handling of Mirai consumer complaints. In an August 1, 2025 email, attorney John Hooper of King & Spalding confirmed that Toyota Legal was "informing Toyota's business units" about "approximately 700 clients" represented by Plaintiffs' counsel, implementing three directives: (1) place "do not call/contact" flags on accounts; (2) cease all collection and repossession activities; and (3) "pull back from collection agencies" and work with credit bureaus to mark accounts "in dispute."

84. The scale of this organization-wide directive affecting 700 consumers proves the harm was systemic, not anecdotal. Toyota's response demonstrates corporate knowledge at the highest levels that Mirai failures had created a consumer protection crisis requiring coordinated intervention across multiple business units.

85. Hooper admitted Toyota expected continued consumer harm despite these measures: "If someone falls through the cracks and their credit is... [not] handled as outlined above, we expect that you will recognize that can happen with this number of people." This admission proves Toyota knew its organizational systems were inadequate to prevent ongoing consumer harm, yet accepted continued damage to consumers as an inevitable cost of doing business.

86. On August 26, 2025, Toyota attorney Jessica Shook confirmed the organizational dysfunction: "There are several departments across both TMNA and TFS that are included in the process. It is not a simple switch—particularly where they are searching for accounts with incomplete information." This admission reveals that Toyota's organizational structure spans multiple business units (Toyota Motor North America and Toyota Financial Services) and that Toyota's own systems could not even locate its customers efficiently despite having collected their personal and financial information.

87. Despite Toyota's August 1, 2025 directives, consumers continue receiving collection demands and credit damage throughout August, September, November, and December 2025.

88. This organizational dysfunction is not inadvertent but structural. Toyota designed systems that cannot effectively respond to widespread product failures, ensuring consumers bear the harm while Toyota avoids accountability. The same organizational failures that prevented Toyota from protecting consumers from credit damage also prevented Toyota from addressing the underlying vehicle and infrastructure defects that caused consumers to default in the first place.

**Individual Plaintiff Experiences**

**Plaintiff Aminah Kamran's Experience**

89.    At the time of her purchase, Toyota sales representative Ash Sheikh made specific oral representations to Ms. Kamran that the Mirai was "capable of achieving 409 miles per full tank" and was "supported by an expanding hydrogen infrastructure with many stations in the works that were already approved." These representations were material to Ms. Kamran's decision to purchase and finance the vehicle.

90.    On September 27, 2024, Ms. Kamran's Mirai suffered complete propulsion system failure while traveling on Interstate 5 in Los Angeles County, California. The vehicle lost all power while she was driving in active freeway traffic.

91.    Ms. Kamran experienced repeated fueling failures, range anxiety due to station outages, and safety concerns including propulsion loss.

92.    The vehicle remained inoperable at Toyota of Orange from late September through late November 2024—nearly two months. When technicians for Toyota of Orange attempted to restart her vehicle, a "huge boom" emanated from the fuel cell stack.

93.    During the nearly two months her vehicle was inoperable, TMCC continued demanding monthly payments of $549.67.

94.    Had Ms. Kamran known the truth about the Mirai's systematic safety defects, actual declining range to only approximately 230 miles, and collapsing infrastructure, she would not have purchased the vehicle.

**Plaintiff Deborah Alvarez Experience**

95.    Ms. Alvarez needed to refinance or trade her existing vehicle—a reliable 2020 Toyota Corolla—to lower her monthly payments. In early May 2025, she saw Toyota advertisements and visited Toyota.com/mirai, where she saw Toyota's representations of a 402-mile range and free fuel.

96.    At the time of purchase, Toyota salesperson Adrian made specific oral representations to Ms. Alvarez that induced her purchase: that she "would not have any problems with the vehicle because fueling is easy and there are great fueling options

nearby"; that "Toyota itself is building and guaranteeing more hydrogen stations quickly in California and in other states"; that the vehicle "has a driving range of 400 miles per tank"; that "Toyota offers 21-day car rental benefits for Mirai owners"; that "even if [she] didn't like [the vehicle], [she] could trade it in later without any loss because it was a Toyota"; and that "this vehicle is great for the environment so it's really the best deal in the world."

97.    Adrian specifically addressed Ms. Alvarez's concerns about potentially driving far or moving by assuring her that Toyota's 21-day rental benefit would solve any hydrogen infrastructure problems she might encounter. Adrian specifically reassured her that Toyota would "stand behind" the 21-day rental promise if she ever traveled or moved, telling her that the benefit "would solve any hydrogen infrastructure problems" she might encounter. These representations were false when made, and Toyota knew they were false.

**Infrastructure / Fueling Problems**

98.    On Ms. Alvarez's first attempt to refuel her vehicle, she encountered three consecutive station failures: the True Zero station she first visited was out of service; the next Iwatani station many miles away was reported by staff to "never work" and was indeed offline; and she was forced to drive across the county to Fountain Valley—running on close to empty—to find a functioning station. This experience, on her very first day of ownership, demonstrated that the "easy" and "reliable" fueling Adrian promised did not exist.

99.    Ms. Alvarez has a fused neck, which creates additional challenges when using hydrogen fuel pumps because the fuel nozzles freeze onto the vehicle's fuel connection approximately 8 out of 10 times she fills, typically requiring 10 minutes of effort to disconnect; on one occasion she waited approximately 45 minutes for a frozen nozzle to release. The physical struggle required to remove stuck fuel connections has caused her to experience neck spasms, exacerbating her existing medical condition,

100.   Ms. Alvarez's vehicle never achieved the promised 400-mile range. The actual range was initially approximately 230 miles per fill-up—verified by the dashboard displaying 230 miles remaining after filling 5 kilograms of hydrogen. She never achieved even 300 miles on a full fill. As of September 2025, the vehicle achieves only approximately 170 miles per fill-up, requiring her to refuel approximately every other day and drive approximately 15 miles to the nearest hydrogen station in Orange, California.

101.   Ms. Alvarez's vehicle suffers from dangerous braking system defects as described in the Safety Defects section above, including requiring excessive force to stop, jerking forward before stopping, and automatic braking engaging without warning.

102.   On June 12, 2025 (less than one month after purchase), Ms. Alvarez's Mirai suffered complete battery failure while parked at a store. The vehicle would not start; when AAA arrived, the battery would not jump or charge, leaving her stranded. AAA technician C. Pacheco performed diagnostic testing and determined the battery had a BAD CELL requiring complete replacement, as documented in AAA Invoice #2421.

103.   Ms. Alvarez was forced to pay $270.88 for emergency battery replacement on a vehicle less than one month old. When Ms. Alvarez attempted to use the promised 21-day rental car benefit that was a key factor in her purchase decision, she was told this benefit was not available for certified pre-owned vehicles—despite Adrian's specific assurances that this benefit applied to her purchase.

104.   The promised three-year fuel card benefit is meaningless because the card will exhaust shortly due to excessive fueling frequency caused by the vehicle's reduced range.

**Plaintiff Dennis Eaton Experience**

105.   In September 2022, Mr. Eaton and his wife Angela were deciding between a Mirai and a Toyota Camry at Toyota Tustin. The salesperson was Adam Parada, who

- 24 -
**COMPLAINT**

remains employed at the dealership. At the time of purchase, Mr. Eaton served as Vice President of Customer Care Operations at Verse.ai, where he ran call contact centers—giving him particular professional expertise in customer service standards, tracking complaint volumes, and recognizing when representatives acknowledge widespread issues.

106.   While the Eatons were deciding between a Mirai and a Toyota Camry, an older sales manager came over to close the deal. The dealership had a hydrogen pump on display, and the sales manager gave them "the whole spiel" about the car being amazing with free fuel. The sales manager specifically represented that he personally drove a Mirai, loved the vehicle, and assured them there would be "zero problems" with fueling. These representations were critical in swaying the Eatons' decision away from the Camry.

107.   The sales manager explicitly told them a hydrogen fueling station was located "right by [their] house" and that fueling would be as convenient as "pumping gas." The dealership specifically promised them 14 days of rental car coverage as part of the purchase agreement—a representation that was material because the Eatons needed this benefit to travel to Utah to visit their children.

108.   Approximately three months after purchase, the hydrogen station near the Eatons' home—the one the sales manager had specifically referenced—was permanently shut down. They were then forced to drive across town to access another station, losing approximately 25 miles of range just traveling to and from fueling.

109.   On one occasion, the hydrogen fueling nozzle became stuck on their vehicle, leaving them stranded for over two hours until a technician could arrive to release it—far from the simple "pumping gas" experience they were promised.

110.   When they attempted to use their promised rental car benefit to travel to Utah, Toyota denied their request, claiming they "didn't qualify" despite the dealership's explicit promises at the time of sale, forcing them to rent vehicles at their own expense for out-of-state trips.

**Specific Defects Experienced**

111. Both Mr. Eaton and his wife Angela experienced multiple instances of unintended acceleration as described in the Safety Defects section above.

112. The Eatons' vehicle exhibited other alarming behaviors: the hydrogen tank would make loud banging noises during operation, which was particularly concerning given this is a high-pressure hydrogen system. The seat heaters would automatically turn on to HIGH setting without any input, creating both a dangerous distraction and physical discomfort while driving. Mr. Eaton first mentioned these issues to Toyota when fighting about the denied rental car benefit; Toyota dismissed these concerns.

113. On July 11, 2025, the Eatons drove to Toyota Tustin specifically to address these safety issues. They asked if they could "work together" and if there was "any way [they] could trade it in and get a Camry" or "something else that wouldn't have the acceleration issues." Mr. Eaton met with both management and Adam Parada, told them "everything you and the sales manager told me about fueling and everything is wrong," detailed the sudden acceleration that scared his wife at the intersection, and explained they "just can't drive this thing anymore."

114. Their response was callous and purely financial: they said the Eatons could trade in the vehicle but were "so far upside down" on the loan—approximately $15,000—that they would have to pay $10,000 to $15,000 "just to get out of the car." When Mr. Eaton pressed about the safety issues, the manager "basically had nothing to say"—he did not care.

115. Mr. Eaton called Toyota Customer Care multiple times to report these issues. Drawing on his professional experience running call centers, he specifically asked the representative about call volumes for this vehicle. She explicitly told him "Something's going on with this, I am getting a lot of calls on this Mirai… a lot of concerns are coming in." This admission confirms that Toyota knew about widespread Mirai defects through their own customer service channels.

116. Due to their serious safety concerns, particularly after Mrs. Eaton's near-accident at the intersection, the Eatons prioritized their family's safety. When they moved to Utah in October 2024, they had to write a check for approximately $15,000 to pay off the vehicle and then sold it to CarMax at a significant loss. There is zero hydrogen infrastructure in Utah, making the vehicle completely unusable there.

117. They have since purchased a Tesla Model Y, which has operated with zero issues, which confirms that the dangerous defects were specific to the Toyota Mirai and not related to their driving habits or maintenance practices.

Plaintiff Enrique Reyes Experience

118. On September 5, 2025, Mr. Reyes's vehicle became permanently inoperable after refueling at the Toyota-approved Air Products station at 190th Street and Prairie Avenue in Torrance. Toyota's foreknowledge of the 190th Street contamination event is demonstrated by its immediate response to Mr. Reyes's service call. When Mr. Reyes called Toyota Santa Monica on September 5, 2025 to report power loss symptoms, the service department's first question—before Mr. Reyes provided any diagnostic information—was "Did you fill up at the 190th station?" When Mr. Reyes confirmed he had, the representative immediately stated: "we think there's a contamination issue because we have 9 Mirais right now and you're going to be the 10th one down." Toyota knew exactly which station was causing vehicle failures before consumers reported their symptoms. By September 24, 2025, Toyota Santa Monica alone had accumulated 19 inoperable Mirais due to the 190th Street contamination, with another dealership reportedly holding an additional 10 affected vehicles. Despite approximately 30 vehicles being rendered permanently inoperable by a known contamination source, Toyota issued no public notice, no NHTSA filing, no safety warning, and no communication to other Mirai owners who continued fueling at the same station.

119. After delivering his vehicle to Toyota Santa Monica on September 6, 2025, Mr. Reyes independently contacted Air Products to inquire about Toyota's

contamination claims. Within three hours, "Will" from Air Products corporate headquarters called Mr. Reyes directly to conduct an interview about the situation. Following Mr. Reyes's report—not any warning from Toyota—the 190th Street Torrance station was shut down and has remained closed. Toyota, despite having knowledge of the contamination affecting dozens of vehicles, took no action to warn the station operator or other consumers.

120.    When Mr. Reyes delivered his vehicle to Toyota Santa Monica on September 6, 2025, Toyota presented him with a corporate questionnaire asking whether he "let the hydrogen sit," how long it sat, and "how old the hydrogen was." This questionnaire—prepared and distributed by Toyota corporate for use across dealerships—demonstrates Toyota's coordinated strategy to shift blame onto consumers for fuel cell failures caused by infrastructure contamination that Toyota knew about but concealed. Mr. Reyes refused to answer these blame-shifting questions and wrote "N/A" on all responses.

121.    Based on publicly available technical documentation about hydrogen fuel cell damage, fuel contamination with water vapor causes corrosion to the fuel cell stack, rendering it permanently inoperable. Toyota claims it can "purge" contaminated fuel without replacing fuel cells, but this contradicts established technical literature about hydrogen fuel cell damage from water contamination. Toyota's purported remedy may leave consumers with vehicles that appear repaired but contain permanently compromised fuel cell stacks with potentially dangerous consequences.

122.    Despite Toyota's knowledge of this contamination event affecting 75+ vehicles, Mr. Reyes received no warning, was subjected to corporate questionnaires designed to blame him for "letting hydrogen sit," and continues paying $899.25 monthly for his inoperable vehicle while Toyota refuses buyback and threatens his credit.

**Plaintiff Nicholas Spruck Experience**

**COMPLAINT**

123.  Prior to purchasing the Subject Vehicle, Spruck researched the Toyota Mirai extensively on Toyota's website, toyota.com/mirai, where Toyota represented that the vehicle achieved a 402-mile range per fill-up, featured 5-minute refueling times comparable to gasoline vehicles, was supported by an expanding hydrogen infrastructure, included advanced safety systems, and carried Toyota's "legendary reliability."

124.  Spruck had previously owned two Toyota Tacomas and a Toyota Prius and trusted the Toyota brand based on these positive experiences.

125.  During the sales process at Longo Toyota, sales representative Juan Maldonado told Spruck that his son owned a Mirai and "absolutely loves it." Maldonado marketed the vehicle as a "vehicle hack" where Spruck could drive it for three years with the $15,000 fuel card, trade it in for another Mirai with another $15,000 fuel card, and "rinse and repeat."

126.  When Spruck informed the sales team he lived in Orange County, they specifically stated: "That's great. There's a bunch. There are a lot of stations down there. It's a perfect car for Orange County."

127.  Upon arrival at Longo Toyota's lot, Spruck observed approximately 50 certified pre-owned Mirais available for immediate purchase. Staff stated they had over 200 total Mirais on site. Many vehicles had poorly executed paint touch-ups on their bumpers, suggesting damages and hasty repairs.

128.  Within approximately three months of purchase (early March 2024), Spruck began experiencing intermittent severe electrical problems with the Subject Vehicle. The radio volume controls would become unresponsive, refusing to adjust the volume up or down. Whenever Spruck received a phone call, text message, or any audible notification, the volume would screech ear-piercingly loud, startling him while driving and creating a hazard.

**COMPLAINT**

129. Spruck documented these electrical failures with video evidence showing himself repeatedly pressing the volume buttons while driving to the dealership with audio blaring, demonstrating the controls were completely non-functional.

130. During this same timeframe, the Subject Vehicle began exhibiting propulsion system failures as described in the Safety Defects section above.

131. In addition to complete stalling, the Subject Vehicle exhibited strange power anomalies when on inclines. When the vehicle was tilted, such as on hills, parking garage ramps, or freeway on-ramps and off-ramps, the car would start to stutter when Spruck applied light pressure to the accelerator. The power delivery was erratic and unpredictable.

132. These power loss issues have continued through the present day. As recently as late November 2025, Spruck experienced the vehicle losing power while accelerating through intersections or when merging onto highways, creating extremely dangerous, almost life-threatening situations.

133. The Subject Vehicle's braking system exhibited electrical control failures as described in the Safety Defects section above.

134. In October 2025, the Subject Vehicle's advanced safety systems exhibited complete failures. On October 19, 2025—the day after Tustin Toyota claimed the vehicle had been "completely fixed and problem free"—the adaptive cruise control system was not functioning correctly. Although Spruck did not receive any error messages, the vehicle was not detecting cars ahead or braking to maintain distance.

135. Additionally, lane assist, lane departure alert, and lane centering—all of which were turned on—were completely inactive yet the dashboard showed these systems were turned on and functional.

136. Spruck documented these issues on video. The videos show Spruck disabling and re-enabling cruise control, lane centering, and lane departure alerts, verifying in the dashboard menu that all notifications and audio warnings are activated,

**COMPLAINT**

and then driving on the freeway as the car drifts across multiple lanes with zero steering vibration, zero audio alerts, and zero steering correction from the safety systems.

137.    If Spruck had not identified this issue, the vehicle could have slammed into stopped or slowed vehicles or drifted off the road. These same safety system failures recurred on October 28, 2025.

138.    Beginning as early as February 18, 2025, the Subject Vehicle's notification system logged multiple serious fault codes, including repeated warnings of "FC System Warning 1" and "FC System Warning 2," instructing Spruck to immediately stop in a safe location and contact his Toyota dealer due to a dangerous Fuel Cell System malfunction. The system also logged an "Advanced Ultrasonic Detect" fault warning of malfunction in the Intelligent Clearance Sonar System.

139.    Disturbingly, many of these alerts did not appear on the dashboard at the time Spruck was driving; instead, they were buried in the notification history, meaning Spruck only discovered them months later. This demonstrates that Toyota's system had been detecting repeated dangerous conditions but failed to provide real-time warnings.

140.    On June 16, 2025, while driving to a photography shoot, multiple warning messages suddenly appeared on Spruck's dashboard including "FCV System Malfunction - Visit Your Dealer," "PKSB Malfunction - Visit Your Dealer," and notifications about sonar system and hydrogen fuel cell malfunctions.

141.    When Spruck reported the electrical issues, the dealership informed him that unless the problem could be replicated on the spot, no repair would be performed and he would be responsible for a diagnostic fee despite his report and video evidence of intermittent failure.

142.    When Spruck brought the Subject Vehicle to Tustin Toyota on June 19, 2025, the initial diagnostic performed by technician William Cantaderio retrieved DTC P0AA649 for "Hybrid/EV Battery Voltage System Isolation Internal Electronic Failure" and P1EEE49 for "Hybrid/EV Battery Voltage System Isolation (Hydrogen

Pump Area) Internal Electronic Failure"—indicating the car's main electric battery was dislodged and loose near the hydrogen fuel.

143. Service advisor Timothy Rau called Spruck with alarming statements about the vehicle's condition. When Spruck said he didn't know hydrogen was flammable, Rau responded: "Yeah, the sun is comprised of hydrogen and of course, the sun is like a nuclear reactor because of all that hydrogen." Rau then stated Spruck was extremely dangerous.

144. Rau explicitly stated that the vehicle had an exhaust system issue where unburnt hydrogen was leaking through, and if it got near a heated component, it posed a fire risk—Spruck's car was extremely dangerous and that if Spruck didn't pay for the repairs, Rau couldn't "in good conscience" let him take the vehicle and drive it off the lot.

145. The estimate for repair was $12,082.26 for hydrogen recirculation pump assembly replacement (job code 890711), including fuel cell stack coolant service. Toyota initially insisted this hydrogen system failure was not covered under the drivetrain warranty.

146. A delay was caused by the replacement hydrogen recirculation pump being ordered from Canada. When it arrived and was installed, that replacement part was also defective, requiring Toyota to order a second pump—further evidencing systemic quality control failures in Mirai components.

147. After delivering devastating news on a Saturday afternoon at 2:00 PM, Timothy Rau informed Spruck that Toyota would not continue covering his rental car and demanded he return the rental that day by 4:00 PM. Spruck's vehicle remained at Tustin Toyota from June 19 to July 7, 2025—18 days without transportation.

148. Toyota ultimately covered the $12,082.26 repair as a "one-time goodwill repair solely in the interest of customer satisfaction" after Spruck reminded them that he was already in active litigation with them.

**COMPLAINT**

149.    Approximately one week after getting the vehicle back from service, while pulling into an intersection, the car stalled out again. Spruck was frantically slamming his foot on the gas as cars came barreling toward him, with the vehicle eventually taking off at the last second to avoid being T-boned.

150.    In October 2025, after driving the Subject Vehicle for consecutive days without any issues, Spruck parked at his apartment complex and went inside for about five minutes. When he returned to the vehicle—which he had just been driving—the car would not start and immediately displayed a long list of electrical errors and dashboard warnings. The vehicle was completely unresponsive and had to be towed to Tustin Toyota.

151.    Spruck was required to pay a $200+ diagnostic fee. Toyota informed him that the cause of the failure was that the 12-volt battery had died. This explanation made no sense to Spruck, who has a background as a former mechanic and technician. A 12-volt battery does not go from healthy to fully dead within a five-minute window, especially after the car had been driven for most of the day.

152.    The service manager then gave a completely contradictory explanation, stating that the car failed to start because the shift lever was "in between gears." Despite these conflicting statements, Toyota charged the battery, tested it, and told Spruck it was healthy and did not need replacement.

153.    The Tustin Toyota invoice (RO# 1696128, dated October 16-18, 2025) documents that the vehicle was towed in with a "depleted battery," that the customer stated the vehicle would not turn on with multiple warning lights, had just filled up but showed no fuel, and experienced power loss while driving. The technician noted: "VEHICLE IS OPERATING AS DESIGNED AT THIS TIME."

154.    On April 10, 2025, Spruck brought the Subject Vehicle to Tustin Toyota for intermittent stalling and frozen infotainment. The service manager recommended Spruck not proceed because the issues were random, telling him he would be "out the

- 33 -
**COMPLAINT**

diagnostic fee for nothing." Based on that advice, Spruck declined service despite video evidence of the frozen controls.

155.  When Spruck explained the acceleration stalling issues, particularly that the car would not accelerate when merging onto highways or pulling into intersections, service personnel at Tustin Toyota blamed Spruck, claiming this was because his foot was touching the brake when he was accelerating—insisting he must have been driving with two feet or pressing both pedals simultaneously.

156.  On three separate occasions, Spruck would arrive at the service center, explain the intermittent electrical and propulsion issues, only to be told they probably wouldn't be able to diagnose it and he should either pay the diagnostic fee with no real hope of resolution or leave.

157.  Each time, while turning Spruck away for the safety issues, the dealership would upsell him on services, telling him the car was due for hydrogen rail inspections and fuel tank strap inspections.

158.  Spruck primarily fueled at the UC Irvine station because it offered hydrogen at $25 per kilogram versus $36 at True Zero stations. However, there would be consistent lines of 10 to 15 cars waiting for the single pump. Many times, after waiting in these long lines, the station would fail and shut down, the hydrogen technician would arrive to fill the tank (during which no one could pump), or the tank would run out of hydrogen, leaving everyone in line stranded.

159.  The UC Irvine station, which had been operating for approximately 20 years, suddenly closed down approximately four months after Spruck purchased the Subject Vehicle. This forced Spruck to use only the expensive True Zero stations, dramatically accelerating the depletion of his fuel card.

160.  In early 2024, Spruck relocated to San Diego for a year. San Diego has only one hydrogen station that is frequently offline. A regular customer at that station told Spruck that a pump had become pressurized while connected to someone's car, blew off the vehicle, and slammed into the side of the pump housing.

**COMPLAINT**

161. Spruck was forced to relocate from San Diego back to Irvine solely based on hydrogen availability, as it was not safe or reliable to operate a Mirai in San Diego.

162. Spruck has driven to Santa Barbara for a wedding photography job with the station showing online, only to find it offline when he arrived, leaving him stranded and unable to run errands or explore the area, barely having enough hydrogen to complete the job and return home.

163. Refueling, when stations work, takes 30 to 60 minutes—not the advertised 5 minutes. The nozzles frequently freeze to vehicles, requiring extended waiting periods. Stations shown as "online" in the vehicle's navigation system and on Toyota's website are frequently offline when Spruck arrives.

164. When Spruck first purchased the Subject Vehicle, he consistently received approximately 350 miles per tank. The range has steadily degraded over time, and Spruck now averages only around 260 miles per tank—losing nearly 100 miles of range and making the vehicle even more of a financial and functional burden.

165. When Spruck fills up the tank and turns on the air conditioning, the range immediately shows 298 miles—not the promised 402+ miles. Using the air conditioning reduces the range dramatically, and this degradation has worsened over time.

**Economic Harm**

166. During the 18 days without transportation while his vehicle was at Tustin Toyota, Spruck couldn't work his photography jobs, couldn't attend medical appointments for his diabetes, and had to rely on friends for occasional rides. The stress caused severe disruptions to his health.

167. In February 2025, with his fuel card running low, Spruck went to Toyota of Costa Mesa to explore trading for a Tacoma. Despite repeatedly stating he was not looking to purchase that day, the dealership kept him there for two hours attempting to sell him a vehicle.

168.   The sales manager at Costa Mesa Toyota became hostile when Spruck wouldn't commit to purchasing. He told Spruck his Mirai had $9,000 in negative equity and that Toyota would only give him a maximum $3,000 for it. He stated that Costa Mesa Toyota doesn't even sell Mirais because "they're problems" and they would have to transport it to a dealership that sells them.

169.   When Spruck still declined to trade that day, the sales manager stood up, said "Good luck with your problem vehicle," shook Spruck's hand dismissively, and walked away.

170.   Toyota Financial Services has been conducting a campaign of harassment against Spruck. They call daily, spoofing a friendly caller ID that displays as "Anthony Adams," but it is always different representatives from Toyota Financial Services.

171.   When Spruck answers and informs them he is recording the call and is in active litigation, they demand he stop recording or they will disconnect. They refuse to speak with his attorney despite repeated requests. They tell Spruck he must send written notice by mail or fax, then put him on hold for 5 to 10 minutes before returning to say no supervisor is available and he must write a letter.

172.   This harassment continues daily despite Spruck's clear invocation of legal representation and promises by Hooper on behalf of Toyota.

173.   Spruck is currently trapped with a vehicle that has approximately $13,471.28 in negative equity. It costs approximately $180 to fill for only 270 miles of actual range, making it nearly $1 per mile to operate.

174.   The Subject Vehicle cannot be sold privately because no one will buy a hydrogen vehicle without the fuel card incentive. It can only be traded back to Toyota at a massive loss, creating a monopoly where Toyota controls both ends of the transaction.

175.   Spruck continues driving this dangerous vehicle because he has no other choice. Every time he drives, he fears the vehicle will stall in an intersection and he will be hit, fears the hydrogen system will catastrophically fail, fears the brakes will

**COMPLAINT**

malfunction, and fears being stranded without fuel because stations shown as operational are actually offline.

176. Spruck is a freelance photographer who relies on the Subject Vehicle as his only vehicle for both rideshare and delivery gig work and to reach time-sensitive commercial, wedding, and event photography assignments.

**Plaintiffs Wendy and Robert Davis**

177. Prior to purchasing their 2022 Toyota Mirai, Wendy Davis and her husband Robert Davis researched the vehicle on Toyota's website (toyota.com/mirai) and reviewed Toyota's representations about the vehicle's capabilities, clean emissions producing only water, and Toyota's "legendary reliability."

178. At Toyota of Orange, salesperson "Mambo" made specific representations that influenced the purchase decision. He stated he personally owned two Mirais—one for himself and one for his family—and had purchased a third after totaling one in an accident. He claimed he achieved 400 miles per tank, that hydrogen refueling stations were "always available," that fuel costs would be lower than gasoline, and that refueling was quick and convenient.

179. Mambo demonstrated the vehicle's high-tech safety features as key selling points, including lane assist, blind spot monitoring, bird's eye view camera, and automatic emergency braking. These advanced safety features were a primary reason for the purchase, as the Davis family believed they would provide protection.

180. Wendy Davis and her husband paid approximately $50,000 for the vehicle after taxes and fees—not the under-$30,000 price initially suggested.

181. The Subject Vehicle exhibits dangerous and unpredictable braking malfunctions, automatic emergency braking defects, brake pedal unresponsiveness, and lane assist defects as described in detail in the Safety Defects section above.

182. The Davis family had to adopt the practice of driving in the far right lane to be able to quickly pull off the road when these malfunctions occurred.

183.   The Subject Vehicle exhibits erratic acceleration behavior. There is often a pause or hesitation when pressing the accelerator, followed sometimes by a sudden, jerky surge. This unpredictable response makes normal driving operations dangerous and difficult to control.

184.   The power issues are pronounced on inclines and when the vehicle is tilted, making routine maneuvers like entering and exiting driveways hazardous.

185.   The lane assist feature is dangerously defective as described in the Safety Defects section above. The Davis family had to disable this "safety" feature because it made driving more dangerous, not safer.

186.   The Davis family reported these life-threatening defects to Toyota over six times. They took the Subject Vehicle to Toyota of Orange at least twice, and also to Toyota Santa Monica. Each time, despite their detailed descriptions of the problems, Toyota claimed they "couldn't recreate" the issues and sent them away without any repairs or solutions.

187.   On one occasion, the service department acknowledged receiving the complaints about the braking system malfunctions but indicated they had no fix available. Specifically, a Toyota employee at one dealership told Wendy Davis's husband that "the best thing is to get rid of it," acknowledging the vehicle's problems.

188.   Despite documented brake system malfunctions appearing in Toyota's own monitoring system, despite six to seven service visits to Toyota Santa Monica and Toyota of Orange, and despite formal complaints, Toyota refused the Davis family's request to repurchase the vehicle in 2023. Toyota sent a letter stating it would take no action regarding their safety concerns. This written refusal, issued after Toyota's own systems had documented brake, pre-collision, and sonar system malfunctions, demonstrates Toyota's deliberate decision to leave a known-dangerous vehicle in consumers' hands.

189.   On July 17, 2024, Wendy Davis was driving the Subject Vehicle to deliver medication for her husband. On her return to work, she came to a complete stop at a

traffic light. When the light turned green, emergency vehicles (fire truck) needed to pass through the intersection, so Wendy Davis kept her foot firmly on the brake.

190.   Despite pressing her foot flat on the brake pedal, the vehicle somehow glided forward before abruptly stopping.

191.   A driver behind Wendy Davis rear-ended her vehicle at high speed.

192.   After the impact, the entire car shut down and logged off completely, even though Wendy Davis had not turned off the engine.

193.   After the July 17, 2024 collision, the Subject Vehicle began experiencing power loss issues it had not exhibited before, adding another layer of danger to an already dangerous vehicle. These new power loss issues compounded the brake failures, making the vehicle unsafe and unfit for use. Robert Davis eventually parked the Mirai and returned to driving his Chevrolet Tahoe, despite higher fuel costs, because he knew the Tahoe would stop when needed. The Mirai transformed from promised reliable transportation into a source of constant fear.

194.   When they were actually using the vehicle, Robert Davis reported waiting over 1.5 hours to fuel with six Mirais ahead of him—far from the promised "refuel in about 5 minutes."

**Common Defects and Experiences Across All Plaintiffs**

195.   Each Plaintiff experienced one or more of the following common defects and failures: (a) degrading range and never able to achieve the promised 402-mile range, with actual range of 170-300 miles that degraded over time; (b) chronic hydrogen station unavailability, with stations shown as "online" frequently being offline, out of hydrogen, or malfunctioning; (c) extended refueling times of 30-90 minutes rather than the promised "5 minutes"; (d) safety system malfunctions including propulsion loss, phantom braking, brake pedal unresponsiveness, and/or unintended acceleration; (e) Toyota's refusal or inability to repair reported defects after multiple attempts; (f) Toyota's refusal to repurchase defective vehicles despite documented

failures; and (g) continued collection activities and credit damage despite vehicle inoperability.

**Chronology of Toyota's Knowledge and Concealment**

196. The following timeline demonstrates Toyota's progressive knowledge of Mirai defects and infrastructure inadequacy, and its deliberate decision to continue sales while concealing known problems:

March 2013: Cal State LA hydrogen station opens; Toyota begins obstruction efforts.

2015: Toyota launches Mirai sales in California.

January 2016 to the present: As confirmed by numerous brand engagement employees including one named Gage, Toyota has weekly cross organizational meetings to discuss hydrogen infrastructure issues and fuel shortages and mechanical issues.

March 2018: Craig Scott admits to CEC that Mirai program depends on government subsidies.

October 2019: "Trailblazer Support Offer" acknowledges fueling difficulties, offers six month loan forbearance.

December 2020: TSB T-SB-0118-20 establishes 12-page specialized pre-delivery procedures.

June 2021-May 2023: Multiple TSBs contain "except Mirai" exclusions.

August 2023: Tech Tip T-TT-0738-23 documents systematic fuel cell malfunctions.

April 2024: TSB T-SB-0021-24 confirms Mirai incompatible with standard maintenance.

2023: Toyota CEO Toyoda admits Mirai is "not commercial, only promotional."

September 2024-present: Plaintiffs' vehicles are inoperable; Toyota continues collections.

**COMPLAINT**

August 2025: Toyota counsel admits "approximately 700 clients" affected and promises to cease collection efforts and does not.

September 2025: 30+ vehicles contaminated at 190th Street station; Toyota issues no warning.

## FIRST COUNT

## Violation of Song Beverly Consumer Warranty Act

## (Cal. Civ. Code Section 1790 et seq.)

197. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

198. The Mirai vehicles are "consumer goods" within the meaning of California Civil Code § 1791(a), as they are goods used or bought for use primarily for personal, family, or household purposes.

199. Toyota is a "manufacturer" within the meaning of California Civil Code § 1791(j), as it is a corporation that manufactures, assembles, or produces consumer goods. Toyota is also a "distributor" within the meaning of California Civil Code § 1791(e), as it is a corporation that distributes consumer goods.

200. Plaintiffs are "buyers" within the meaning of California Civil Code § 1791(b), as they are individuals who buy consumer goods from a seller or manufacturer for purposes other than resale, or who are entitled to the benefit of express warranties.

201. Toyota provided express warranties with each Mirai vehicle. These express warranties include, but are not limited to: (a) the 8-year/100,000-mile fuel cell electric vehicle (FCEV) warranty covering the fuel cell stack, hydrogen storage tanks, and related components; (b) the 3-year/36,000-mile basic warranty covering the vehicle; (c) the 3-year/35,000-mile ToyotaCare maintenance plan; (d) three years of roadside assistance with unlimited miles; and (e) affirmations of fact and promises made in Toyota's marketing materials, including promises of "up to 402 miles of range," "refuel in about 5 minutes," and "up to $15,000 of complimentary hydrogen fuel."

202. Toyota also made implied warranties of merchantability pursuant to California Civil Code § 1791.1 and the Uniform Commercial Code. By selling the Mirai vehicles, Toyota impliedly warranted that the vehicles were merchantable—that is, that they would pass without objection in the trade, were fit for the ordinary purposes for which such vehicles are used, were adequately contained, packaged, and labeled, and conformed to the promises or affirmations of fact made on the container or label.

203. The Mirai vehicles suffer from defects and nonconformities that substantially impair their use, value, and safety to Plaintiffs. These nonconformities include, but are not limited to: (a) fuel cell system defects causing propulsion loss, as documented in TSB T-SB-0043-23 and Tech Tip T-TT-0738-23; (b) 12-volt battery defects causing parasitic drain and premature failure, as documented in TSB T-SB-0021-24 which explicitly excludes the Mirai from standard battery maintenance procedures; (c) sudden unintended acceleration defects; (d) phantom emergency braking defects; (e) inability to achieve advertised range, with actual range of 170-230 miles versus the promised 402 miles; and (f) inability to utilize the vehicle for its ordinary purpose of reliable personal transportation due to chronic hydrogen infrastructure failures that Toyota knew existed and concealed.

204. Plaintiffs presented their vehicles to Toyota's authorized repair facilities on multiple occasions for repair of the nonconformities. Toyota and its authorized repair facilities failed to conform the vehicles to the applicable express warranties after a reasonable number of repair attempts.

205. Toyota's failure to repair the defects was willful. Toyota's willful knowledge is demonstrated by: (a) the explicit "except Mirai" exclusions in TSB T-SB-0021-24, TSB T-SB-0033-22, and TSB T-SB-0024-23, proving Toyota knew the Mirai could not be maintained using standard procedures; (b) Toyota's real-time telematics monitoring that detected and logged safety-critical malfunctions, as demonstrated when Toyota called Robert Davis unsolicited after his vehicle displayed brake, pre-collision, and sonar system malfunctions; (c) Toyota's subsequent deletion

- 42 -
**COMPLAINT**

of those safety alerts from Mr. Davis's application before his service appointment; (d) the Toyota Santa Monica service department's immediate question to Mr. Reyes—"Did you fill up at the 190th station?"—proving Toyota knew exactly which infrastructure was causing vehicle failures; (e) Toyota Customer Care's admission to Mr. Eaton that "a lot of concerns are coming in" about the Mirai; and (f) Toyota's August 2025 acknowledgment through counsel of "approximately 700 clients" with systematic problems.

206.   Pursuant to California Civil Code § 1793.2(d), when the manufacturer or its representative is unable to service or repair a new motor vehicle to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the vehicle or promptly make restitution. Toyota has failed to do either.

207.   Pursuant to California Civil Code § 1794(a), Plaintiffs are entitled to recover damages and other legal and equitable relief, including the costs of cover (difference between purchase price and reasonable cost of replacement vehicle), consequential damages, incidental damages, and all other relief allowed by law.

208.   Pursuant to California Civil Code § 1794(c), because Toyota's violations were willful, Plaintiffs are entitled to a civil penalty of up to two times the amount of actual damages. Toyota's willfulness is demonstrated by: (a) its continued sale of Mirai vehicles despite documented knowledge of defects; (b) its systematic concealment of TSBs and internal data from consumers; (c) its manipulation of the h2fcp.org website to conceal infrastructure failures; (d) its deliberate obstruction of independent hydrogen stations that could have served consumers; and (e) its admission through counsel that it expected consumers to "fall through the cracks" and suffer continued harm.

209.   Pursuant to California Civil Code § 1794(d), Plaintiffs are entitled to recover costs and expenses, including attorneys' fees, reasonably incurred in this action.

**COMPLAINT**

## SECOND COUNT

### Violation of California Unfair Competition Law

### (Cal. Bus. & Prof. Code §§ 17200 et seq.)

210.   Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

211.   California Business and Professions Code § 17200 prohibits "any unlawful, unfair or fraudulent business act or practice." Toyota engaged in business acts and practices that were unlawful, unfair, and fraudulent.

212.   Plaintiffs suffered injury in fact and lost money or property as a result of Toyota's unfair competition. Plaintiffs seek restitution, disgorgement of profits, and injunctive relief pursuant to Business and Professions Code § 17203.

213.   Unlawful Conduct: Toyota's conduct was unlawful because it violated California Civil Code §§ 1790 et seq. (Song-Beverly Consumer Warranty Act), California Civil Code §§ 1709-1710 (fraud and deceit), and 15 U.S.C. § 2301 et seq. (Magnuson-Moss Warranty Act), as alleged herein. Each violation of these statutes constitutes an independent violation of § 17200.

214.   Unfair Conduct: Toyota's conduct was unfair because it offends established public policy and is immoral, unethical, oppressive, and unscrupulous. Toyota: (a) marketed and sold vehicles it knew could not function as promised due to both vehicle defects and infrastructure inadequacy; (b) concealed known defects documented in dozens of TSBs while continuing to sell vehicles at premium prices; (c) manipulated the h2fcp.org station-status website to conceal infrastructure failures from consumers; (d) deliberately obstructed independent hydrogen stations, including the Cal State LA station, that could have served consumers, while publicly claiming to support infrastructure expansion; (e) continued to collect payments and pursue collection activities against consumers who could not use their vehicles due to Toyota's fraud; (f) threatened consumers' credit scores when consumers stopped paying for inoperable vehicles; and (g) sold vehicles knowing its own dealerships could not keep

- 44 -

inventory fueled, as evidenced by Longo Toyota begging independent stations for hydrogen.

215. Fraudulent Conduct: Toyota's conduct was fraudulent because it was likely to deceive members of the public. Toyota made uniform misrepresentations through Toyota.com/mirai, Monroney labels, dealer training scripts, and advertising materials that: (a) promised 402 miles of range when actual range was 170-230 miles; (b) promised "refuel in about 5 minutes" when stations were chronically offline, had multi-hour wait times, or were unable to dispense fuel; (c) promised convenient fueling infrastructure when Toyota knew the infrastructure was inadequate and collapsing; (d) promised "up to $15,000 of complimentary hydrogen fuel" when the fuel was unavailable; and (e) concealed safety defects including sudden acceleration, phantom braking, and propulsion loss. These representations were likely to deceive reasonable consumers and did in fact deceive Plaintiffs.

216. Plaintiffs suffered injury in fact and lost money or property as a result of Toyota's unfair competition. Plaintiffs paid premium prices—ranging from $49,500 to over $66,000—for vehicles that Toyota knew could not perform as represented. The harm to Plaintiffs is substantial: they have suffered diminished vehicle value (90-95% depreciation), out-of-pocket expenses for repairs and alternative transportation, damaged credit from collection activities, emotional distress from safety incidents, and the total loss of use of vehicles they continue to pay for.

217. The gravity of the harm to Plaintiffs substantially outweighs any utility of Toyota's conduct. Toyota derived billions of dollars in revenue from Mirai sales and financing while consumers were left with unusable vehicles and destroyed credit.

218. Pursuant to Business and Professions Code § 17203, Plaintiffs seek: (a) restitution of all amounts paid by Plaintiffs for Mirai vehicles; (b) disgorgement of all profits Toyota obtained through its unfair competition; and (c) injunctive relief prohibiting Toyota from continuing its unlawful, unfair, and fraudulent practices, including an order requiring Toyota to: (i) cease making false representations about the

Mirai; (ii) disclose known defects to consumers and regulators; (iii) cease collection activities and negative credit reporting against Plaintiffs; (iv) remove false marketing materials; and (v) implement a buyback program.

### THIRD COUNT

### Fraudulent Concealment

219. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

220. Toyota concealed and suppressed material facts concerning:

a. The existence and contents of Technical Service Bulletins documenting systemic Mirai defects, including TSB T-SB-0118-20 (pre-delivery procedures), TSB T-SB-0021-24 (battery defects with "other than the Mirai" exclusion), Tech Tip T-TT-0738-23 (fuel cell malfunction codes), TSB T-SB-0104-22, TSB T-SB-0033-22, and TSB T-SB-0024-23;

b. Toyota's internal knowledge, documented through its TAS case system and weekly "hydrogen shortage" meetings, that the Mirai suffered from chronic and widespread defects affecting hundreds of consumers;

c. Toyota's knowledge that California's hydrogen fueling infrastructure was inadequate to support practical vehicle ownership, as evidenced by Craig Scott's March 2018 admission that the program could not survive without government subsidies;

d. Toyota's knowledge that the Mirai was "not commercial, only promotional," as admitted by CEO Akio Toyoda;

e. Toyota's deliberate obstruction of independent hydrogen stations, including the Cal State LA station, which would have expanded consumer fueling options;

f. Toyota's manipulation of the h2fcp.org station-status website to conceal infrastructure failures;

g. Toyota's knowledge that its own authorized dealerships could not keep Mirai inventory fueled;

h. The actual range of Mirai vehicles (170-230 miles) versus the advertised range (402 miles) and degrading nature

i. Toyota's weekly meetings to discuss mechanical and infrastructure issues and safety issues;

j. Safety defects including sudden unintended acceleration, phantom emergency braking, propulsion loss, and fuel cell failures..

221. Toyota had a duty to disclose these material facts. A duty to disclose arises when: (a) the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff; (b) the defendant actively conceals a material fact from the plaintiff; or (c) the defendant makes partial representations while suppressing related material facts.

222. All three circumstances exist here:

a. Exclusive Knowledge: Toyota possessed exclusive knowledge of the TSBs, TAS case data, telematics information, weekly shortage meeting data, and internal admissions that were not available to consumers. The "except Mirai" language in Toyota's own service bulletins—showing Mirai exclusion from standard procedures—was available only to dealers, not consumers.

b. Active Concealment: Toyota actively concealed material facts by: maintaining TSBs as confidential dealer-only information; manipulating h2fcp.org to show stations as available when Toyota knew they were not; pressuring independent stations to remain unlisted; and marketing the Mirai as a practical daily driver while internally documenting that it was a "promotional" vehicle.

c. Partial Representations: Toyota made partial representations that created a duty to disclose the whole truth. Toyota represented that the Mirai could achieve 402 miles of range without disclosing that real-world range was 170-

**COMPLAINT**

230 miles. Toyota represented that refueling would take "about 5 minutes" without disclosing chronic station failures. Toyota represented that infrastructure was expanding without disclosing its deliberate obstruction of independent stations.

223. Toyota intended that Plaintiffs rely on its concealment and nondisclosure. Toyota's uniform marketing materials, dealer training scripts, and website content were specifically designed to induce consumer purchases. Toyota's concealment was not negligent—it was deliberate and systematic, as evidenced by the organization-wide protocols for handling "hydrogen shortage" complaints and the directive to cease collection activities for "approximately 700 clients" when the scope of the fraud became undeniable.

224. Plaintiffs were unaware of the concealed facts. The concealed facts were not reasonably discoverable through ordinary diligence. TSBs are not publicly available. Toyota's internal sales data, TAS case tracking, and weekly shortage meetings are confidential. The manipulation of h2fcp.org was invisible to consumers. Plaintiffs reasonably relied on Toyota's public representations and omissions.

225. Plaintiffs justifiably relied on Toyota's omissions. Had Toyota disclosed the truth—that the Mirai was a promotional vehicle with documented defects and inadequate infrastructure support—Plaintiffs would not have purchased or leased Mirai vehicles, or would have paid substantially less for them. No reasonable consumer would pay $60,000 for a vehicle that cannot be reliably refueled.

226. As a direct and proximate result of Toyota's fraudulent concealment, Plaintiffs suffered damages including: (a) the purchase price or lease payments; (b) the difference between the price paid and the actual value of the defective vehicles; (c) out-of-pocket expenses including fuel costs, alternative transportation, repairs, and towing; (d) credit damage from collection activities or anxiety from the threat of the same; (e) diminished value (90-95% depreciation); and (f) consequential damages including emotional distress from safety incidents and being stranded.

227. Toyota's fraudulent concealment was willful, wanton, and malicious, entitling Plaintiffs to punitive damages in an amount sufficient to punish Toyota and deter similar conduct.

## FOURTH COUNT

## Negligent Misrepresentation

228. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

229. Toyota made false representations to Plaintiffs including: (a) That Mirai vehicles could achieve "up to EPA Estimated 402 Miles of Range," when Toyota knew or should have known the actual range was 170-230 miles under real-world conditions; (b) That Mirai owners could "refuel in about 5 minutes," when Toyota knew or should have known that stations were chronically offline, had extended wait times, and frequently could not dispense fuel; (c) That California's hydrogen infrastructure was robust and expanding, when Toyota knew or should have known the infrastructure was inadequate and collapsing—and that Toyota was actively obstructing independent stations; (d) That Mirai vehicles would provide reliable daily transportation, when Toyota knew or should have known of systematic defects documented in multiple TSBs; (e) That the $15,000 complimentary fuel benefit was meaningful, when Toyota knew or should have known fuel was frequently unavailable; (f) That 21-day rental benefits would be available, when Toyota restricted or denied these benefits to consumers; (g) Specific oral representations made by Toyota salespeople, including representations by Ash Sheikh to Plaintiff Kamran that the Mirai was "capable of achieving 409 miles per full tank" and was "supported by an expanding hydrogen infrastructure"; representations by salesperson Adrian to Plaintiff Alvarez that she "would not have any problems with the vehicle because fueling is easy" and that "Toyota itself is building and guaranteeing more hydrogen stations quickly"; and representations by the sales manager to Plaintiff Eaton that there would be "zero problems" with fueling and that a station was located "right by [his] house."

230. Toyota had no reasonable grounds for believing these representations were true. Toyota possessed internal data contradicting each representation: (a) Toyota's TSBs documented systemic defects that impaired range and reliability; (b) Toyota's weekly "hydrogen shortage" meetings documented chronic infrastructure failures; (c) Toyota's communications with regulators acknowledged infrastructure inadequacy and dependence on government subsidies; (d) Toyota's executive admissions characterized the Mirai as "not commercial, only promotional"; (e) Toyota's own dealerships could not keep inventory fueled, as evidenced by Longo Toyota begging independent stations for hydrogen; (f) Michael Dray's testimony establishes that Toyota actively obstructed independent stations while publicly claiming to support infrastructure expansion.

231. Toyota intended to induce Plaintiffs to rely on its misrepresentations in purchasing or leasing Mirai vehicles. The misrepresentations appeared in Toyota's carefully crafted marketing materials, were incorporated into dealer training scripts, and were designed specifically to generate sales.

232. Plaintiffs justifiably relied on Toyota's misrepresentations. Toyota is a major automobile manufacturer with a reputation for quality and reliability. Plaintiffs reasonably believed Toyota's representations about its own vehicles. The information necessary to discover the falsity of Toyota's representations was not available to consumers exercising reasonable diligence.

233. As a direct and proximate result of Toyota's negligent misrepresentations, Plaintiffs suffered damages including the purchase price or lease payments, diminished value, out-of-pocket expenses, credit damage, and consequential damages.

## FIFTH COUNT

## Breach of Express Warranty

234. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

- 50 -
COMPLAINT

235. Toyota made express warranties to Plaintiffs. Under California Commercial Code § 2313, an express warranty is created by: (a) any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain; (b) any description of the goods which is made part of the basis of the bargain; and (c) any sample or model which is made part of the basis of the bargain.

236. Toyota made express warranties through written warranty documents, including: (a) The 8-year/100,000-mile FCEV warranty expressly warranting that the fuel cell stack, hydrogen storage tanks, and related components would be free from defects in materials and workmanship; (b) The 3-year/36,000-mile basic warranty expressly warranting that the vehicle would be free from defects; (c) The ToyotaCare maintenance plan warranting maintenance coverage for 3 years/35,000 miles; (d) Three years of roadside assistance with unlimited miles.

237. Toyota made express warranties through affirmations of fact and promises in its marketing materials, which became part of the basis of the bargain, including: (a) "Up to Estimated 402 Miles of Range" (without mention of the EPA estimate)—an affirmation of fact concerning the vehicle's capabilities; (b) "Refuel in about 5 minutes"—a promise concerning the refueling experience; (c) "Up to $15,000 of Hydrogen Fuel Included with Mirai Purchase or Lease"—a promise concerning complimentary fuel; (d) Monroney label statements concerning range, efficiency, and features; (e) Representations in Toyota.com/mirai marketing materials concerning reliability, convenience, and infrastructure.

238. Toyota made oral express warranties through its authorized sales representatives, including: (a) Representations by Ash Sheikh to Plaintiff Kamran that the Mirai was "capable of achieving 409 miles per full tank" and was "supported by an expanding hydrogen infrastructure with many stations in the works"; (b) Representations by salesperson Adrian to Plaintiff Alvarez that she "would not have any problems with the vehicle," that "Toyota itself is building and guaranteeing more

- 51 -
**COMPLAINT**

hydrogen stations quickly," that the vehicle "has a driving range of 400 miles per tank," that "Toyota offers 21-day car rental benefits for Mirai owners," and that she "could trade it in later without any loss because it was a Toyota"; (c) Representations by the sales manager to Plaintiff Eaton that he personally drove a Mirai, loved the vehicle, there would be "zero problems" with fueling, and that fueling would be as convenient as "pumping gas.".

239.   These express warranties became part of the basis of the bargain. Plaintiffs reviewed Toyota's marketing materials, Monroney labels, and website content before purchasing. Plaintiffs relied on oral representations made by Toyota's authorized sales representatives at the time of purchase.

240.   Toyota breached its express warranties. The Mirai vehicles do not conform to Toyota's warranties because: (a) The vehicles do not achieve the promised range—actual range is 170-230 miles, not 402 miles; (b) The vehicles cannot be refueled "in about 5 minutes" due to chronic station failures, wait times, and unavailability; (c) The complimentary fuel benefit is worthless when fuel is unavailable; (d) The vehicles suffer from defects in materials and workmanship, including fuel cell defects, battery defects, sudden acceleration, and phantom braking; (e) The 21-day rental benefits were restricted or denied to consumers like Plaintiffs Alvarez and Eaton; (f) The vehicles cannot be traded "without any loss"—they have lost 90-95% of their value.

241.   Toyota failed to repair the defects within a reasonable time or after a reasonable number of attempts. Plaintiffs presented their vehicles for repair on multiple occasions, and Toyota failed to conform the vehicles to the express warranties.

242.   As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs suffered damages including the difference between the value of the vehicles as warranted and their actual value, out-of-pocket expenses, diminished resale value, and consequential damages.

**SIXTH COUNT**

**Breach of Implied Warranty**

243.   Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

244.   A contract for the sale of goods existed between Toyota (through its authorized dealers) and Plaintiffs. Toyota is a "merchant" with respect to automobiles within the meaning of California Commercial Code § 2104(1).

245.   Pursuant to California Commercial Code § 2314, a warranty that goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. To be merchantable, goods must at minimum: (a) pass without objection in the trade under the contract description; (b) be fit for the ordinary purposes for which such goods are used; (c) be adequately contained, packaged, and labeled; and (d) conform to the promises or affirmations of fact made on the container or label.

246.   Toyota impliedly warranted that the Mirai vehicles were merchantable—that they were fit for the ordinary purpose for which automobiles are used: reliable personal transportation.

247.   The Mirai vehicles are not merchantable because they are not fit for the ordinary purpose of reliable personal transportation: (a) The vehicles cannot be reliably refueled. Consumers cannot depend on hydrogen stations being operational, having adequate supply, or being able to dispense fuel. Plaintiff Alvarez encountered three consecutive station failures on her first day of ownership. Plaintiff Eaton's nearby station was permanently shut down. Plaintiff Reyes's vehicle was contaminated at a Toyota-approved station. (b) The vehicles suffer from safety defects that render them unreasonably dangerous. Plaintiff Kamran lost all power on Interstate 5 in active freeway traffic. Plaintiff Eaton and his wife experienced repeated unintended acceleration events, including a terrifying incident where Mrs. Eaton's vehicle surged toward an intersection. Plaintiff Alvarez experienced automatic braking that engaged without warning, stranding her in an intersection. (c) The vehicles do not achieve the

range necessary for ordinary use. Actual range of 170-230 miles—with uncertain refueling availability—does not permit reliable daily transportation. (d) The vehicles would not "pass without objection in the trade." Toyota's own dealerships could not keep inventory fueled. Toyota acknowledged through counsel that "approximately 700 clients" were experiencing systematic problems. A vehicle that cannot be refueled and that Toyota's own dealers struggle to maintain does not pass without objection.

248.   Plaintiffs were in privity with Toyota. Even if privity is required, it exists here because: (a) Toyota's warranties accompanied the vehicles and were intended to benefit consumers; (b) Toyota directly marketed to consumers through Toyota.com/mirai and national advertising; (c) Toyota controlled the warranty process and repair network; and (d) California law does not require privity for implied warranty claims against manufacturers.

249.   Toyota had notice of the breach. Toyota received notice through: (a) its TAS case system tracking consumer complaints; (b) its weekly "hydrogen shortage" meetings; (c) its telematics monitoring of vehicle incidents; (d) communications from Plaintiffs' counsel identifying hundreds of affected consumers; and (e) Toyota's own acknowledgment through counsel of "approximately 700 clients" with problems.

250.   As a direct and proximate result of Toyota's breach of the implied warranty of merchantability, Plaintiffs suffered damages including diminished value, out-of-pocket expenses, and consequential damages.

## SEVENTH COUNT

## Violation of Magnuson Moss

251.   Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

252.   The Mirai vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1). Plaintiffs are "consumers" within the meaning of 15 U.S.C. § 2301(3). Toyota is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4) and (5).

253. Toyota provided "written warranties" within the meaning of 15 U.S.C. § 2301(6), including the FCEV warranty, basic warranty, ToyotaCare plan, and roadside assistance warranty. These written warranties constitute undertakings in writing in connection with the sale of consumer products to refund, repair, replace, or take other remedial action with respect to the products in the event that the products fail to meet specifications set forth in the undertaking.

254. Toyota also provided "implied warranties" within the meaning of 15 U.S.C. § 2301(7), specifically implied warranties of merchantability arising under state law.

255. Toyota breached its written warranties by: (a) failing to repair defects in materials and workmanship within a reasonable time or after a reasonable number of attempts; (b) failing to provide vehicles that conform to the specifications set forth in the warranties; and (c) failing to honor the promised benefits including complimentary fuel and rental car coverage.

256. Toyota breached its implied warranties by selling vehicles that are not merchantable and not fit for the ordinary purpose for which automobiles are used, as set forth in the Sixth Cause of Action above.

257. The amount in controversy of each Plaintiff's individual claim meets or exceeds the sum of $25, as required by 15 U.S.C. § 2310(d)(3)(A).

258. The aggregate amount in controversy of this action exceeds $50,000, exclusive of interest and costs, as required by 15 U.S.C. § 2310(d)(3)(B).

259. Plaintiffs have afforded Toyota a reasonable opportunity to cure its breach. Plaintiffs presented their vehicles for repair on multiple occasions. Toyota failed to cure the breaches. Toyota has not offered adequate refunds, replacements, or buybacks.

260. Pursuant to 15 U.S.C. § 2310(d)(1), Plaintiffs are entitled to recover damages and other legal and equitable relief, including: (a) the diminution in value of their vehicles; (b) the cost of repairs and out-of-pocket expenses; (c) consequential

damages; (d) costs and expenses reasonably incurred in this action; and (e) attorneys' fees pursuant to 15 U.S.C. § 2310(d)(2).

261. As a direct and proximate result of Toyota's breach of the implied warranty of merchantability, Plaintiffs suffered damages including diminished value and consequential damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

1. For actual damages in an amount to be proven at trial, including but not limited to: a. The purchase price, lease payments, and financing charges paid for their defective Mirai vehicles; b. The diminution in value of their vehicles; c. Out-of-pocket expenses for repairs, alternative transportation, rental vehicles, and towing; d. Consequential damages for credit harm and other incidental losses.

2. For civil penalties pursuant to California Civil Code § 1794(c) of up to two times the amount of actual damages, due to Toyota's willful violations of the Song-Beverly Consumer Warranty Act.

3. For punitive damages in an amount sufficient to punish Toyota for its fraudulent, malicious, and oppressive conduct and to deter similar conduct in the future.

4. For restitution and disgorgement of all ill-gotten profits obtained through Toyota's unfair, unlawful, and fraudulent business practices, pursuant to California Business & Professions Code § 17203.

5. For prejudgment interest on all damages from the date of each Plaintiff's vehicle purchase at the maximum rate permitted by law.

6. For attorneys' fees and costs pursuant to California Civil Code § 1794(d), 15 U.S.C. § 2310(d)(2), and as otherwise provided by law.

7. For an order compelling Toyota to implement a repurchase or replacement program for Plaintiffs' vehicles in accordance with California Civil Code § 1793.2(d).

8. For injunctive relief.

9. For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

**Plaintiffs** hereby request a trial by jury on all causes of action so triable.

Dated:  December 12, 2025                     INGBER LAW GROUP

                                                      */s/ Jason M. Ingber*
                                                      Jason M. Ingber, Esq.
                                                      Attorney for Plaintiffs

**COMPLAINT**